IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INSTITUTE FOR DISABILITIES RESEARCH AND TRAINING, INC., a Maryland Corporation )<br><br>Plaintiff, )<br><br>v. )<br><br>WAL-MART STORES, INC., a Delaware Corporation, )<br><br>Defendant. ) | C.A. No. _____ |

**COMPLAINT FOR BREACH OF CONTRACT**

The Institute for Disabilities Research and Training ("IDRT"), a Maryland corporation, by and through its attorneys, files this complaint for damages against Wal-Mart Stores, Inc. ("Wal-Mart"), a Delaware corporation, and states as follows:

**I. The Parties**

1. The plaintiff, IDRT, is a corporation incorporated in and in good standing in Maryland.

2. IDRT is in the trade and business, *inter alia*, of providing development, training and technical assistance to businesses, organizations and governments that serve and/or employ persons with disabilities, particularly persons who are hearing-impaired. IDRT develops its training using its own original works and staff and translates and transforms the training products/services of others to be accessible to the hearing-impaired.

3. IDRT has had its principal business office in the State of Maryland since its 1986 incorporation under its former name, "The Conference Center, Inc." Its principal business office has been located at 11323 Amherst Avenue, Wheaton, Maryland since January 2002.

4.      Defendant Wal-Mart is a corporation that was incorporated in the State of Delaware on or about October 31, 1969. Copies of Wal-Mart's certificate of incorporation, as amended and restated, are attached hereto as Exhibit 1. Wal-Mart's Registered Agent is the Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

5.      Wal-Mart has its principal place of business in the State of Arkansas. Wal-Mart engages in business through retail stores in the various states of the United States and in countries throughout the world. It operates its retail stores under the names, *inter alia*, of Wal-Mart, Wal-Mart Express, Wal-Mart Super Centers, and/or Sam's Club. Wal-Mart has registered at least twelve names for its retail operations with the Secretary of State in Arkansas, and to plaintiff's information, knowledge and belief, each of the retail stores is operated for and as part of Wal-Mart's business.

## II.  Subject Matter and Personal Jurisdiction

6.      Subject matter jurisdiction is founded on 28 U.S.C. § 1332, in that there is complete diversity of state citizenship of the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      As more fully stated in this Complaint, the parties executed a development agreement (the "Development Agreement") effective March 28, 2002, in which IDRT was to perform certain services for Wal-Mart and for which Wal-Mart agreed to make certain payments. The parties agreed, in paragraph 35 of the Development Agreement, to personal jurisdiction in the state or federal courts of the state of incorporation of the party against whom an action was filed to enforce the Development Agreement and/or to claim damages. A copy of the Development Agreement is attached hereto as Exhibit 2.

### III. Background of Plaintiff's Undertaking in the Agreement

8. Defendant Wal-Mart hires, engages and employs thousands of employees in its retail stores as part of its trade and business, who are engaged to fulfill numerous jobs, tasks and positions within Wal-Mart's retail stores.

9. In or about 2000-2001, the United States of America and Wal-Mart became involved in a controversy concerning whether Wal-Mart's employment practices were in compliance with the Americans With Disabilities Act ("ADA"), PL 101-336, 42 U.S.C. § 12101, *et seq.* At issue was whether Wal-Mart's employment practices in "training" were compliant with the ADA, particularly for those persons whose ability to hear and/or speak was impaired.

10. In conjunction with that controversy, in or about December 2001, Wal-Mart retained IDRT to translate approximately 260 audio/visual English language training tapes/modules to formats that could be accessed, used and comprehended by persons with hearing disabilities.

11. IDRT and Wal-Mart engaged in negotiations to memorialize the terms and conditions of IDRT's undertakings for Wal-Mart, and IDRT prepared numerous drafts of agreements. The parties' agreement was ultimately memorialized in the March 28, 2002 Development Agreement.

### IV. Plaintiff's Undertaking for Defendant

12. Wal-Mart had produced approximately 260 proprietary individual training tapes or modules (hereinafter, "training modules"), which covered training in diverse general subjects for its employees in its retail stores (*e.g.*, a training module entitled "Associates") and in more specific subjects for employees engaged in specific retail positions (*e.g.*, a training module entitled "Jewelry Presentation").

13. The training modules were played or shown to Wal-Mart's employees on an individual basis, at Wal-Mart's various retail stores throughout the United States.

