# EXHIBIT 1

CERTIFICATE OF INCORPORATION

OF

WAL-MART, INC.

FILED

OCT 31 1969  10 A M

Eugene ~~~~~~~
Secretary of State

7321-9

## CERTIFICATE OF INCORPORATION

### OF

### WAL-MART, INC.

------------

FIRST:     The name of the Corporation is

WAL-MART, INC.

SECOND:     Its registered office in the State of Delaware is located at No. 100 West Tenth Street, in the City of Wilmington, County of New Castle.  The name and address of its registered agent is The Corporation Trust Company, No. 100 West Tenth Street, Wilmington, Delaware.

THIRD:     The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

FOURTH:     The total number of shares of all classes of stock which the Corporation shall have authority to issue is Twenty Thousand (20,000) shares, of which Ten Thousand (10,000) shares shall be classified as Preferred Stock, without par value (herein called "Preferred Stock"), and of which Ten Thousand (10,000) shares shall be classified as Common Stock of the par value of $1.00 per share (herein called "Common Stock").  The designations, preferences, limitations and relative rights of the shares of Preferred Stock and of Common Stock are as follows:

1.  <u>Preferred Stock</u>.  The Preferred Stock may be issued in such one or more series as shall from time to time be created and authorized to be issued by the Board of Directors as hereafter provided.

The Board of Directors is hereby expressly authorized, by resolution or resolutions from time to time adopted providing for the issuance of Preferred Stock, to fix and state the designations, powers, preferences and relative, participating, optional and other special rights of the shares of each series of Preferred Stock, and the qualifications, limitations and restrictions thereof, including (but without limiting the generality of the foregoing) any of the following with respect to which the Board of Directors shall determine to make affirmative provisions:

a)  the distinctive name and serial designation;

b)  the annual dividend rate or rates and the dividend payment dates;

c)  whether dividends are to be cumulative or non-cumulative and the participating or other special rights, if any, with respect to the payment of dividends;

d) whether any series shall be
subject to redemption and, if so, the
manner of redemption and the redemption
price or prices;

e) the amount or amounts of prefer-
ential or other payment to which any series
is entitled over any other series or over
the Common Stock on voluntary or involuntary
liquidation, dissolution or winding up;

f) any sinking fund or other retirement
provisions and the extent to which the charges
therefor are to have priority over the payment
of dividends on or the making of sinking fund
or other like retirement provisions for shares
of any other series or over dividends on the
Common Stock;

g) any conversion, exchange, purchase or
other privileges to acquire shares of any other
series or of the Common Stock;

h) the number of shares of such series;

i) the voting rights, if any, of such
series;

j) the stated value, if any, for such
series, the consideration for which shares of

3

such series may be issued and the amount
of such consideration which shall be credi-
ted to the capital account.

Each share of each series of Preferred Stock shall have
the same relative rights and be identical in all respects
with all the other shares of the same series.

Before the Corporation shall issue any shares
of Preferred Stock of any series authorized as herein-
before provided, a certificate setting forth a copy of
the resolution or resolutions with respect to such series
adopted by the Board of Directors of the Corporation pur-
suant to the foregoing authority vested in said Board
shall be made, filed and recorded in accordance with the
then applicable requirements, if any, of the laws of the
State of Delaware, or, if no certificate is then so re-
quired, such certificate shall be signed and acknowledged
on behalf of the Corporation by its President or a Vice
President and its corporate seal shall be affixed thereto
and attested by its Secretary or an Assistant Secretary
and such certificate shall be filed and kept on file at
the principal office of the Corporation in the State of
Delaware and in such other place or places as the Board of
Directors shall designate.

Shares of any series of Preferred Stock which

shall be issued and thereafter acquired by the Corporation through purchase, redemption, conversion or otherwise, may by resolution or resolutions of the Board of Directors be returned to the status of authorized but unissued Preferred Stock of the same series. Unless otherwise provided in the resolution or resolutions of the Board of Directors providing for the issue thereof, the number of authorized shares of stock of any such series may be increased or decreased (but not below the number of shares thereof then outstanding) by resolution or resolutions of the Board of Directors and the filing of a certificate complying with the foregoing requirements. In case the number of shares of any such series of Preferred Stock shall be decreased, the shares representing such decrease shall, unless otherwise provided in the resolution or resolutions of the Board of Directors providing for the issuance thereof, resume the status of authorized but unissued Preferred Stock, undesignated as to series.

2. <u>Common Stock</u>. The Common Stock shall have no special rights or limitations.

FIFTH:    The name and mailing address of each incorporator is as follows:

| Name | Mailing Address |
|------|-----------------|
| B. J. Consono | 100 West Tenth Street<br>Wilmington, Delaware |
| F. J. Obara, Jr. | 100 West Tenth Street<br>Wilmington, Delaware |
| J. L. Rivera | 100 West Tenth Street<br>Wilmington, Delaware |

SIXTH:    The powers of the incorporators named in Article FIFTH shall cease upon the filing of this Certificate of Incorporation and the business of the Corporation shall be carried on by its initial Board of Directors which shall consist of the following:

| Name | Address |
|------|---------|
| S. Robson Walton | First National Bldg., Tulsa, Oklahoma |
| Joseph J. McCain Jr. | First National Bldg., Tulsa, Oklahoma |
| L. J. Fulton | First National Bldg., Tulsa, Oklahoma |

SEVENTH:  The Corporation is to have perpetual existence.

EIGHTH:    In furtherance, and not in limitation, of the powers conferred by law, the Board of Directors of the Corporation is expressly authorized to make, alter or repeal the by-laws of the Corporation in the manner provided in such by-laws.  Elections of directors need not be by written ballot unless the by-laws of the Corporation shall so provide.

NINTH:    The Corporation reserves the right to amend, alter or repeal any provision contained in this Certificate of Incorporation in the manner now or hereafter prescribed by the statutes of the State of Delaware, and all rights and powers conferred on Directors and stockholders herein are granted subject to this reservation.

6

TENTH:    Whenever a compromise or arrangement is pro-
posed between this Corporation and its creditors or any class of
them and/or between this Corporation and its stockholders or any
class of them, any court of equitable jurisdiction within the State
of Delaware may, on the application in a summary way of this Corpo-
ration or of any creditor or stockholder thereof, or on the appli-
cation of any receiver or receivers appointed for this Corporation
under the provisions of Section 291 of Title 8 of the Delaware Code
or on the application of trustees in dissolution or of any receiver
or receivers appointed for this Corporation under the provisions
of Section 279 of Title 8 of the Delaware Code order a meeting of
the creditors or class of creditors, and/or of the stockholders or
class of stockholders of this Corporation, as the case may be, to
be summoned in such manner as the said court directs.    If a majority
in number representing three-fourths in value of the creditors or
class of creditors and/or of the stockholders or class of stock-
holders of this Corporation, as the case may be, agree to any com-
promise or arrangement and to any reorganization of this Corporation
as consequence of such compromise or arrangement, the said compro-
mise or arrangement and the said reorganization shall, if sanctioned
by the court to which the said application has been made, be binding
on all the creditors or class of creditors, and/or on all the stock-
holders or class of stockholders, of this Corporation, as the case
may be, and also on this Corporation.

WE, THE UNDERSIGNED, being each of the Incorporators
hereinbefore named, for the purpose of forming a corporation pursuant
to the General Corporation Law of the State of Delaware, do make
this Certificate, hereby declaring and certifying that this is our
act and deed and the facts herein stated are true, and accordingly
have hereunto set our hands this ___31st___ day of ___October___, 1969.

STATE OF DELAWARE )
) ss:
COUNTY OF NEW CASTLE )

BE IT REMEMBERED that on this 31st day of
October A.D. 1969, personally came before me, a Notary
Public for the State of Delaware, B. J. Consono, F. J.
Obara, Jr. and J. L. Rivera, all of the parties to the
foregoing certificate of incorporation, known to me
personally to be such, and severally acknowledged the
said certificate to be the act and deed of the signers
respectively and that the facts stated therein are true.

GIVEN under my hand and seal of office the day
and year aforesaid.

_____
Notary Public

728300074    FILED

RESTATED CERTIFICATE OF INCORPORATION

OF

WAL-MART STORES, INC.

OCT 26 1988

WAL-MART STORES, INC., a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

1.    The name of the corporation is:

WAL-MART STORES, INC.

The date of filing its original Certificate of Incorporation with the Secretary of State was October 31, 1969.

2.    This Restated Certificate of Incorporation only restates and integrates and does not further amend the provisions of the Certificate of Incorporation of this corporation as heretofore amended or supplemented and there is no discrepancy between those provisions and the provisions of this Restated Certificate of Incorporation.

3.    The text of the Certificate of Incorporation as amended or supplemented heretofore is hereby restated without further amendments or changes to read as herein set forth in full:

FIRST:   The name of the Corporation is

WAL-MART STORES, INC.

SECOND:  Its registered office in the State of Delaware is located at Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name and address of its registered agent is The Corporation Trust Company,

Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware.

THIRD: The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

FOURTH: The total number of shares of all classes of stock which the Corporation shall have authority to issue is One Billion, Four Hundred Million (1,400,000,000) shares, of which One Billion, Three Hundred Million (1,300,000,000) shares shall be classified as Common Stock, of the par value of 10¢ per share (herein called "Common Stock"), and of which One Hundred Million (100,000,000) shares shall be classified as Preferred Stock of the par value of 10¢ per share (herein called "Preferred Stock").