14. The training modules would be played or displayed by computer, and were identified by the parties in the Development Agreement as Computer Based Learning Modules ("CBL Modules"). (Exhibit 2, ¶¶ 1 and 5).

15. In order to detail IDRT's obligations under the Development Agreement and, in part, to detail the basis or standard by which Wal-Mart agreed to pay IDRT for its services, the parties defined various terms which categorized and described the component parts of each CBL Module (e.g., "standard and complex CBL Modules"; and "screen" and "screen components") in the Development Agreement.

16. The Development Agreement also provided that Wal-Mart had certain obligations and responsibilities, among which were to provide IDRT with groups of Wal-Mart's proprietary CBL Modules in accordance with a time schedule, that was referred to as the Master ASL Timeline (¶ 21).

17. Under the Development Agreement, IDRT was to (1) translate the audio portion of each CBL Module into American Sign Language ("ASL") for effective communication of Wal-Mart's training materials to the hearing impaired; (2) explain the text, symbols and pictorial displays on each CBL Module through ASL translations by a certified ASL interpreter on videotape; and (3) code the translation and direct Wal-Mart to the location on each CBL Module at which the ASL videotape translation insert should be embedded to facilitate the seamless interaction of a deaf viewer with the CBL Module training.

18. Under the Development Agreement, IDRT's work product was to be provided to a third-party contractor, engaged by Wal-Mart, who would in turn embed IDRT's videotaped

ASL translations at the appropriate places and times on each CBL Module and make a new digitized CBL Module that could be played to and manipulated by Wal-Mart's deaf employees.

19. To facilitate the embedding of plaintiff's video translations and explanations into the CBL Modules, IDRT was to develop and supply a coding system and additional material so that the third-party could determine precisely at which point in each CBL Module to embed plaintiff's ASL interpreter and interpretation.

20. The time in which IDRT had to complete is performance under the Development Agreement was driven and/or necessitated by the time parameters to which Wal-Mart and the United States had agreed in their resolution of the complaints of ADA violations.

21. To memorialize and effectuate the timing involved in IDRT's undertakings, Wal-Mart established a Master ASL Timeline which was made an integral component of the Agreement. (¶ 20).

22. Because of Wal-Mart's time commitments under its ADA–claims resolution with the United States, Wal-Mart requested and IDRT agreed to begin its services in December 2001, even before the Development Agreement between the parties was completed and executed.

23. From time to time, during and in relation to IDRT's performance under the Development Agreement, Wal-Mart requested and IDRT agreed to perform certain "add-on" or miscellaneous work/services incident to translating and transposing defendant's CBL Modules to make them accessible to the hearing impaired.

### V. Wal-Mart's Payment Obligations

24. The amount and scheduling of payments for IDRT's development of the CBL Modules were negotiated from in or about December 2001 to March 2002, with the Agreement being finalized on or about March 28, 2002.

25. Over the course of their negotiations, the parties modified their original understanding by which IDRT would develop all 260 CBL Modules for a fixed and/or determinable price, to an agreement that, at Wal-Mart's request, divided IDRT's performance under the Agreement into four phases. Wal-Mart agreed to submit to IDRT a designated number of CBL Modules for IDRT to interpret, translate, video and code for each of the four phases within the times stated in the Master ASL Timeline. (¶ 25(A)(1)).

26. The Development Agreement specified a fixed payment ("Phase Contract Price") for each of the four phases and, subject to other sections of the Agreement, Wal-Mart agreed to pay IDRT the Phase Contract Price for each phase in which IDRT provided its services to complete the undertaking (viz, $1,199,250; $799,500; $666,250 and $799,500, respectively, for Phases I through IV). (¶ 25(B)).

27. Phase I was defined by the dates in the Master ASL Timeline, with Phase I beginning on the first date on which Wal-Mart submitted the first group of modules to IDRT and ending on the date on which the last of the minimum number of modules to be submitted for development in Phase I were submitted to IDRT. Each other phase was defined by the ending date of the previous phase and the designated date on the Master ASL Timeline on which Wal-Mart submitted the last of the minimum number of CBL Modules in that respective phase to IDRT (¶ 25(A)(i)).

28. Each phase of performance was to automatically follow the other, unless either party notified the other in writing at least 30 days before the beginning of the next phase that it was terminating the Agreement at the end of the phase then in development. (¶ 25(A)(2)).