The designations, preferences, limitations and relative rights of the shares of Preferred Stock and of Common Stock are as follows:

1. <u>Preferred Stock</u>. The Preferred Stock may be issued in such one or more series as shall from time to time be created and authorized to be issued by the Board of Directors as hereafter provided.

The Board of Directors is hereby expressly authorized, by resolution or resolutions from time to time adopted providing for the issuance of Preferred Stock, to fix and state the designations, powers, preferences and relative, participating, optional and other special rights of the shares of each series of

Preferred Stock, and the qualifications, limitations and restrictions thereof, including (but without limiting the generality of the foregoing) any of the following with respect to which the Board of Directors shall determine to make affirmative provisions:

a) the distinctive name and serial designations;

b) the annual dividend rate or rates and the dividend payment dates;

c) whether dividends are to be cumulative or non-cumulative and the participating or other special rights, if any, with respect to the payment of dividends;

d) whether any series shall be subject to redemption and, if so, the manner of redemption and the redemption price or prices;

e) the amount or amounts of preferential or other payment to which any series is entitled over any other series or over the the Common Stock on voluntary or involuntary liquidation, dissolution or winding up;

f) any sinking fund or other retirement provisions and the extent to which the charges therefor are to have priority over the payment of dividends on or the making of sinking fund or other like retirement provisions for shares of any other series or over dividends on the Common Stock;

g)   any conversion, exchange, purchase or other privileges to acquire shares of any other series or of the Common Stock;

h)   the number of shares of such series;

i)   the voting rights, if any, of such series;

j)   the stated value, if any, for such series, the consideration for which shares of such series may be issued and the amount of such consideration which shall be credited to the capital account.

Each share of such series of Preferred Stock shall have the same relative rights and be identical in all respects with all the other shares of the same series.

Before the Corporation shall issue any shares of Preferred Stock of any series authorized as hereinbefore provided, a certificate setting forth a copy of the resolution or resolutions with respect to such series adopted by the Board of Directors of the Corporation pursuant to the foregoing authority vested in sai Board shall be made, filed and recorded in accordance with the then applicable requirements, if any, of the laws of the State of Delaware, or, if no certificate is then so required, such certificate shall be signed and acknowledged on behalf of the Corporation by its President or a Vice President and its corporate seal shall be affixed thereto and attested by its Secretary or an Assistant Secretary and such certificate shall be filed and kept on file at the principal office of the Corporation in the State of Delaware and in such other place or places as the Board of Directors shall designate.

Shares of any series of Preferred Stock which shall be issued and thereafter acquired by the Corporation through purchase, redemption, conversion or otherwise, may by resolution or resolutions of the Board of Directors be returned to the status of authorized but unissued Preferred Stock of the same series. Unless otherwise provided in the resolution or resolutions of the Board of Directors providing for the issue thereof, the number of authorized shares of stock of any such series may be increased or decreased (but not below the number of shares thereof then outstanding) by resolution or resolutions of the Board of Directors and the filing of a certificate complying with the foregoing requirements. In case the number of shares of any such series of Preferred Stock shall be decreased, the shares representing such decrease shall, unless otherwise provided in the resolution or resolutions of the Board of Directors providing for the issuance thereof, resume the status of authorized but unissued Preferred Stock, undesignated as to series.

2. <u>Common Stock</u>. The Common Stock shall have no special rights or limitations.

3. In connection with the merger of KUHNCO, INC. ("Kuhnco"), a wholly-owned subsidiary of WAL-MART STORES, INC. ("Wal-Mart") into KUHN'S-BIG K STORES CORP. ("Kuhn") a series of Preferred Stock is established to which the following provisions shall be applicable:

SECTION 1. Designation of Series. The series shall be designated Series A 8% Cumulative Convertible Preferred Stock, par value $.10 per share with a stated value of $25.00 per share (herein called "Series A Preferred Stock").

SECTION 2.    Numbers of Shares.    The number of shares of Series A Preferred Stock to be issued is up to 532,759.

SECTION 3.    Dividend Rate.    The dividend rate for Series A Preferred stock is $2.00 per share per annum; provided, however, that dividends may be declared and paid only out of retained earnings of Wal-Mart, and provided, further, that the dividend payable on the first dividend payment date subsequent to the effective date of the merger of Kuhnco into Kuhn shall be that proportion of the $.50 per share regular quarterly dividend equal to that portion of Wal-Mart's fiscal quarter ended next preceding such dividend payment date which occurs subsequent to the effective date of the merger of Kuhnco into Kuhn.  Dividends on the Series A Preferred Stock shall be preferential and cumulative, so that so long as any Series A Preferred Stock shall be outstanding Wal-Mart will not declare or pay, or set apart for payment, any dividends (other than dividends payable in shares of any class or classes of stock of Wal-Mart ranking junior to the Series A Preferred Stock), and will not redeem, purchase or otherwise acquire, directly or indirectly, whether voluntarily, for a sinking fund, or otherwise, any shares of any class or classes of stock of Wal-Mart ranking junior to the Series A Preferred Stock if at the time of making such declaration, payment, setting apart, distribution, redemption, purchase or acquisition, full cumulative dividends upon all outstanding shares of Series A Preferred Stock shall not have been paid or declared and set apart for payment for all past quarterly dividend periods, provided that notwithstanding the foregoing Wal-Mart may at any time redeem, purchase or otherwise acquire shares of stock of any such junior class in exchange for, or out of the net cash proceeds from the concurrent sale of, other shares of stock of any such junior class.

SECTION 4.    Dividend Payment Dates.    The dates at which dividends on the Series A Preferred Stock shall be payable are May 15, August 15, November 15 and February 15 of each year.

SECTION 5.    Redemption.
(a)    The Series A Preferred Stock shall not be redeemable by Wal-Mart prior to October 1, 1986.  Thereafter, the Series A Preferred Stock shall be redeemable by Wal-Mart, at its option, in whole or in part (if in part, the shares to be redeemed shall be selected by lot) and the redemption price for the Series A Preferred Stock shall be $27.50 per share plus accrued and unpaid dividends; provided, however, that until September 1, 1991, no redemption shall be permitted other than pursuant to paragraph (b) below or the last sentence of this paragraph (a), unless for any period of ten (10) consecutive trading days within the thirty (30) days preceding the date notice of redemption shall be given pursuant to paragraph (c) below the average of the last reported sales prices for the Common Stock (as defined in Section 8 below) on the New York Stock Exchange shall be equal to at least 125% of the amount of

the conversion price for the Common Stock as then in effect under Section 8 below. Notwithstanding the foregoing, if Wal-Mart should be a party to any consolidation or merger whereby the outstanding shares of Common Stock are to be exchanged for or converted into cash or other securities of an issuer unrelated or unaffiliated with Wal-Mart, Wal-Mart may, at its option exercisable not later than 30 days prior to the effective date of any such consolidation or merger, redeem any or all of the outstanding shares of the Series A Preferred Stock effective as of the later of October 1, 1986 or the effective date of any such consolidation or merger at a price of $27.50 per share plus accrued and unpaid dividends.

(b)  At December 31 of each year set forth in the table below, Wal-Mart shall redeem from each holder of shares of Series A Preferred Stock the respective number of shares owned by each holder at the record date for such redemption set forth in the table below, at $27.50 per share, plus all dividends accrued and unpaid on such Series A Preferred Stock up to the date fixed, upon giving the notice hereinafter provided:

| Year | Percent of Shares of Series A Preferred Stock Owned By Each Holder on Record Date |
|---|---|
| 1986 | 20.0% |
| 1987 | 25.0% |
| 1988 | 33.3% |
| 1989 | 50.0% |
| 1990 | 100.0% |

During the continuance of a default by Wal-Mart (because of lack of funds legally available or for any other reason) in making any redemption required under this paragraph 5 (b), no sum shall be set aside for or applied to the purchase or redemption (pursuant to any applicable sinking fund or redemption provisions or otherwise) of any shares of any class or series of stock ranking as to dividends or assets on a parity with or junior to Series A Preferred Stock and no dividend shall be declared or paid or any other distribution ordered or made upon any shares of any class or series of stock ranking as to dividends junior to Series A Preferred Stock.

(c)  Not less than 30 nor more than 60 days prior to the date fixed for redemption of the Series A Preferred Stock or any part thereof, notice specifying the time and place thereof shall be given by mail to the holders of record of the shares of Series A Preferred Stock selected for redemption at their respective addresses as the same shall appear on the stock books of Wal-Mart and by publication in at least one daily newspaper of general circulation in Nashville, Tennessee and one such newspaper in New York, New York, once each week for three consecutive weeks. The failure to give such notice or any defect therein or in the mailing or publication thereof shall not affect the validity of the proceedings for redemption. Any notice which was mailed in the manner herein provided shall be conclusively presumed to have

been duly given whether or not the holder receives the notice. Upon such redemption date, or upon such earlier date as the Board of Directors shall designate for payment of the redemption price (unless Wal-Mart shall default in the payment of the redemption price as set forth in such notice), the holders of shares of Series A Preferred Stock shall have no interest in or claim against Wal-Mart by virtue of the shares to be so redeemed and shall have no voting or other rights with respect to such shares except the right to convert such shares within the time hereinafter set forth and except the right to receive the moneys payable upon such redemption from Wal-Mart or otherwise, without interest thereon, upon surrender (and endorsement, if required by Wal-Mart) of the certificates, and the shares represented thereby shall no longer be deemed to be outstanding. Upon redemption or conversion of Series A Preferred Stock in the manner set out herein, or upon purchase of the Series A Preferred Stock by Wal-Mart, Series A Preferred Stock so acquired by Wal-Mart shall be cancelled and shall not be reissued. Except where Series A Preferred Stock must be converted before the effective date of a consolidation or merger as provided in Section 8(a), after giving any notice of redemption and prior to the close of business on the tenth day prior to the redemption date, as hereinafter provided, the holders of the shares of Series A Preferred Stock so called for redemption may convert such shares into shares of the Common Stock of Wal-Mart, in accordance with the conversion privileges set forth in Section 8 hereof.