29.     According to the Development Agreement, Wal-Mart was to pay IDRT the Phase Contract Price, in part, to compensate IDRT for the workforce and commitment IDRT was required to employ/make in each phase of the Development Agreement. (¶ 25(B)).

30.     The Phase Contract Price was determined by (1) the parties' agreement that the defendant would pay IDRT $266.50 for each "screen" on each CBL training module developed by IDRT; (2) estimating an average of 50 screens per CBL Module to be developed; and (3) multiplying the estimated average number of screens for the CBL Modules to be submitted in each respective phase, by the per screen development amount of $266.50. (¶ 25(F)(1)).

31.     Wal-Mart agreed that if it submitted to *less* than the specified minimum number of designated CBL Modules per phase for development to IDRT, Wal-Mart would pay IDRT at least the Phase Contract Price (¶ 25(F)(2)).

32.     Wal-Mart also agreed that if it had breached the Development Agreement when IDRT tendered its final invoice (as defined in the Development Agreement) ("Final Invoice) for payment, Wal-Mart would pay IDRT at least the Phase Contract Price for the last phase of the contract in which IDRT was to perform work/services. (¶ 30).

33.     Other than as stated in paragraphs 31 and 32 above, IDRT agreed to be paid (i) the lesser of the Phase Contract Price or (ii) a total amount equal to the number of screens it developed for the CBL Modules submitted to it in the respective phase, multiplied by $266.50 per screen and Wal-Mart agreed to pay such per screen payments within 30 days of receipt of each interim invoice ("Interim Invoice") that IDRT submitted to it. (¶ 25(F)(1).

34.     As IDRT was performing its work/services under the Development Agreement, Wal-Mart requested that IDRT perform additional related services and work. The parties agreed that Wal-Mart would pay a special stipulated rate or amount for these add-on services in addition

to the payments due and calculated under the Development Agreement and that charges for add-on or miscellaneous services would be billed and paid in accordance with the billing schedule and payment requirements in the Development Agreement.

35. In addition to compensating IDRT for its development of the CBL Modules, Wal-Mart was to pay/reimburse IDRT for its materials and expenses, at the amounts and/or rates stated or defined in the Development Agreement.

36. Wal-Mart agreed that if it failed to pay IDRT the compensation and expenses as provided for in the Development Agreement, such failure would constitute a breach of the Agreement. (¶ 29(F).

37. Wal-Mart agreed that if it did not pay IDRT when and as required, it would pay IDRT interest at the rate of eight percent (8%) per annum on Wal-Mart's unpaid balances.

38. At the conclusion of IDRT's services and work for the last phase of its performance, IDRT was to tender its Final Invoice to Wal-Mart to account for all modules submitted to IDRT in each of the four phases, all modules and screens developed by IDRT in the four phases, all add-on work, all Interim Invoices, and all payments received by IDRT from Wal-Mart to date, and was to state the balances remaining due and owing to IDRT for the work/services it rendered to Wal-Mart. Under the Development Agreement, balances were to be paid to IDRT within 30 days of Wal-Mart's receipt of the Final Invoice.

### VI. Wal-Mart's Breach of Its Payment Obligations

39. At Wal-Mart's request, IDRT began to render its development services in or about December 2001 for Phase I. Phase I ended on March 22, 2002, when IDRT was to receive the 90th CBL Module from Wal-Mart for development. During Phase I, Wal-Mart submitted a total of 93 modules to IDRT for development.

40. IDRT received 51 CBL Modules from Wal-Mart for development in Phase II, and IDRT continued its performance under the Development Agreement.

41. Wal-Mart also requested IDRT to perform certain add-on or miscellaneous services in each of Phase I and Phase II and thereafter. IDRT agreed to and did perform these add-on services for the additional fee/charge stipulated to in the Development Agreement.

42. On or about April 26, 2002, Wal-Mart informed IDRT that it was exercising its option to terminate the Agreement after Phase II.

43. During Phase I and II and thereafter, as IDRT continued its development and special services for Wal-Mart, IDRT submitted numerous Interim Invoices to Wal-Mart, each of which was required to be paid, per the Development Agreement, within 30 days of receipt. (¶ 25(F)(2)).

44. From April 2002 to January 2003, Wal-Mart made partial payments on the Interim Invoices. The last Interim Invoice (#25) was submitted to Wal-Mart on or about December 1, 2002. The last payment on the Interim Invoices made by Wal-Mart occurred on or about January 3, 2003.