(d)  No fractional shares of the Series A Preferred Stock shall be redeemed. In the event the number of shares to be redeemed from any holder thereof includes a fractional share, the number of shares to be redeemed from said holder shall be rounded to the nearest whole number.

(e)  Redemption of the Series A Preferred Stock shall be made only out of Retained Earnings of Wal-Mart.

SECTION 6.  Voting Rights.
(a) At every meeting of stockholders of Wal-Mart, every holder of Series A Preferred Stock shall be entitled to one vote for each share of Series A Preferred Stock standing in his name on the books of Wal-Mart, with the same and identical voting rights, except as expressly provided herein, as a holder of a share of Wal-Mart Common Stock. The Series A Preferred Stock and any other stock having voting rights shall vote together as one class, except as provided by law and in Paragraphs (b) and (c) hereof.

(b) If and whenever accrued dividends on the Series A Preferred Stock shall not have been paid or declared and a sum sufficient for the payment thereof set aside, in an amount equal to six quarter-annual dividends on any shares of Series A Preferred Stock at the time outstanding, then and in such event, the holders of the Series A Preferred Stock, voting separately as a class, shall be entitled, at any annual meeting of the stockholders or special meeting held in place thereof, or at a special meeting of the holders of the Series A Preferred Stock

called as hereinafter provided, to elect two directors.  Such right of the holders of Series A Preferred Stock to elect two directors may be exercised until dividends in default on the Series A Preferred Stock shall have been paid in full or funds sufficient therefor set aside, and when so paid or provided for, then the right of the holders of the Series A Preferred Stock to elect such directors shall cease, but subject always to the same provisions for the vesting of such voting rights in the case of any such future dividend default or defaults.  At any time after such voting power shall have so vested in the holders of the Series A Preferred Stock, the Secretary of Wal-Mart may, and upon the written request of the holders of record of 25% or more in amount of the Series A Preferred Stock then outstanding, addressed to him at the principal office of Wal-Mart in the State of Arkansas, shall call a special meeting of the holders of the Series A Preferred Stock for the election of the directors to be elected by them as herein provided, to be held within 40 days after delivery of such request and at the place and upon the notice provided by law and in the By-laws for the holding of meetings of stockholders; provided, however, that the Secretary shall not be required to call such special meeting in the case of any such request received less than 90 days before the date fixed for the next ensuing annual meeting of stockholders.  No such special meeting and no adjournment thereof shall be held on a date less than 30 days before the annual meeting of the stockholders or special meeting held in place thereof next succeeding the time when the holders of the Series A Preferred Stock become entitled to elect a director as above provided.  If at any such annual or special meeting or any adjournment thereof the holders of at least a majority of the Series A Preferred Stock then outstanding shall be present or represented by proxy, then by vote of the holders of at least a majority of the Series A Preferred Stock present or so represented at such meeting, the then authorized number of directors of Wal-Mart shall be increased by two, and the holders of the Series A Preferred Stock shall be entitled to elect the two additional directors so provided for.  The directors so elected shall serve until the next annual meeting or until their successors shall be elected and shall qualify; provided, however, that whenever the holders of the Series A Preferred Stock shall be divested of voting power as above provided, the term of office of the persons elected as directors by the holders of the Series A Preferred Stock as a class shall forthwith terminate, and the number of the Board of Directors shall be reduced accordingly.  If, during any interval between any special meeting of the holders of Series A Preferred Stock for the election of a director to be elected by them as provided above and the next ensuing annual meeting of stockholders, or between annual meetings of stockholders for the election of directors, and while the holders of the Series A Preferred Stock shall be entitled to elect two directors the office of either of the directors who have been elected by the holders of the Series A Preferred Stock shall, by reason of resignation, death or removal, be vacant, (1) the vacancy shall

be filled by a majority vote of the remaining directors then in office, although less than a quorum, and (2) if not so filled within 40 days after the creation thereof, the Secretary of Wal-Mart shall call a special meeting of the holders of the Series A Preferred Stock and such vacancy shall be filled at such special meeting. Any director elected to fill any such vacancy by the remaining directors then in office may be removed from office by vote of the holders of a majority of the shares of the Series A Preferred Stock. A special meeting of the holders of the Series A Preferred Stock may be called by a majority vote of the Board of Directors for the purpose of removing such director. The Secretary of Wal-Mart shall, in any event, within ten days after delivery to Wal-Mart at its principal office in the State of Arkansas of a request to such effect signed by the holders of at least 25% of the outstanding shares of the Series A Preferred Stock, call a special meeting for such purpose to be held within 40 days after delivery of such request, provided, however, that the Secretary shall not be required to call such a special meeting in the case of any such request received less than 90 days before the date fixed for the next ensuing annual meeting of stockholders.

(c)   The consent of holders of more than two-thirds of the outstanding shares of Series A Preferred Stock is required to amend the certificate of incorporation of Wal-Mart to (i) create or authorize any class of stock ranking prior or superior to the Series A Preferred Stock as to assets or dividends, or any class of securities convertible into any such a class of stock, or (ii) change the terms of the Series A Preferred Stock in any manner prejudicial to the holders thereof; provided, however, that no separate consent of the holders of the Series A Preferred Stock shall be required to amend the certificate of incorporation to create or authorize any class of stock ranking on a parity with the Series A Preferred Stock as to assets or dividends, or as to any class of securities convertible into any such class of stock if such stock or other securities are issued for new consideration and not as a dividend or other distribution to the stockholders of Wal-Mart.

SECTION 7.   Liquidation Rights.   The amount payable on Series A Preferred Stock in the event of any liquidation, dissolution or winding up of the affairs of Wal-Mart shall be $27.50 per share plus accrued and unpaid dividends, which amount shall be paid and distributed before any distribution may be made with respect to the outstanding shares of Wal-Mart Common Stock or any other class of shares of Wal-Mart ranking junior to the Series A Preferred Stock with respect to payment of dividends or distributions upon dissolution and winding up of Wal-Mart.

SECTION 8.   Conversion Right.
(a)   Subject to and upon compliance with the provisions of this Section 8 and except as provided in the last sentence of this paragraph (a), the Series A Preferred Stock may at the option of the holder at any time, or in the case of shares called

for redemption until and including the tenth day prior to the date fixed for redemption (but not thereafter if payment of the redemption price has been duly provided for by the date fixed for redemption), be converted into shares of the Common Stock, par value $.10 per share, of Wal-Mart ("Common Stock") (as such shares shall be constituted at the conversion date) at the conversion price in effect at the conversion date. Notwithstanding the provisions of this paragraph (a) and Section 5(c), if Wal-Mart shall be a party to any consolidation or merger whereby the outstanding shares of Common Stock are to be exchanged for or converted into cash or other securities of an issuer unrelated or unaffiliated with Wal-Mart and Wal-Mart exercises its option to redeem the Series A Preferred Stock pursuant to the last sentence of Section 5(a), the Series A Preferred Stock may not be converted after the effective date of any such consolidation or merger.

(b)   The holder of each share of Series A Preferred Stock may exercise the conversion privilege in respect thereof by delivering to any transfer agent of the Series A Preferred Stock (i) the shares to be converted, (ii) written notice that the holder elects to convert such shares and stating the name or names (with address) in which the stock certificate for Common Stock is to be issued. Conversion shall be deemed to have been effected on the date when such delivery is made, and such date is referred to in this Section as the "conversion date." On the conversion date or as promptly thereafter as practicable, Wal-Mart shall issue and deliver to the holder of the Series A Preferred Stock surrendered for conversion, or on his written order, a certificate for the number of full shares of Common Stock issuable upon the conversion of such Series A Preferred Stock and a check or cash in respect of any fraction of a share as provided in subparagraph (c) of this Section 8. The person in whose name the stock certificate is to be issued shall be deemed to have become a holder of Common Stock of record on the conversion date. No adjustment shall be made for any dividends on such shares of Series A Preferred Stock or for dividends on the shares of Common Stock issued on conversion.

(c)   Wal-Mart shall not be required to issue fractional shares of Common Stock upon conversion of Series A Preferred Stock. The number of full shares of Common Stock issuable upon conversion of the shares of Series A Preferred Stock surrendered therefor shall be computed on the basis of the aggregate number of shares so surrendered. If any fractional interest in a share of Common Stock would be deliverable upon the conversion of any Series A Preferred Stock, Wal-Mart shall in lieu of delivering the fractional share therefor make an adjustment therefor in cash at the current market value thereof, computed on the basis of the last reported sale price of the shares of Common Stock on the New York Stock Exchange on the last business day before the conversion date or, if there was no reported sale on that day, on the basis of the mean of the closing bid and asked quotations on that Exchange on that day, or if the Common Stock is not then

listed on that Exchange, on the basis of the mean of the closing bid and asked quotations in the over-the-counter market on that day as reported by NASDAQ, or any similar reporting service.