45. Wal-Mart has paid some, but not all, of the amounts invoiced on the Interim Invoices and has paid many of the invoices after the date on which they were required to be paid (*i.e.*, 30 days after receipt).

46. On or about January 23, 2003, IDRT submitted a Final Invoice for $152,446.57 to Wal-Mart for payment.

47. After Wal-Mart received the Final Invoice, it informed IDRT that IDRT did not account for several CBL Modules that IDRT had developed in or about November, 2001, and asked IDRT to recalculate the Final Invoice.

48. Between approximately January 23, 2003 and February 19, 2003, IDRT audited its records of the CBL Modules it had received from Wal-Mart and of Wal-Mart's other requests for services, its records of the work IDRT had completed and submitted to Wal-Mart's agent, its Interim Invoices, and its records of Wal-Mart's payments. IDRT then tendered a revised Final Invoice ("Revised Final Invoice"), along with a complete accounting of its services, to Wal-Mart on February 19, 2003. The amount of balance due (including interest charges that had accrued under the Development Agreement) on the Revised Final Invoice was $174,299.57. A copy of Revised Final Invoice (and attachments thereto) is attached hereto as Exhibit 3.

49. Wal-Mart received the Revised Final Invoice on February 26, 2003. Copies of the Domestic Return Receipt and the first page of IDRT's letter of February 19, 2003 to Wal-Mart are attached, collectively, as Exhibit 4.

50. Despite the complete accounting and explanations provided in the Revised Final Invoice, Wal-Mart has failed to pay any further monies for IDRT's performance of its obligations under the Development Agreement. On May 22, 2003, IRDT made one further written demand to Wal-Mart for payment.

51. In or about June 2003, Wal-Mart called IDRT and represented that its attorneys would be coming to Maryland to resolve the Revised Final Invoice and requested IDRT to schedule a day on which it could meet and discuss the Revised Final Invoice with Wal-Mart's attorneys. IDRT agreed.

52. Wal-Mart failed to keep its appointment with IDRT, failed to make any contact with IDRT, failed to make payment on the Revised Final Invoice, and failed to have any further contact with IDRT about the Revised Final Invoice.

53. As of March 10, 2005, contract interest in the amount of $27,275.77 has accrued under the Development Agreement on the unpaid balance due on the February 19, 2003 Revised Final Invoice. *See* Interest Worksheet attached hereto as Exhibit 5.

54. There is no reasonable basis for Wal-Mart to ignore the Revised Final Invoice that IDRT submitted to it and Wal-Mart's failure to pay the invoice is without substantial justification and is in bad faith.

## CLAIM FOR BREACH OF CONTRACT

55. The allegations in paragraphs 1-54 are reasserted and incorporated by reference herein as if set forth in their entirety.

56. Plaintiff IDRT provided services to defendant Wal-Mart under the Development Agreement and presented Wal-Mart with invoices for IDRT's services.

57. Wal-Mart has refused to remit payment for the Final Revised Invoice. The total amount due under these invoices is $174,299.57, plus additional interest due under paragraph 37 of the Development Agreement.

58. Defendant's failure to pay in full the amount due on the Final Revised Invoice is a breach of the Development Agreement.

59. As a result of Wal-Mart's breach of the Development Agreement, IDRT has suffered damages in the amount of $174,299.57, plus interest.

WHEREFORE, plaintiff requests the court enter judgment in favor of plaintiff and against defendant in the amount of $174,299.57 plus $27,275.77 in interest accrued through March 10, 2005 and any additional interest accruing at 8% per annum from March 11, 2005 until the entire amount of the Final Revised Invoice is paid, together with post-judgment interest,

reasonable attorney fees and costs incident to filing and prosecuting this action, and other relief as the Court deems just and proper.

                              MORRIS, NICHOLS, ARSHT & TUNNELL

                              */s/ Patricia R. Uhlenbrock*
                              Jack B. Blumenfeld (#1014)
                              Patricia R. Uhlenbrock (#4011)
                              1201 North Market Street
                              P.O. Box 1347
                              Wilmington, DE  19899-1347
                              (302) 658-9200
                              jblumenfeld@mnat.com
                              puhlenbrock@mnat.com
                                Attorneys for Plaintiff

OF COUNSEL:

Harvey Greenberg, Esquire
29 W. Susquehanna Avenue - Suite 700
Towson, MD  21204
(410) 823-2277


March 22, 2005