(d)  Unless and until an adjusted conversion price of the Common Stock is required to be computed as hereinafter provided, the conversion price for such Common Stock shall be $45.60 per share, provided, however, that in the event that the average of the last reported sales prices for trades of shares of Wal-Mart Common Stock on the New York Stock Exchange for the five trading days immediately preceding the effective date of the Merger of Kuhnco into Kuhn (the "Five-Day Average Price") is less than $36.50 per share, the conversion price shall be equal to 125% of the Five-Day Average Price; provided, further that in the event that the Five-Day Average Price is greater than $39.50 per share, the conversion price shall be equal to 120% of the Five-Day Average Price.   The number of shares of Common Stock issuable upon conversion of one share of Series A Preferred Stock shall be determined by dividing $25.00 by the conversion price then in effect.

(e)  In case Wal-Mart shall pay or make a dividend or other distribution on any class of its capital stock in Common Stock, the conversion price in effect at the opening of business on the day following the date fixed for the determination of stockholders entitled to receive such dividend or other distribution shall be reduced by multiplying such conversion price by a fraction of which the numerator shall be the number of shares of Common Stock outstanding at the close of business on the date fixed for such determination and the denominator shall be the sum of such number of shares and the total number of shares constituting such dividend or other distribution, such reduction to become effective immediately after the opening of business on the day following the date fixed for such determination.   For the purposes of this paragraph (e), the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of Wal-Mart but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.   Wal-Mart will not pay any dividend or make any distribution on shares of Common Stock held in the treasury of Wal-Mart.

(f)  In case Wal-Mart shall issue rights or warrants (other than employee stock options granted under any of Wal-Mart's employee stock option plans) to all holders of its Common Stock entitling them to subscribe for or purchase shares of Common Stock at a price per share less than the current market price per share (determined as provided in paragraph (j) below) of the Common Stock on the date fixed for the determination of stockholders entitled to receive such rights or warrants, the conversion price in effect at the opening of business on the day following the date fixed for such determination shall be reduced by multiplying such conversion price by a fraction of which the numerator shall be the number of shares of Common Stock outstanding at the close of business on the date fixed for such determination plus the number of shares of Common Stock which the

aggregate of the offering price of the total number of shares of Common Stock so offered for subscription or purchase would purchase at such current market price and the denominator shall be the number of shares of Common Stock outstanding at the close of business on the date fixed for such determination plus the number of shares of Common Stock so offered for subscription or purchase, such reduction to become effective immediately after the opening of business on the day following the date fixed for such determination. For the purposes of this paragraph (f) the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of Wal-Mart but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of Common Stock. Wal-Mart will not issue any rights or warrants in respect of shares of Common Stock held in the treasury of Wal-Mart.

(g) In case outstanding shares of Common Stock shall be subdivided into a greater number of shares of Common Stock, the conversion price in effect at the opening of business on the day following the day upon which such subdivision becomes effective shall be proportionately reduced, and, conversely, in case outstanding shares of Common Stock shall each be combined into a smaller number of shares of Common Stock, the conversion price in effect at the opening of business on the day following the day upon which such combination becomes effective shall be proportionately increased, such reduction or increase, as the case may be, to become effective immediately after the opening of business on the day following the day upon which such subdivision or combination becomes effective.

(h) In case Wal-Mart shall, by dividend or otherwise, distribute to all holders of its Common Stock evidences of its indebtedness or assets (including securities, but excluding any rights or warrants referred to in paragraph (f) above, any dividend or distribution paid in cash out of the retained earnings of Wal-Mart and any dividend or distribution referred to in paragraph (e) above), the conversion price shall be adjusted so that the same shall equal the price determined by multiplying the conversion price in effect immediately prior to the close of business on the date fixed for the determination of stockholders entitled to receive such distribution by a fraction of which the numerator shall be the current market price per share (determined as provided in paragraph (j) below) of the Common Stock on the date fixed for such determination less the then fair market value (as determined by the Board of Directors, whose determination shall be conclusive) of the portion of the assets or evidences of indebtedness so distributed applicable to one share of Common Stock and the denominator shall be such current market price per share of the Common Stock, such adjustment to become effective immediately prior to the opening of business on the day following the date fixed for the determination of stockholders entitled to receive such distribution.

(i) The reclassification (including any reclassification upon a consolidation or merger in which Wal-Mart is the surviving corporation) of Common Stock into securities other than

Common Stock shall be deemed to involve (a) a distribution of such securities other than Common Stock to all holders of Common Stock (and the effective date of such reclassification shall be deemed to be "the date fixed for the determination of stockholders entitled to receive such distribution" and "the date fixed for such determination" within the meaning of paragraph (h) above), and (b) a subdivision or combination, as the case may be, of the number of shares of Common Stock outstanding immediately prior to such reclassification into the number of shares of Common Stock outstanding immediately thereafter (and the effective date of such reclassification shall be deemed to be "the day upon which such subdivision becomes effective" or "the day upon which such combination becomes effective," as the case may be, and "the day upon which such subdivision or combination becomes effective" within the meaning of paragraph (g) above).

(j)   For the purpose of any computation under paragraphs (f) and (h) above, the current market price per share of Common Stock on any date shall be deemed to be the average of the daily closing prices for the 30 consecutive business days selected by Wal-Mart commencing not more than 45 business days before the day in question.  The closing price for each day shall be the last reported sales price regular way or, in case no such reported sale takes place on such day, the average of the reported closing bid and asked prices regular way, in either case on the New York Stock Exchange, or, if the Common Stock is not listed or admitted to trading on such Exchange, on the principal national securities exchange on which the Common Stock is listed or admitted to trading or, if not listed or admitted to trading on any national securities exchange, the average of the closing bid and asked quotations in the over-the-counter market, as reported by NASDAQ, or any similar reporting service.  For the purposes of this paragraph (j), the term "business day" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday, other than any day on which securities are not traded on such exchange or in such market.

(k)   Wal-Mart may make such reductions in the conversion price, in addition to those required by paragraphs (e), (f), (g) and (h) above, as it considers to be advisable in order that any event treated for Federal income tax purposes as a dividend of stock or stock rights shall not be taxable to the recipients.

(l)   Whenever the conversion price is adjusted as herein provided:

(i)   Wal-Mart shall compute the adjusted conversion price in accordance with this Section 8 and shall prepare a certificate signed by the Treasurer of Wal-Mart setting forth the adjusted conversion price and showing in reasonable detail the facts upon which such adjustment is based, and such certificate shall forthwith be filed with the Transfer Agent for the Series A Preferred Stock.

(ii)   a notice stating that the conversion price has been adjusted and setting forth the adjusted

conversion price shall forthwith be required, and as soon as practicable after it is required, such notice shall be mailed to the holders of record of the outstanding shares of Series A Preferred Stock; provided, however, that if within 10 days after the completion of mailing such a notice, an additional notice is required, such additional notice shall be deemed to be required pursuant to this clause (ii) as of the opening of business on the tenth day after such completion of mailing and shall set forth the conversion price as adjusted at such opening of business, and, upon the completion of mailing of such additional notice, no other notice need be given of any adjustment in the conversion price occurring at or prior to such opening of business and after the time that the next preceding notice given by mail became required.

(m)  In case:

(i)  Wal-Mart shall declare a dividend (or any other distribution) on its Common Stock payable otherwise than in cash out of its retained earnings; or

(ii)  Wal-Mart shall authorize the granting to the holders of its Common Stock of rights or warrants to subscribe for or purchase any shares of capital stock of any class or of any other rights; or

(iii) of any reclassification of the capital stock of Wal-Mart (other than a subdivision or combination of its outstanding shares of Common Stock), or of any consolidation or merger to which Wal-Mart is a party for which approval of any stockholders of Wal-Mart is required, or of the sale or transfer of all or substantially all of the assets of Wal-Mart; or

(iv) of the voluntary or involuntary dissolution, liquidation, or winding up of Wal-Mart:

then Wal-Mart shall cause to be mailed to the Transfer Agent of the then Series A Preferred Stock and to the holders of record of the outstanding shares of this Series, at least 20 days (or 10 days in any case specified in clause (i) or (ii) above) prior to the applicable record date hereinafter specified, a notice stated (x) the date on which a record is to be taken for the purpose of such dividend, distribution, rights or warrants, or, if a record is not to be taken, the date as of which the holders of Common Stock of record to be entitled to such dividend, distribution, rights or warrants are to be determined, or (y) the date on which such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding up is expected to become effective, and the date as of which it is expected that holders of Common Stock of record shall be entitled to exchange their shares of Common Stock for securities or other property deliverable upon such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding up.

(n)  The issue of stock certificates on conversions of Series A Preferred Stock shall be without charge to the

converting shareholder for any tax in respect of the issue thereof. Wal-Mart shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares in any name other than that of the holder of the Series A Preferred Stock converted, and Wal-Mart shall not be required to issue or deliver any such stock certificate unless and until the person or persons requesting same shall have paid to Wal-Mart the amount of such tax or shall have established to the satisfaction of Wal-Mart that such tax has been paid.

(o)   Wal-Mart shall at all times reserve and keep available, free from pre-emptive rights, out of its authorized but unissued stock, for the purpose of effecting the conversion of Series A Preferred Stock such number of its duly authorized shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding Series A Preferred Stock.

FIFTH:  The Corporation is to have perpetual existence.

SIXTH:  In furtherance, an not in limitation, of the powers conferred by law, the Board of Directors of the Corporation is expressly authorized to make, alter or repeal the by-laws of the Corporation in the manner provided in such by-laws. Elections of directors need not be by written ballot unless the by-laws of the Corporation shall so provide.

SEVENTH:  The Corporation reserves the right to amend, alter or repeal any provision contained in this Certificate of Incorporation in the manner now or hereafter prescribed by the statutes of the State of Delaware, and all rights and powers conferred on Directors and stockholders herein are granted subject to this reservation.

EIGHTH:  Whenever a compromise or arrangement is proposed between this Corporation and its creditors or any class of them and/or between this Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of

this Corporation or of any creditor or stockholder thereof, or on the application of any receiver or receivers appointed for this Corporation under the provisions of Section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this Corporation under the provisions of Section 279 of Title 8 of the Delaware Code order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors and/or of the stockholders or class of stockholders of this Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this Corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this Corporation, as the case may be, and also on this Corporation.

NINTH: To the fullest extent permitted by Delaware General Corporation Law as the same exists or may hereafter be amended, a director of this Corporation shall not be liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director.

4.  This Restated Certificate of Incorporation was duly adopted by the board of directors in accordance with Section 245 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, said WAL-MART STORES, INC. has caused this certificate to be signed by Robert K. Rhoads, its Vice President and attested by J. Scott Melton, its Assistant Secretary, this 25th day of October , 1988.

WAL-MART STORES, INC.

By _____
   Robert K. Rhoads,
   Vice President

ATTEST:

By _____
   J. Scott Melton,
   Assistant Secretary

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 02:00 PM 08/26/1991
912385167 - 732109

CERTIFICATE OF AMENDMENT

OF

RESTATED CERTIFICATE OF INCORPORATION

\* \* \* \* \*

WAL-MART STORES, INC., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, DOES HEREBY CERTIFY:

FIRST:  That at a meeting of the Board of Directors of WAL-MART STORES, INC. resolutions were duly adopted setting forth a proposed amendment to the Restated Certificate of Incorporation of said corporation, declaring said amendment to be advisable and calling a meeting of the stockholders of said corporation for consideration thereof.  The resolution setting forth the proposed amendment is as follows:

RESOLVED, that the Restated Certificate of Incorporation of this corporation be amended by changing the first paragraph of article Fourth thereof so that, as amended, said paragraph shall be and read as follows:

> "FOURTH:  The total number of shares of all classes of stock which the Corporation shall have authority to issue is Five Billion, Six Hundred Million (5,600,000,000) shares, of which Five Billion, Five Hundred Million (5,500,000,000) shares shall be classified as Common Stock, of the par value of 10¢ per share (herein called "Common Stock"), and of which One Hundred Million (100,000,000) shares shall be classified as Preferred Stock of the par value of 10¢ per share (herein called "Preferred Stock")."

SECOND:  That thereafter, pursuant to resolution of its Board of Directors, the annual meeting of the stockholders of said corporation was duly called and held, upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware at which meeting the necessary number of shares as required by statute were voted in favor of the amendment.

THIRD:  That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, said WAL-MART STORES, INC. has caused this certificate to be signed by Robert K. Rhoads, its Vice President and attested by J. Scott Melton, its Assistant Secretary, this 19th day of August, 1991.

By _____
        Robert K. Rhoads,
        Vice President

Attest:

By _____
        J. Scott Melton
        Assistant Secretary

# CERTIFICATE OF AMENDMENT

## OF

## RESTATED CERTIFICATE OF INCORPORATION

* * * * *

WAL-MART STORES, INC., a corporation organized and existing under and by virtue of the General Corporation law of the State of Delaware, DOES HEREBY CERTIFY:

FIRST: That at a meeting of the Board of Directors of WAL-MART STORES, INC. resolutions were duly adopted setting forth a proposed amendment to the Restated Certificate of Incorporation of said corporation, declaring said amendment to be advisable and calling a meeting of the stockholders of said corporation for consideration thereof. The resolution setting forth the proposed amendment is as follows:

RESOLVED, that the Restated Certificate of Incorporation of this corporation be amended by changing the first paragraph of article Fourth thereof so that, as amended, said paragraph shall be and read as follows:

"FOURTH: The total number of shares of all classes of stock which the Corporation shall have the authority to issue is Eleven Billion, One Hundred Million (11,100,000,000) shares, of which Eleven Billion (11,000,000,000) shares shall be classified as Common Stock, of the par value of 10¢ per share (herein called "Common Stock"), and of which One Hundred Million (100,000,000) shares shall be classified as Preferred Stock of the par value of 10¢ per share (herein called "Preferred Stock")."

SECOND: That thereafter, pursuant to resolution of its Board of Directors, the annual meeting of the stockholders of said corporation was duly called and held, upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware at which meeting the necessary number of shares as required by statute were voted in favor of the amendment.

1

005249.00038:0452002.01

THIRD:   That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, said WAL-MART STORES, INC. has caused this certificate to be signed by Martin G. Gilbert, its Vice President and attested by Allison D. Garrett, its Assistant Secretary, this 27th day of July, 1999.


By:    /s/ Martin G. Gilbert
       Martin G. Gilbert, Vice President


Attest:


By:    /s/ Allison D. Garrett
       Allison D. Garrett, Assistant Secretary

2

005249.00038:0452002.01





 **Search Incorporations, Cooperatives, Banks and Insurance Com**

Home
About the Office
Elections
Business /
Commercial Services
Capitol Grounds
News
Educational Materials
Tours



State Capitol, Rm 256
Little Rock, AR 72201
501-682-1010
Email

| | |
|---|---|
| Corporation Name | WAL-MART STORES, INC. |
| Fictitious Names | BUD'S DISCOUNT CITY |
| | BUD'S WAREHOUSE OUTLET |
| | BUD'S WAREHOUSE OUTLET |
| | FORT SMITH REMARKETING |
| | SAM'S CLUB |
| | SAM'S WHOLESALE CLUB |
| | WAL-MART |
| | WAL-MART EXPRESS |
| | WAL-MART NEIGHBORHOOD MARKET |
| | WAL-MART SUPERCENTER |
| | WAL-MART SUPERCENTER |
| | WAL-MART VACATIONS |
| Filing # | 100067582 |
| Filing Type | Foreign For Profit Corporation |
| Filed under Act | For Bus Corp; 958 of 1987 |
| Status | Good Standing |
| Principal Address | |
| Reg. Agent | THE CORPORATION COMPANY |
| Agent Address | 425 W. CAPITOL AVE., STE. 1700 |
| | Little Rock, AR 72201 |
| Date Filed | 03/31/1970 |
| Officers | SEE FILE, Incorporator/Organizer |
| Foreign Name | N/A |
| Foreign Address | 702 SW 8TH STREET |
| | BENTONVILLE, AR 72716 |
| State of Origin | DE |

Purchase a Certificate of Good Standing
for this Entity

Pay Franchise Tax for this corporation

Use your browser's back button to return to the Search Results

# EXHIBIT 2

# DEVELOPMENT AGREEMENT

Between

Institute for Disabilities Research
and Training, Inc.

and

Wal-Mart Stores, Inc.

# TABLE OF CONTENTS

Page Nos.

INTRODUCTORY PARAGRAPHS ................................................................................1

DENITIONS AND TERMS .......................................................................................2

DEVELOPER'S UNDERTAKING ..............................................................................4

WAL-MART'S UNDERTAKING ...............................................................................6

COMPENSATION/PAYMENT/EXPENSES ................................................................7

      A.     CONTRACT PHASES........... ..............................................7

      B.     PHASE CONTRACT  PRICE ...................................................8

      C.     BILLABLE SCREENS ..........................................................8

      D.     INITIAL PAYMENT.............................................................8

      E.     CATCH-UP PAYMENTS........................................................9

      F.     SCHEDULING AND MANNER OF PAYMENT...........................9


   EXPENSES ...................................................................................10

      A.     COSTS ...........................................................................10

      B.     ADDITIONAL EXPENSES ....................................................11

      C.     EXPENSE INVOICES...........................................................11

      G.     FINAL EXPENSE INVOICE ..................................................11

CONFIDENTIALITY/COPYRIGHT ............................................................................12

BREACH OF AGREEMENT ......................................................................................12

MISCELLANEOUS ...................................................................................................14

## AGREEMENT OF DEVELOPMENT

This Agreement is between Institute for Disabilities Research and Training, Inc., a Maryland corporation (hereinafter referred to as "IDRT" and/or "Developer"); and Wal-Mart, Stores Inc., an ~~Arkansas~~ Delaware corporation (hereinafter referred to as "Wal-Mart" and/or "Client").

### Introductory Paragraphs

1.    IDRT and Wal-Mart desire to enter into an Agreement in which IDRT will review, analyze, propose changes and additions to and using American Sign Language (ASL) produce videotape interpretations of Wal-Mart's proprietary Computer-Based Learning Modules ("CBL" or "CBL Module") for the purpose and with the intent that such CBL Modules may be accessed by deaf persons (the "Developer's Undertaking"). This Agreement sets out the terms and conditions of the undertaking of each party, and the payment for the Developer's Undertaking.

2.    This Agreement will be known as the "Development Agreement," and its date will be the date on which the last party to this Agreement executed it.

3.    This Agreement will include all work involved in the parties' undertakings that began before the date of the Agreement and was in contemplation of this Agreement. However, all prior negotiations, promises, statements and agreements regarding the undertaking of the parties are merged into this Agreement. Unless specifically included in this Agreement, any such prior negotiations, promises, statements, and agreements are not binding and are void.

4.    Wal-Mart has selected Cognitive Arts as its agent/representative to make programming changes to the CBL Modules in accordance with IDRT's work product. IDRT will assist, provide advice and supply its videotape interpretations of the CBL Modules to Cognitive Arts, as provided in this Agreement. It is understood and agreed that Cognitive Arts is not a party to this Agreement and is not an agent, partner, or otherwise associated with IDRT; and

1

except to the extent of providing Cognitive Arts with its work product and providing reasonable advice and assistance to Cognitive Arts for it to make the programming changes to the CBL Modules consistent with its work product, IDRT is not responsible for the work product of Cognitive Arts.

NOW, WHEREFORE, the parties have covenanted, agreed, promised and stipulated to perform the undertakings and to make the payments that are provided herein:

### Definitions and Terms

5.    *Computer-Based Learning Module*:   Wal-Mart has produced as its proprietary product certain Computer-Based Learning (CBL) software for training employees (a/k/a "Associates").  The CBL Software is organized into individual units of Training or Modules, each of which is reproduced on a computer storage medium. Each CBL Module consists of a series of computer-generated Screens that are related to the topic or subject of the respective CBL Module and are sequentially displayed to the computer operator when the CBL Module is engaged or run on a computer.  A Screen may display text, symbols and/or pictorial displays of still and/or moving pictures.  As a Screen is displayed, audio may also be reproduced by the computer-regeneration.   A Screen may have allied components engaged by the computer operator through mouse manipulation and/or keystroke.  Such allied components may be text displayed questions and answers related to the respective Screen; and/or pictorial displays of still and/or moving pictures.  Allied components may also have audio that is reproduced during the display of the respective Screen Component.  The textual, symbolic, pictorial and audio features that are displayed and/or audibly reproduced in conjunction with a Screen are hereinafter referred to as "Screen Components."

6.    *Standard and Complex CBL Modules*:    Each of the CBL Modules is categorized into two types; viz,  Standard or Complex CBL Module. In a Standard CBL Module, each Screen

2

will contain a single function for the user (e.g. visual and audio explanation pertaining to the message displayed in the Screen). In a Complex CBL Module, one or more Screens will contain multiple paths or functions for the user (e.g. by selecting an option displayed on the Screen, subsidiary matters related to the Screen's primary message are displayed)

7. *Scripts*: Wal-Mart has or will provide the Developer with a "Microsoft Word" file of the exact Script of each Screen and Screen Component of each CBL Module. The Script shall fully and accurately contain the text and audio content of each Screen and Screen Component. These Scripts are hereinafter referred to as "Client Script" or "Scripts."

8. *Raw Footage*: In order to make the CBL Modules accessible to deaf persons who communicate through ASL, the Developer will engage Interpreters to translate or "sign" the audio and selected text of each Screen and Screen Component. The Interpreters will be videotaped and the videotapes will be provided to Cognitive Arts. The videotapes of Interpreters will be referred to hereinafter as "Videotape" or "Raw Footage."

9. *Code*: The Developer will develop a Coding System to indicate on the Client Script, the precise point on the Screen and/or Screen Component at which a particular segment of Raw Footage should be inserted and/or the precise point at which any recommended changes to text, symbols or pictorial displays should be made. The Developer will also develop an Index or Spreadsheet which references the Code to the specific video interpretation to be inserted into the respective Screen or Screen Component of the Training Module.

10. *IDRT'S Work Product*: IDRT's work product consists of the Raw Footage or videotapes of Interpreters, edited and encoded Client Scripts, Spreadsheets and any manuals, references or other indexes that IDRT prepares in conjunction with the Developer's undertaking; and instructions and directions for referencing the Raw Footage to the edited and encoded Client Script.

## Developer's Undertaking

11.    IDRT will review and analyze each of the CBL Modules to be developed by IDRT in accordance with this Agreement.  The analysis will involve reviewing each Screen of each CBL Module and each Screen Component allied with each Screen; and reviewing the Client Script of each CBL Module.  IDRT will determine whether the text, symbols or pictorial displays on any Screen and Screen Component should be changed to be accessible to deaf persons.  This review and analysis will be in conjunction with IDRT's review and analysis of the audio of each Screen and Screen Component's and of each CBL Module's Script. To the extent IDRT opines that the text, symbols and/or pictorial display should be altered or changed to make the Screen more accessible to deaf persons, it will note such changes on the Client's Script. However, any such change that results in a change to the content of a Screen or Screen Component, will be presented to Client for approval.

12.    All audio as detailed on the respective Client Script and reproduced on each Screen and Screen Component for each CBL Module will be reviewed and analyzed by IDRT for the purpose of translating it using ASL.

13.    IDRT will prepare videotapes that will display such person or persons selected by IDRT as Interpreters to interpret or "sign," using ASL, the audio of each Screen and Screen Component of each of the CBL Modules.  The "transformation" of audio to visual signing will be such as to make the CBL Module, in the opinion of IDRT, accessible, useable and understandable to deaf persons using ASL as the method of communication.  In conjunction with the transformation and videotaping of the signing of audio, IDRT will determine if any of the text, symbols and/or pictorial displays on the Screen and Screen Component may be more

4

accessible and understandable by deaf persons if they are explained by the Interpreters utilizing ASL, and if so, IDRT will prepare videotapes of its interpreters signing such selected text, symbols and/or pictorial displays.

14.    In conjunction with producing its interpretations IDRT will coordinate with client as necessary to ascertain the meaning of any word or phrase that may be unique to the Client and its business. To the extent IDRT develops "signs" for such unique words and phrases, it will provide Client a "Glossary" of signs for such unique words and phrases.

15.    IDRT will select and provide the personnel, equipment and materials to make professional quality videotapes of persons using ASL to "sign" or interpret the transformed audio dialog and such other selected text, symbols and pictorial displays.  IDRT will select ASL Interpreters who are experienced and will be able to professionally sign the interpretations on videotape.

16.    IDRT will prepare an Index of each videotape so that Cognitive Arts will be able to identify and locate each portion of video translation ("Video Clip"), as designated by IDRT to be programmed into the CBL Modules.

17.    IDRT will develop a Coding System for the video clips and insert the Codes in the Client Scripts of each Screen and Screen Component to indicate the point on the CBL Module that each video clip it produces should be inserted.  In conjunction with the Coding System, IDRT will prepare a Spreadsheet, which references the respective location on the videotapes of each video clip to be inserted into the CBL Module.

18.    IDRT will submit the Client Script, enhanced by its embedded Codes and any proposed changes to text, symbols and pictorial displays; the videotapes of the transformed audio dialog and additional interpretation of text, symbols and pictorial images; and the Coding Information and Index of each videotape (i.e. the Developer's "work product") to Cognitive Arts

who has the responsibility of programming the CBL Modules to incorporate IDRT's recommended changes and modifications on the Scripts and inserting the video clips of translation made by IDRT, in each of the respective Screens and Screen Components.

19.    IDRT will provide advice to Cognitive Arts, so as to assist it in programming the CBL Modules to make the changes, modifications and additions recommended by IDRT and to incorporate the Raw Footage into the CBL Modules. IDRT's assistance and advice shall also consist of providing progress reports to Cognitive Arts as to the status of its work on the CBL Modules under development; and, from time to time, meeting with representatives of Cognitive Arts and/or Client as necessary to complete its undertakings. Coordination and communications with Cognitive Arts and Client up to and including 34 hours for each three (3) month period in this Agreement are included in the charges and payments for "Compensation For Development," as hereinafter provided.

20.    The undertakings to produce the interpretations of Client's CBL Modules shall be accomplished pursuant to a Timetable that is attached hereto as Exhibit A and which is incorporated by reference herein ("Master ASL Timeline")

### Wal-Mart's Undertaking

21.    Wal-Mart shall provide to IDRT groups of its CBL Modules in accordance with the attached Master ASL Timeline. The CBL Modules shall be provided to IDRT on removable computer media, such as a disc. At or before the time CBL Modules are to be provided to IDRT, Wal-Mart shall also provide IDRT with an exact copy of the Client Script of the respective CBL Modules provided.

22.    Wal-Mart shall designate one or more of its representatives who shall have authority to assist IDRT in transforming the audio and/or visual displays of the Training Modules into ASL.    Wal-Mart's representative shall also provide timely assistance to IDRT in

transforming the words and phrases unique to Wal-Mart's business and industry and to timely approve such changes recommended by IDRT to the Screen and Screen Components. Wal-Mart's undertaking shall be accomplished promptly and not result in a delay to IDRT's production schedule.

23.    Wal-Mart has the sole discretion to determine the titles of the CBL Modules to be included in each group for development: however, Wal-Mart understands and agrees it will make its designation of titles so as to reasonably permit IDRT to develop the CBL Modules within the time parameters of the Master ASL Timeline.

24.    Wal-Mart shall make payment to IDRT for development of the CBL Modules, in the amount and manner hereafter described.

### Compensation/Payment/Expenses

25.    *Compensation for Development*:

A.    Contract Phases

(1)    The submission of CBL Modules to IDRT as directed by the Master ASL Timeline will be in four (4) phases.  The Phases will be determined by the following number of CBL Modules to be submitted to IDRT for Development in accordance for the Master ASL Timeline.

| Phase I: | 90 CBL Modules |
|---|---|
| Phase II: | 60 CBL Modules |
| Phase III: | 50 CBL Modules |
| Phase IV: | 60 CBL Modules |

(2)    The undertakings and payments described in this Agreement shall be performed in the four sequential Phases as provided herein. Each Phase shall automatically follow the other, unless either party notifies the other in writing at least 30 days prior to the beginning of the next phase,  that they will terminate the Development Agreement at the end of the Phase then in development. In that event, each party is responsible for completing the terms

and conditions of this Development Agreement through the Phase during which such notice was given. In the event of such termination, the Development Agreement will be considered completed at the end of the Phase being developed when Notice to Terminate was provided and neither party will have any liability or responsibility for the balance of CBL Modules to have been submitted in subsequent Phases.

        (3)    It is agreed that IDRT has begun and is the process of developing CBL Module for Phase I.

        B.    Phase Contract Price. It is understood and agreed that IDRT has and will engage staff and has and will be required to acquire and utilize various resources in order to complete the Developer's undertakings described in this Agreement. The Phase Contract Price applies to each Phase in the Contract and, in part, is intended to compensate IDRT for its engagement and commitment to the development. The Phase Contract Price is as follows:

| Phase I: | $ 1,199,250.00 |
| PhaseII: | $ 799,500.00 |
| Phase III: | $ 666,250.00 |
| Phase IV: | $ 799,500.00 |

        C.    Billable Screens.

        (1)    A Billable Screen for a Standard CBL equals one Screen of on-line content. A Billable Screen for a complex CBL equals an Opening Screen; a Task Screen, each row of content in the Script Matrix, a Conclusion Screen or a Feedback Screen.

        (2)    To the extent either the Client, or the Developer identifies a Screen that is identical to one already developed in the current or a previously developed CBL Module, that Screen will not be counted as a Billable Screen.

        D.    Initial Payment. Wal-Mart agrees to pay the amount of fifty thousand dollars ($50,000) to IDRT at the time it executes this Agreement. This amount will be credited

against the last payment due by Wal-Mart to IDRT, according to the manner of payment hereafter provided.

       E.    Catch-up Payments:  Within 10 business days of the execution of this Agreement, Wal-Mart agrees to pay IDRT for all invoices submitted for already developed CBL Modules.

       F.    Scheduling and Manner of Payment.

       (1)    Upon submission of its work product for each group of developed CBL Modules to Cognitive Arts, IDRT will invoice Wal-Mart for the respective group of CBL Modules. The payment to be made at such time will be based on the number of Billable Screens in the respective group of CBL Modules. The invoice of IDRT will detail the number of Billable Screens in the respective Group counted in accordance with Paragraph 25(C)(1) and (2). Excepting for the "Initial," "Catch-Up," and Phase Contract payments pay within thirty (30) days of receipt of such invoice, Wal-Mart shall make ~~a sequential~~ payment ~~on the Minimum Contract Price~~, based on the number of Billable Screens in the respective group, multiplied by two hundred, sixty-six dollars and fifty cents ($266.50) for each Billable Screen.

       (2)    During each respective Phase initiated in accordance with Paragraph 25A(2), if less than the number of CBL Modules stated in Paragraph 25A(1) hereof are submitted to IDRT for development, Wal-Mart shall pay to IDRT the Phase Contract Price, reduced by the amounts previously paid to IDRT for the CBL Modules developed during the respective Phase. IDRT will submit and Wal-Mart shall pay to IDRT within thirty (30) days of receipt, an invoice detailing the amounts calculated in this paragraph. In the event such invoice shall be the Final Invoice for Development, it will also contain the credit in Paragraph 25(F)(3) hereof.

(3)    Upon the submission of its final Invoice to Wal-Mart for the last group of CBL Modules developed by IDRT for the last Contract Phase, Wal-Mart will be credited with the Initial Payment made, and such credit will be deducted from the payment remaining due IDRT.

(4)    Both IDRT and Wal-Mart understand and agree both must comply with their undertakings in accordance with the Timeline. If either fails to perform its undertaking within 10 business days of the dates specified in the Timeline unless the non-performing party agrees in writing to such late performance prior to the specified date, they shall be in breach of the Agreement. If Wal-Mart fails to provide its CBL Module and Scripts in accordance with the Timeline, the Timeline shall be automatically extended and adjusted to equal the number of days between the date such CBL Modules and Scripts were received by IDRT and the date on which such CBL Modules and Scripts should have been received in accordance with the Timeline or any adjustment thereto.

(5)    Without prior written agreement by Wal-Mart, if any CBL Module and Script developed by IDRT is submitted more them five (5) business days after it is due to be submitted to Cognitive Arts in accordance with the Timeline, as extended or adjusted as provided in subsection (3) of this paragraph, the payment due for such late submitted CBL Modules and Scripts, shall be reduced by 19% of the amount otherwise invoiced for the Billable Screens for such late submitted CBL Modules and Scripts.

26.    *Expenses*:

A.    Costs.    But for the designated expenses as stated in this Agreement, all cost incurred by IDRT in the development of its work product are included in the compensation to be paid to IDRT. By example and not by limitation, IDRT is solely responsible for the costs of its employees, any and all contractors it may engage to produce the Raw Footage

(i.e. interpreters or "signers"); the cost of all materials and ordinary office expenses and overhead.

B.    Additional Expenses.    Specific expenses not included in the compensation to be paid IDRT include travel related expenses for automobile travel (at 27 cents a mile), mass transit charges (e.g., airfare), hotel charges and reimbursement for food or meals when IDRT and its employees and representatives are required to travel outside a fifty (50) mile radius of IDRT's office for completion of any work related to the Developer's Undertaking. The reimbursement for meals is for food only and will not exceed $25 per day. When air travel and hotel accommodations are utilized, IDRT will request Wal-Mart to make such travel arrangements; however, Wal-Mart agrees to make such travel arrangements that reasonably accommodate the schedules of IDRT and its employees and if unable to do so, IDRT will make its own travel arrangements. Additionally, such expenses include any extraordinary, incidental and reasonable costs necessary to complete the Developer's Undertaking; for example, messenger service charges, United Parcel Service (UPS) and Federal Express delivery charges.

C.    Expense Invoices.    Beginning February 28, 2002, IDRT will submit an invoice for expenses to Wal-Mart every thirty (30) days. All Expense Invoices shall detail the type and nature of expense, its cost and/or calculations (such as mileage). Payment for each Expense Invoice shall be made within thirty (30) days of the date of the respective Expense Invoice.

D.    Final Expense Invoice.    The Final Invoice for Expenses shall be submitted to Wal-Mart no later than forty-five (45) days after submission of the last Invoice for Compensation in the last Phase of the Contract; and it shall include the balance of any previously billed Expenses that have not been paid as of the date of such last Expense Invoice and unbilled

expenses since the last submitted Expense Invoice. Payment of the Final Expense Invoice shall be made within 30 days of the date of the Final Expense Invoice.

### Confidentiality/Copyright

27.    IDRT understands and agrees that the Training Modules and Scripts provided to it are the property of Wal-Mart and understands and agrees that such material is Wal-Mart's confidential work product. Except to the extent necessary to complete its own work product, and coordinate with Cognitive Arts for it to program the Training Modules to incorporate IDRT's work product, IDRT agrees that it will not transmit or communicate to anyone or reproduce or copy for any other purpose, the Training Modules and Scripts of Wal-Mart. IDRT and its employees agree to execute a Non-Disclosure agreement in accordance with this paragraph.

28.    The work product produced by IDRT is the property of IDRT. However, providing Wal-Mart pays IDRT the Compensation as required in this Agreement, IDRT assigns to Wal-Mart all of IDRT's right, title and interest to its work product as "work-for-hire" under the United States Copyright Laws.

### Breach of Agreement

29.    The following acts/omissions constitute a breach of this Agreement. This list is not all-inclusive. If any breach occurs, and the non-breaching party continues with this Agreement, that breach is waived. However, waiver of any one breach does not constitute a waiver of any other similar or different breach.

      A.    Provided Wal-Mart complies with its schedule to provide the CBL Modules and Scripts required in the Agreement, non-delivery of IDRT's work product to Cognitive Arts within 10 business days of the time periods required in this Agreement.

B.    Delivery of IDRT's work product to Cognitive Arts in a form that is not reasonably useable by Cognitive Arts to make the programming changes to the CBL Modules, as reflected in the work product of IDRT.

C.    Failure of IDRT to complete any of the Developer's Undertakings, as provided herein.

D.    Failure of Wal-Mart to provide IDRT its CBL Module and Scripts within ten (10) business days of the time periods required in this Agreement.

E.    Failure of Wal-Mart to complete any of Wal-Mart's Undertakings, as provided herein.

F.    Failure of Wal-Mart to pay the compensation and expense payments, as provided in this Agreement.

30.    If there is a breach of this Agreement by Wal-Mart and IDRT renders its Final Invoice for Compensation, it is understood and agreed that the balance of the Minimum Contract Price for the then current Contract Phase will be due and payable.

31.    In determining whether IDRT has completed the Developer's Undertaking under this Agreement, Wal-Mart understands and agrees that any act and/or omission of Cognitive Arts in completing the programming of the CBL Modules shall not be attributable to IDRT. However, both parties understand and agree that part of IDRT's Undertaking is to provide a suitable work product to Cognitive Arts so as to enable it to program and reprogram the CBL Modules in accordance with IDRT's work product and to provide reasonable assistance to Cognitive Arts with respect to programming of the CBL Modules in accordance with IDRT's work product.

## Miscellaneous

32.    Each party agrees that in the event of any disagreement between them they will, in good faith, attempt to resolve their differences by negotiations between themselves.

33.    Each of the Introductory Paragraphs is a part of this Agreement and is fully binding on the parties.

34.    Any changes to the terms and conditions of the Agreement must be in writing and signed by each of the parties.

35.    In an action between the parties to enforce or claim damages for breach of this Agreement, the first party making such claim (Plaintiff) must file such claim in the state court or federal district court of the state of incorporation of the party against whom such claim is made; and the law of such state shall govern the terms and conditions of this Agreement.  (Wal-Mart and IDRT's state of incorporation are, respectively, Arkansas and Maryland.)

36.    If any one part of this Agreement is deemed void or unenforceable, the balance of this Agreement shall be deemed to be valid and enforceable and shall be deemed to be severable from the balance of the Agreement.

37.    If any payment for compensation or expenses is not made when and as required hereunder, the amounts remaining unpaid and due shall bear interest at the rate of eight percent (8%) per annum on the balance remaining unpaid from the date such payment or payments were due to be paid.

38.    Each party to this Agreement has had the opportunity to review its terms and conditions and have its legal representatives do so; and by executing the Agreement, each party acknowledges it fully understands and agrees with the terms and conditions of this Agreement.

39.   This Agreement was prepared by IDRT.   However, each party understands and agrees that in the event any term or condition must be construed, no presumption shall arise against IDRT because it prepared the Agreement.

40.   The representatives who sign on behalf of the corporate parties hereto, represent and acknowledge this Agreement has been presented to the corporate officers and directors responsible for the operation of their respective corporate bodies and the approval of corporate acts; the respective corporate officers and directors have approved this Agreement and that each respective corporate body has authorized the signatories of this Agreement to accept and bind it, on behalf of the respective corporate bodies.

INSTITUTE FOR DISABILITIES RESEARCH
AND TRAINING, INC.

Date Signed: _3/34/02_        By: _Corinne K. Vinopol_ (CORPORATE SEAL)
                                  Corinne K. Vinopol, President

                                  Stores
WAL-MART, INC.

Date Signed: _3/28/02_        By: _____

                              Printed Name: _Coleman Peterson_

                              Title: _Executive Vice President - People Division_

Approved as to legal terms only
by _____
    Wal-Mart Legal Team
Date: _3/27/02_

15

# MASTER ASL TIMELINE

Last Updated 3/19/2002

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 12/21/01 | 12/28/01 | 01/04/02 | 01/11/02 | 01/18/02 | 01/25/02 | 02/01/02 | 02/08/02 | 02/15/02 | 02/22/02 | 03/01/02 | 03/08/02 | 03/15/02 | 03/22/02 | 03/29/02 | 04/05/02 | |
| WM Delivers Scripts | 3 | | | 6 | 6 | 6 | 7 | 6 | 6 | 7 | 6 | 7 | 6 | 7 | 6 | 6 | 105 / 105 |
| IDRT Delivers Tapes | | | | | | 6 | 7 | 7 | 6 | 6 | 7 | 7 | 6 | 7 | 6 | 6 | 79 / 79 |
| CA Delivers Modules | | | | | | | | | | 6 | 0 | 3 | 3 | 3 | 3 | 3 | 24 / 24 |
| WM QC/Fix Modules | | | | | | | | | | | 3 | 3 | 3 | 3 | 3 | 3 | 21 / 21 |
| WM/Legal Developed | | | | | | | | | | | | | | | | | 0 |
| ISD Pilot/Roll Modules | | | | | | | | | | | | 3 | 3 | 3 | 3 | 3 | 15 / 15 |
| WM/Legal Delivered | | | | | | | | | | | | | | | | | 0 |
| Status | █ | | | | | | | | | | | | | | | | 0 / 0 |

| Week # | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 04/12/02 | 04/19/02 | 04/26/02 | 05/03/02 | 05/10/02 | 05/17/02 | 05/24/02 | 05/31/02 | 06/07/02 | 06/14/02 | 06/21/02 | 06/28/02 | 07/05/02 | 07/12/02 | 07/19/02 | 07/26/02 | |
| WM Scripts to IDRT | 7 | 7 | 7 | 7 | 5 | 7 | 7 | 6 | 5 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 86 / 191 |
| IDRT Tapes to CA | 6 | 6 | 6 | 6 | 6 | 7 | 6 | 6 | 6 | 6 | 5 | 6 | 6 | 6 | 6 | 6 | 96 / 175 |
| CA Modules to WM | 1 | 6 | 5 | 5 | 6 | 6 | 6 | 6 | 6 | 6 | 5 | 6 | 6 | 6 | 6 | 9 | 121 / 145 |
| WM QC/Fix Modules | 3 | 3 | 5 | 5 | 5 | 5 | 5 | 6 | 6 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 109 / 130 |
| WM/Legal Developed | | | 32 / 16 | | | | | | | | | | | | | 98 / 21 | 2 |
| ISD Pilot/Roll to Stores | 3 | 3 | 3 | 3 | 5 | 5 | 5 | 9 | 5 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 112 |
| WM/Legal Delivered | | | | | | | | 47 / 15 | | | | | | | | | 0 |
| Status | █ | | | | | | | | | | | █ | | | | | 0 / 0 |

| Week # | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 08/02/02 | 08/09/02 | 08/16/02 | 08/23/02 | 08/30/02 | 09/06/02 | 09/13/02 | 09/20/02 | 09/27/02 | 10/04/02 | 10/11/02 | 10/18/02 | 10/25/02 | 11/01/02 | 11/08/02 | 11/15/02 | |
| WM Scripts to IDRT | 7 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 4 | 4 | 4 | 4 | 4 | 69 / 260 |
| IDRT Tapes to CA | 5 | 5 | 5 | 5 | 5 | 5 | 6 | 6 | 5 | 5 | 5 | 4 | 4 | 4 | 4 | 4 | 75 / 250 |
| CA Modules to WM | 9 | 9 | 9 | 7 | 9 | 5 | 5 | 5 | 5 | 5 | 5 | 4 | 4 | 4 | 4 | 5 | 95 / 240 |
| WM QC/Fix Modules | 9 | 9 | 9 | 9 | 9 | 5 | 5 | 5 | 5 | 5 | 5 | 6 | 9 | 9 | 9 | 5 | 100 / 230 |
| WM/Legal Developed | | | | | | | | | | | | | 88 / 41 | | | | 97 |
| ISD Pilot/Roll to Stores | 9 | 8 | 8 | 9 | 8 | 8 | 8 | 7 | 7 | 7 | 7 | 6 | 6 | 6 | 6 | 5 | 113 / 225 |
| WM/Legal Delivered | | | | | | | | | | | | | 179 / 61 | | | | 0 |
| Status | | | | | | | | | | | | | | | █ | | 0 / 0 |

Last Updated 3/19/2002

| Week # | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 | 64 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 11/22/02 | 11/29/02 | 12/06/02 | 12/13/02 | 12/20/02 | 12/27/02 | 01/03/03 | 01/10/03 | 01/17/03 | 01/24/03 | 01/31/03 | 02/07/03 | 02/14/03 | 02/21/03 | 02/28/03 | 03/07/03 | |
| WM Scripts to IDRT | | | | | | | | | | | | | | | | | 260 |
| IDRT Tapes to CA | 4 | 4 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 260 |
| CA Modules to WM | 4 | 4 | 3 | 3 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 260 |
| WM OC/Fix Modules | 4 | 4 | 3 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 260 |
| WM/Legal Developed | | 4 | 4 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 45/62 | 0 | 0 | 0 | 0 | 0 | 0 |
| ISD Pilot/Roll to Stores | 4 | 4 | 3 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 2 | 1 | 0 | 0 | 0 | 35 |
| WM/Legal Delivered | | | | | | | | | | | 43/124 | | | | | | 0 |
| Status | | | | | | | | | | | | | | | | | 0 |

| Week # | 65 | 66 | 67 | Total |
|---|---|---|---|---|
| Week Ending | 03/14/03 | 03/21/03 | 03/28/03 | |
| WM Scripts to IDRT | | | | |
| IDRT Tapes to CA | 0 | 0 | 0 | 260 |
| WM Scripts to IDRT | 0 | 0 | 0 | 260 |
| CA Modules to WM | 0 | 0 | 0 | 260 |
| WM OC/Fix Modules | 0 | 0 | 0 | 260 |
| WM/Legal Developed | 0 | 0 | 0 | 0/81 /220 |
| ISD Pilot/Roll to Stores | 0 | 0 | 0 | 0 |
| WM/Legal Delivered | 0 | 0 | 0 | 260 |
| Status | | | 3/20 | 09/220 |