# _EXHIBITS TO FINAL PRETRIAL ORDER_

## EXHIBIT A TO PRE-TRIAL ORDER

**UNCONTESTED STATEMENT OF FACTS**

IDRT is incorporated and headquartered in Maryland. IDRT is in the business of providing development, training and technical assistance to businesses that serve or employ persons with disabilities, particularly persons who are hearing-impaired.

Wal-Mart is incorporated in Delaware and has its corporate headquarters in Arkansas. Wal-Mart operates retail stores throughout the United States and the world. Wal-Mart hires, engages, and employs thousands of employees as part of its trade and business who are engaged to fulfill numerous jobs, tasks, and positions with Wal-Mart's retail stores.

In or about 2000 to 2001, the U.S. Equal Employment Opportunities Commission ("EEOC") in Arizona filed a Complaint in the U.S. District Court of Arizona against Wal-Mart for violations of the Americans With Disabilities Act ("ADA"). P.L. 101-336, 42 U.S.C. § 12101, *et seq.* At issue was whether Wal-Mart's employment practices in "training" were compliant with the ADA, particularly for those persons whose ability to hear and/or speak was impaired. Wal-Mart provided in-house employee training by a series of audio-video media presentations. The media presentations were on VHS tapes, CDs, DVDs, and/or digitalized into computer-coded files. The format of the media presentations evolved with technological changes. At the relevant times to this case, the media presentations were being converted to computer-coded files. No matter their format, an employee "played" these media presentations at their individual sites of employment throughout the United States.

1

The media presentations were made in a series of subject areas relevant to Wal-Mart's practices and philosophies. For example, one subject matter was "Leadership Training." Some subjects, like this one, were broad and were broken down into various subtopics, each being a separate Module of Training. Other subjects were narrower. At the relevant time, there were approximately 260-300 separate individual Modules of Training. The number and content of these Modules was not static, as Wal-Mart continually revised and developed its in-house training. It was these Modules of Training which became the subject of concern between the EEOC and Wal-Mart, and in turn, the Development Agreement (Exhibit 2 to the Complaint).

IDRT was introduced to Wal-Mart as a specialist in the area of converting media presentations into a format that could be accessible to the hearing impaired and the deaf by various methods and means. One method and means was to interpret the audio feed of an audio-visual presentation into American Sign Language ("ASL"), film an interpreter "signing" the audio translation and at the point on the audiovisual display where the respective audio is played, implant as a small visual inset on the display, a film clip of the respective audio being "signed" by an ASL interpreter. At Wal-Mart's request, IDRT attended an EEOC meeting in Arizona to help explain this conversion process to the EEOC. To demonstrate that a Wal-Mart Training Module so converted, would satisfy the EEOC, IDRT was contracted to convert one of Wal-Mart's Training Modules as a "demonstration project." The subject of this Training Module and its title was "Hazardous Communications."

Wal-Mart had an existing relationship with Cognitive Arts (CA) in Chicago, Illinois. The relationship included using CA to transfer Wal-Mart's Training Modules

into digitalized computer-coded files to be uploaded onto computer hard drives. In October-November 2001, CA retained and paid IDRT to complete the translation and conversion of the "Hazardous Communications" Training Module for Wal-Mart. The method and means by which the conversion was accomplished became, for the most part, the method and means for the conversion of each of Wal-Mart's Training Modules under the contract at issue. Briefly, it is described as follows: Wal-Mart would send a CD of the Training Module to IDRT. IDRT would watch and listen to the training lesson and make suggested changes to both video and audio content to make it adaptable for interpretation by ASL (i.e., in addition to audio, in some instances, text, symbols and pictorial displays require ASL explanation or change). To make the conversion more efficient and accurate, Wal-Mart also provided IDRT with a written "script" of the Module. Using the "script," in conjunction with its view of the audiovisual play of the Module, IDRT would modify the "script" to reflect suggested changes and embed a code to reflect the point at which various video clips of signed ASL interpretations should be incorporated into the media display. The explanation, changes and audio test was translated into ASL, which, in turn, was "signed" by a certified ASL interpreter and filmed on digital video media. The "coding system" developed by IDRT provided the means by which "Cognitive Arts" could determine exactly where on the audiovisual media, the ASL interpretation was to be imbedded. (Note: there was to be considerable coordinating effort between the three participants to insure the ASL translations would effectively and accurately communicate the Training Module to a deaf employee.)

It took about two weeks for the "Hazardous Communication" Module to be converted by IDRT and encoded in digital format by Cognitive Arts. It was completed

in/about 11/13/2001 and it was shown by Wal-Mart to the EEOC for its approval. The EEOC approved the conversion of Training Modules by this process and based on Wal-Mart's completing the conversion of all its Training Modules in this way, these parties began discussing a resolution of the EEOC Complaint by Consent Order.

The EEOC and Wal-Mart negotiations also involved concerns about deadlines or time requirements for Wal-Mart to complete the conversion process for all of its Training Modules. In turn, Wal-Mart developed a Timeline to reflect time restrictions to meet the EEOC requirements for converting all of its Training Modules. That Timeline changed, from time to time, as the EEOC/Wal-Mart negotiations continued. The Master ASL Timeline became the controlling document and imposed time requirements to effectuate the conversion process so as to comply with the Consent Order in the Arizona case. Ultimately, the Master ASL Timeline was attached to and made part of Wal-Mart and IDRT's Development Agreement, which is attached to the Complaint as Exhibit No. 2.

While still negotiating to reach the final terms of a "Consent Order" (primarily as to the time in which to complete the conversion) in December 2001, Wal-Mart requested IDRT to undertake the development of all of its Training Modules. While the final time requirements with the EEOC were not concluded, Wal-Mart had agreed to begin the process immediately. Upon Wal-Mart's request, IDRT advised that fully committed, its staff could convert seven Training Modules a week. Wal-Mart initially agreed with the EEOC and IDRT to have seven Training Modules converted per week.

In/about 12/15/02, Wal-Mart requested IDRT to undertake the project immediately, with the understanding that the parties subsequently would prepare and

execute a Contract to fully describe the terms and conditions of the undertaking. IDRT agreed. The demonstration Module ("Hazardous Communications") was developed for a flat Contract Price of $6,000. The amount of time and effort to develop each Training Module varied, depending upon the amount of interpretation required; that variation was roughly dependant on the number of separate "Screens" of text and audio in each Module that required interpretation. Because of the sizeable task, speed and time requirements with which it needed to be completed, IDRT also requested and Wal-Mart agreed to advance $50,000. With these understandings, in December 2001, Wal-Mart began forwarding to IDRT various Training Modules to be developed in accordance with the method and means established by the development of the "Hazardous Communication" Module.

The project continued in December 2001, and in the months of January and February 2002 and into March 2002, without a written agreement establishing the exact terms of payment. Between December 2001 and March 2002 draft contracts were submitted and negotiations continued on the terms and conditions of the Development Agreement. The parties settled on a method of compensation that would result in IDRT being paid for each Module in accordance with the payment of $266.50 for each Screen of visual/audio text on each respective Training Module. But, because of its substantial dedication of time and resources to the project, IDRT wanted assurance of a minimum obligation on the part of Wal-Mart. In the latter part of March 2002, the parties reached a compromise agreement as to the scope and terms of the project. That compromise is incorporated in the Development Agreement (attached as Exhibit 2 to the Complaint).

Generally described, the project was divided into four Phases. Thirty days before the end of each Phase, Wal-Mart could opt out of the contract. For each Phase, Wal-Mart would be responsible for submitting a minimum number of Modules for development and if it did not meet the minimum number of Modules per Phase, at the end of the Contract, it would be responsible for the payment of the difference between a "Phase Contract Price" and the "per-Screen" development price for the Modules submitted in the respective Phase. Timely, before the end of Phase II, Wal-Mart opted out of the Development Agreement. Nevertheless, development for Modules already submitted, continued.

On or about January 23, 2003, IDRT submitted what it termed a "Final Invoice" for $152,446.57 to Wal-Mart. The amount included what IDRT contended was due for payment of development work during the Phases and additional development work after Phase II. This document was prepared by IDRT's Maryland counsel, Harvey Greenberg, Esquire. After Wal-Mart questioned various items on the first "Final Invoice," Mr. Greenberg prepared a "Revised Final Invoice," in the amount of $174,299.57, which IDRT submitted to Wal-Mart on February 26, 2003. Wal-Mart did not pay this invoice, which forms the basis of IDRT's Complaint.

### EXHIBIT B TO PRE-TRIAL ORDER

### CONTESTED ISSUES OF FACT AND LAW

### 1.    Facts - IDRT

When the project was first represented to IDRT, Wal-Mart represented that it had 300 Training Modules and it wanted IDRT to review, analyze and interpret each of them according to the methodology used to analyze and interpret the Training Module called "Hazardous Communications," which was developed by IDRT in November 2001 in a Development Project with Cognitive Arts (on behalf of Wal-Mart).  Wal-Mart represented to IDRT that pursuant to its settlement of its case with the EEOC, Wal-Mart was under strict time requirements to convert all of its Training Modules using the development techniques and methods represented by the conversion "Hazardous Communication." Wal-Mart physically counted the Screens in its Modules, and informed IDRT that the average Screen-count was fifty per Module.  The parties preliminarily agreed that for each Training Module, Wal-Mart would pay IDRT $266.50 for each Screen developed and the Contract Price for developing all 300 Modules would be $3,997,500.00.  Wal-Mart requested IDRT to undertake the development project in December, 2001, under these general representations and with assurance IDRT would be paid for its development work in an amount that would be equal to $266.50 for each screen of each Training Module developed by IDRT.  IDRT agreed and on or about December 15, 2001 began the project without a written contract setting out all the terms of the development project.  Wal-Mart represented that EEOC had allotted Wal-Mart 60.5 weeks to complete the conversion of the three hundred ASL Modules.  With that time frame in mind and the total number of Modules to be converted, in conjunction with the IDRT's staffing and resources to be employed for the project, the parties agreed on a time schedule in which, at specific intervals, a designated number of

1

Modules would be submitted to IDRT for development. Initially, it was agreed that 15 Training

Modules would be submitted for 'development,' on or about December 15, 2001; then,

beginning February 7, 2002 and every 7 days thereafter, an additional 7 Training Modules for

development would be submitted, until completion of all three hundred modules. These weekly

intervals and number of Training Modules were selected to comply both with IDRT's projected

available staff and resources to develop Training Modules and the times allotted by the EEOC.

Wal-Mart instructed IDRT to prepare a Development Agreement reiterating the terms and

conditions of the undertaking and to submit it to Wal-Mart. Based upon these representations

and understandings, IDRT prepared and submitted on or about January 10, 2002, a Development

Agreement to Wal-Mart (hereinafter, "1/10/02 Agreement"). It provided for Module

development and payment in accordance with the representations stated herein. It also included

a *minimum contract price* for the unitary project of 3,997,500. The 1/10/02 Agreement will be

offered as an Exhibit in Plaintiff's case-in-chief.

Between January 10, 2002 and February 18, 2002 there was contact between parties with

respect to the 1/10/02 Agreement. After its December 15, 2001 representations of the scope of

the undertaking to be included in the Development Agreement, Wal-Mart decided, instead of a

unitary contract for development of all of its Training Modules, it wished to have the contract

and development project broken into "Phases." By this time, Wal-Mart had developed a "Master

ASL Timeline" to reflect, by date, the number of weeks in the project and the flow of module

development for each week. Wal-Mart submitted a copy of "Master ASL Timeline" ("Master

Timeline" or "Timeline") to IDRT as the document that would control the dates and number of

Training Modules to be submitted to IDRT for development. By dated week, the Timeline

provided for submission of the Training Modules in periodic intervals. With adjustments to

reflect the modules that had been submitted since the undertaking began on Week 1 (12/21/01) through January 11, 2002, the Timeline provided, by dated week, the same schedule of module submission that had been described in summary fashion in the 1/10/02 Agreement. The Master Timeline also broke down other undertakings involved in the development project by the parties involved, and it was agreed that the development project would be based on and proceed in accordance with the "Master ASL Timeline" and the agreement was modified, to so provide. Wal-Mart requested that there be 5 separate contract Phases in which the 300 Modules would be developed, and designated the number of Modules to be submitted in each Phase in accordance with the Timeline. There were 309 Modules on this Timeline. The five Phases and the number of Modules to be submitted in each Phase were included in the next version of the contract (hereinafter, the "2/18/02 Agreement"). Each subsequent Phase was to begin automatically after the preceding Phase ended unless, either party (although Wal-Mart was the one requesting it) opted-out of the next Phase, thirty days before the end of the respective Phase in progress. Paragraphs 20, 21, 23 25(A)(1), 25(F)(3) and (4) of the 2/18/02 Agreement expressly incorporate the Timeline by reference.

Because of the opt-out provision that could be requested at the end of each "Phase," IDRT proposed that there be a *minimum contract price* for each Phase. The minimum contract price for each Phase was based on the number of designated Modules to be submitted in each Phase, times the stated average of fifty screens per Module, times the development price of $266.50 per screen. At the end of a respective phase, Wal-Mart would be billed the difference between the aggregate number of screens billed during the Phase and the designated *minimum contract price* of each Phase. Each Phase was determined by the Timeline's designation of the number of Modules to be submitted in the designated weeks on the Timeline. Accordingly,

Phase I began with the first group of 3 Modules submitted in the first designated week of 12/21/01 and ended when the 90th modules was to be submitted in accordance with the Timeline – March 22, 2002. Phase II was to begin immediately after Phase I concluded, and Phase II ended when the 60th Module in Phase II was to be submitted in accordance with the Timeline. Each week began on a Friday, and on Friday, March 22, 2002, cumulatively the 90th Module was to have been submitted. (Cumulatively, the Timeline provided that 91 Modules were to have been submitted by March 22, 2002.) The 2/18/02 Agreement was submitted to Wal-Mart on or about February 18, 2002. That Agreement will be offered as an Exhibit in Plaintiff's case-in-chief.

A month later, on or about March 19, 2002, Wal-Mart returned the 2/18/02 Agreement with proposed changes. One of those changes involved the number of Phases. Wal-Mart now proposed four Phases instead of five Phases; and reduced the total number of Modules from 300 to 260 Modules, broken down over four Phases. The designated number of Modules to be submitted in Phases I through III did not change; the designated number of Modules in Phase IV became sixty. Wal-Mart also proposed to delete in its entirety the section including the *minimum contract price* for each Phase. Wal-Mart also provided an updated version of its Master Timeline to be included as part of the contract. It contained the same dates, number of weeks, and number of Modules per week for Phase I, as in the Timeline of 2/18/02 Agreement. For Phases II, III and IV, the same dates and number of weeks were designated as in the Timeline of the 2/18/02 Agreement, but the number of Modules per week was changed to conform to the aggregate Module count of 60, 50 and 60 Modules, respectively, in Phases II through IV. The termination dates of the Phase II, III and Phase IV, were respectively, 5/31/02, 8/9/02 and 11/1/02.

After discussion, a third revision of the Development Agreement was prepared and submitted to Wal-Mart on or about March 21, 2002. It contained provisions that reflected negotiations between the parties. There were still four separate Phases in the contract with an opt-out provision for each Phase. There was still the same designated number of Modules to be submitted in each Phase "in accordance to the Master Timeline." However, in place of the *minimum contract price*, the parties agreed to a "**Phase Contract Price**." This was set out in the third revised agreement (hereinafter, "3/21/02 Agreement"). As before, a designated number of Modules were to be submitted in each Phase "in accordance with the Master Timeline." If not, Wal-Mart agreed to pay the difference between the Module billing in the respective Phase and the "Phase Contract Price." IDRT intends to submit a copy of the "3/21/02 Agreement" as an exhibit in its case-in-chief. The essential difference between *Minimum Contract Price* and **Phase Contract Price** was this. Even if the aggregate screen billing in a respective Phase was less than the Phase Contract Price, no additional billing was due, as long as Wal-Mart submitted at least the designated number of Modules per Phase in accordance with the Timeline.

The 3/21/02 Agreement, as modified and compromised, became the final Development Agreement which was signed by IDRT on March 24, 2002 and by Wal-Mart on March 28, 2002. The final Development Agreement had attached to it the same Timeline attached to the 3/21/02 Agreement and the same provisions with respect to "**Phase Contract Price**," designation of Modules per Phase and designation of each Phase by the number of modules to be submitted to IDRT "in accordance to the Master ASL Timeline." Similarly, the final Development Agreement contained the same references to and requirements of adherence for the Timeline in paragraphs 20, 21, 23, 25(A)(1), 25(F)(4) and (5) as the 3/21/02 Agreement. (Note: paragraph 25(F)(4) and (5) were the same as paragraphs 25(F)(3) and (4) in the 3/21/02 Agreement).

Wal-Mart opted-out of the contract, timely, before the end of Phase II. Nevertheless, IDRT continued to work on Module development and performed additional work, as requested by Wal-Mart. Invoices were still being sent to Wal-Mart for payment and payments were still being made on work done on the Modules developed during the Phases, as well as additional work done at the request of Wal-Mart after the end of Phase Two. In or about January of 2003, IDRT reviewed all of its invoice records and receipts and made a final invoice billing to Wal-Mart on January 23, 2003. Wal-Mart responded to the final invoice. It lodged an affirmative response. It attached a portion of a "spreadsheet" that identified 3 Modules which Wal-Mart asserted "were not listed on your list but they should be included." IDRT reviewed additional records and the records previously reviewed and submitted the revised final invoice to Wal-Mart, the invoice at issue in this case.

The contested factual issues are these:

(1)      Wal-Mart submits that each Phase was based only on a number count of Modules, irrespective of Module submission in accordance with the dates in the Master Timeline. By Wal-Mart's definition of only number-count driven Phases, Phase I ended when the 90th Module was submitted, not on the date designated in the Timeline for submission of the 90th Module (i.e. 3/22/02). That construction of the term phase makes the section on Phase Contract Price meaningless.

IDRT contends that each Phase was determined in accordance with the submission requirements and dates in the Timeline. IDRT's Revised Final Invoice billing was based on 93 Modules submitted in Phase I and 51 in Phase II; thus, generating a calculation of the Phase II Contract Price; and a balance due. Specifically, based on its Revised Final Invoice, the remaining amount due for Phase II was $204,916.49; and the remaining balance due for Phase I

was $18,145.58. With additional add-on miscellaneous work, the grand total of the revised final invoice was $224,299.57, less a $50,000 credit for the initial payment, yielding a total on which the suit was based, namely, $174,299.57. Wal-Mart claims it does not owe the Phase Contract Price billing for Phase Two because, it contends, it complied with the designated number of Modules to be submitted in Phase II (i.e. 60). It asserts that since Phase I ended simply with the submission of 90 Modules, it is only relevant to count the number of additional Modules submitted thereafter for development. It asserts that it submitted 60 or more Modules, subsequent to Phase I; thus, it is not obligated to pay the Phase Contract Price calculation for Phase II. Accordingly, the primary issue contested in this case is a determination of the contract terms with respect to the "Phase" and when each was to begin and end.

(2)     Also in dispute are specific fact issues with respect to "Module Counting" and date of Module submission.

Wal-Mart claims that the Training Module called "Hazardous Communications", developed in November 2001 by IDRT under the contract with Cognitive Arts for the demonstration project, should be counted as a "Module" submitted for development under the terms of the Development Agreement. IDRT did not develop Hazardous Communications during the Development Agreement because it had been previously developed in the Demonstration Contract and accordingly, it was not developed as part of the Modules submitted for development under the development agreement. Wal-Mart insists that it should be counted toward the number of Modules to be counted in the Development Agreement.

During the development project, IDRT received supplemental material which was identified as Leadership Lesson batches. It developed these supplemental materials based on an agreement with Wal-Mart, to bill them as one Module respectively for each of the three batches

7

of supplemental material. They were billed and paid that way. The actual "Leadership Lesson" Training Modules which these materials supplemented, were never submitted to IDRT for development. There were supposed to have been fifteen separate "Leadership Lessons Training Modules submitted for development. Instead, the three batches of supplemental material were submitted. Since this suit was file, Wal-Mart contends that the supplemental material should be counted as fifteen separate Training Modules for development, even though they were supplemental materials and not the Modules themselves.

Wal-Mart claims that it should be credited for one additional Module which IDRT showed on its interim invoices as "Firearms basics". Wal-Mart's Training Modules for the "Firearms Training" was submitted on two discs. One disc consisted of test questions and answers; and the second consisted of a short "content" or lecture. Of the questions and answers and lecture submitted, 38 screens applied in common to each state; but there were separate specific questions designated for each of the 13 states included (between 3-8). The playing of a Training Module in any one of the 13 states would comprise the lecture 38 common questions and the particular screens for each state. After consulting with Wal-Mart as to billing for Module purposes and count, it was agreed the 38 common screens would be billed 1-time; so there would be no repeat billing for the 38 screens common to each of the 13 states for which the Training Modules were developed; and the two CDs would be counted as 13 modules (one per state). Since the filing of the suit, Wal-Mart contends the 38 common screen billing means it should be counted as a separate "Training Module." IDRT contends that it is fallacious.

Finally, there is a factual dispute the timing of the receipt of the Training Modules identified as Tabs 12, 13, 14, and 15. These Training Modules were received by IDRT after the date on the Timeline closing out Phase II; i.e. May 31, 2002. Wal-Mart contends that these four

Modules were "submitted on May 31, 2002 and should have been counted as part of Phase II. IDRT received the CD's comprising these Modules on June 1, 2002, after the May 31, 2002 operate date.

### 2.    Facts – Wal-Mart (Counterclaim)

Wal-Mart's counterclaim is for the balance of a $50,000.00 payment (for which IDRT concedes that Wal-Mart is entitled to credit) over the miscellaneous sums that the Court may find should be credited to IDRT for its invoice Billing:

Until submission of its Revised Final Invoice, IDRT had neglected to invoice Wal-Mart for two modules, "Labor Relations #6" ($7,995.002) and "Advanced Photo Systems" ($13,145.58).  Wal-Mart agrees that IDRT is entitled to credit for its work on them.  Wal-Mart also agrees to pay a $200.00 "correcting balance" on "Invoice No. 24."  On the other hand, IDRT notes that Wal-Mart is entitled to credit for $10,393.50 related to Wal-Mart's payment of incorrectly high charges on IDRT "Invoice No. 2."

Wal-Mart further believes that IDRT is entitled to part of a claimed $10,406.57 in interest for late payment on certain interim invoices.  However, the parties' records of when payment was made differ.  The parties hope to resolve this issue before trial.  Assuming that plaintiff is entitled to the full amount of interest claimed then the total miscellaneous credits owed to plaintiff would be as follows:

| | |
|---|---|
| Labor Relations #6 | $  7,995.00 |
| Advanced Photo Systems | 13,145.58 |
| Correction to Invoice No. 24 | 200.00 |
| Interest | 10,406.57 |
| Subtotal | $31,747.15 |

|  |  |
|---|---|
| Less Correction to Invoice 2 | -10,393.50 |
| Total | $21,353.65 |

Subtracting that sum from Wal-Mart's $50,000 payment would yield a balance of $28,646.35 owed by plaintiff to Wal-Mart:

|  |  |
|---|---|
|  | $50,000.00 |
|  | -21,353.65 |
| Balance owed by IDRT to Wal-Mart | $28,646.35 |

### 3.    Primary Legal Issue

In interpreting contract provisions, the first determination is whether the contractual language at issue is ambiguous. *True North Communications, Inc. v. Publicis S.A.*, 711 A.2d 34, 38 (Del. Ch. 1997). A contract claim is not ambiguous simply because the parties disagree as to its meaning; it is ambiguous when the relevant provisions are reasonably or fairly susceptible of different interpretations or they have two or more meanings. *E.I. du Pont de Nemours & Company v. Allstate Ins. Company*, 693 A.2d 1059, 1061 (Del. 1997); *see also Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996). A true test for ambiguity of a contract is not what the parties intended the contract to mean, but what a reasonable person in the position of the parties would have thought it meant (i.e., the objective rule). *Rhone-Poulenc Basic Chemicals Company v. American Motorists Ins. Company*, 616 A.2d 1192, 1195 (Del. 1992); *see also MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 210 (3rd Cir. 2005) (applying Delaware law in the same way for "disclaimers of fraud" in insurance policies). In absence of ambiguity, there is no room for construction of an agreement or for the interpretation or search for the intent of the parties. *See, e.g., Nepa v. Marta*, 415 A.2d 470, 473 (Del. 1980); *Myers v. Myers*, 408

A.2d 279, 280 (Del. 1979).  In certain cases in order to determine whether ambiguities exist, a preliminary assessment of the extrinsic evidence may be necessary.  *See Demetree v. Commonwealth Trust Company,* C.A. No. 14354, 1996 WL 494910, at * 4 n.8 (Del. Ch. Aug. 27, 1996) (attached hereto).

Not Reported in A.2d                                                    Page    1
Not Reported in A.2d, 1996 WL 494910 (Del.Ch.)
(Cite as: Not Reported in A.2d)
C

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle
County.
William C. DEMETREE and Jack C. Demetree,
Plaintiffs,
v.
COMMONWEALTH TRUST CO., Trustee of
Trust 896 U/A dated November 29, 1962,
Defendant.
Civil Action No. 14354.

Submitted: Aug. 13, 1996.
Decided: Aug. 27, 1996.

Richard A. Levine, Richard H. Morse, and Janet Z.
Charlton, of Young, Conaway, Stargatt & Taylor,
Wilmington, for Plaintiffs.
Richard P. Beck, and Barbara MacDonald, of
Morris, James, Hitchens & Williams, Wilmington,
for Defendant.

MEMORANDUM OPINION
ALLEN, Chancellor.
*1 Pending are cross-motions for summary
judgment in this action for specific performance of a
contract. The determination of these motions
requires an interpretation of two contracts executed
contemporaneously on July 22, 1966. Summary
judgment has been requested on the basis of those
contracts and other documents executed by and
between the parties, as well as affidavits and
deposition testimony.

The first contract ("Sublease"), entered into between
plaintiffs, William C. Demetree and Jack C.
Demetree ("Demetrees"), and Horne's Enterprises,
Inc. ("Horne's"), granted the Demetrees a Sublease
for a portion of a parcel of land leased by Horne's
from defendant, Commonwealth Trust Co.
("Commonwealth"), in a prior contract ("Prime
Lease"). The Prime Lease provided for an initial
term of fifteen years and granted Horne's an option
to renew for four additional successive ten year
periods. As contemplated under the Prime Lease,
the subsequent Sublease required the Demetrees to
construct a motel on the premises and granted a
conditional option to renew the Sublease in the event
that the Prime Lease had been renewed as well.

The second contract ("Triparty Agreement"),
executed contemporaneously by the Demetrees,
Horne's, and Commonwealth, both extended the
initial termination date of the Prime Lease from
1981 to 1985, and granted the Demetrees a
conditional right to enter into a direct lease with
Commonwealth if the Prime Lease were terminated
by Horne's "prior to the expiration of the four
renewal periods" provided for in the Prime Lease.
An interpretation of this right to enter into a new
direct lease "on the same terms, provisions, and
conditions" *as the Sublease* is the subject of this
dispute.

In 1985 the original term of the Prime Lease expired
and the Prime Lease was extended until 1995. In
1990 Horne's sought protection of the bankruptcy
court and in that connection entered into a release
with Commonwealth in which it waived its right to
extend the Prime Lease. The Demetrees did not
learn of this at the time; they continued to occupy
the premises pursuant to their Sublease. On May
18, 1995, the Demetrees received notice that both
the Prime Lease and Sublease would terminate on
December 31, 1995. Commonwealth informed the
Demetrees that, in its view, the Demetrees had no
right to renew the Sublease or require
Commonwealth to enter into a new direct contract.

The Demetrees disagree and here seek specific
performance compelling Commonwealth to enter
into a new lease term which the Demetrees contend
is required by the Triparty Agreement. According
to the Demetrees' interpretation of the Triparty
Agreement, Commonwealth is contractually
obligated to enter into a direct lease for a term
ending December 31, 2005, with an option to renew
for two additional ten year terms.

For the following reasons, I conclude that the
Triparty Agreement did not create a legal obligation
for Commonwealth to enter into the demanded new
direct lease. The Triparty Agreement, however,
obligates Commonwealth to enter into a direct lease
with the Demetrees for a single seventeen year term,
without an option to renew, as provided by the
terms of the Sublease. FN1 The Demetrees' motion
for summary judgment should be granted as a matter
of law pursuant to Court of Chancery Rule 56 since
there is no dispute as to the material facts set forth

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d

Page  2

**(Cite as: Not Reported in A.2d)**

below.  *See Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979).  Commonwealth's motion for summary judgment is denied because the Demetrees are entitled to the above stated specific performance.

FN1.  Although neither of the parties argued that the contracts entitle the Demetrees to a direct lease with a seventeen year non-renewal term, as will be discussed below, this is the most objectively reasonable construction of the literal meaning of the contractual language used by the parties.

## I. FACTS

### 1. THE PRIME LEASE

**\*2**  On September 3, 1963, Commonwealth, a Delaware corporation and trustee of Trust 896, leased then undeveloped trust property along Route 896, in Newark, Delaware, to Horne's to be used as the site of a motel and restaurant.  The Prime Lease provided for an initial term of fifteen years, commencing January 1, 1964, and an option to renew for four successive ten year terms under the same terms and conditions.

### 2. THE SUBLEASE

On July 22, 1966, with Commonwealth's consent, Horne's subleased a portion of the property to the Demetrees for an initial seventeen year term, ending December 31, 1985, on the condition that Demetree construct and operate a Horne's Franchise Motor Lodge on the subleased premises. FN2    The Sublease granted the Demetrees a right to renew the Sublease upon the same terms and conditions only if the Prime Lease was renewed for such period. Under the Sublease, Horne's was under no legal obligation to renew the Prime Lease.   Section 18 of the Sublease stated that:

FN2.  Construction of the motel was to be completed within eighteen months.     At the time of this contract, the Demetrees planned to sub-sublease the property to Scott-Douglas Corporation to operate the motel once it was constructed.

in the event that Lessor fails to renew the prime lease beyond its initial term or any renewal term ... [the] Sublease shall terminate at the end of the then existing term, notwithstanding the fact that Lessee may have prior to receipt of this notice indicated its

desire to exercise the renewal option.
The Sublease specified rents payable for the initial period and four renewal periods.

### 3. THE TRIPARTY AGREEMENT

Contemporaneously,    on   July   22,   1966, Commonwealth, Horne's, and the Demetrees entered into the Triparty Agreement. FN3    The Triparty Agreement extended the initial term of the Prime Lease to twenty-two years so that it would end on the same day as the Sublease, December 31, 1985, unless renewed.    In addition, paragraphs 4 and 5 of the Triparty Agreement granted the Demetrees a right to enter into a direct lease with Commonwealth if the Prime Lease were terminated under specified circumstances.

FN3.  Benjamin Vinton, Jr., Commonwealth's president at the time of the Triparty Agreement, signed the contract on behalf of Commonwealth, but it appears from his January 3, 1996 deposition testimony that he was not involved in the negotiations or drafting of the clause at issue.

Paragraph 4 of the Triparty Agreement provided that Commonwealth would notify the Demetrees of "any default or breach" by Horne's.   In the event of such a default or breach, the Demetrees would be entitled either to cure such default or breach to avoid termination of the Prime Lease by Commonwealth or enter into a new direct lease with Commonwealth on specified terms.     Paragraph 4 stated that "in event said Prime Lease is terminated for any reason" the Demetrees have the right to:
execute *a new lease with Lessor on the same terms, provisions and conditions as set forth in said sublease* except that all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable, and except that the terms of paragraph 3(a) of [the Triparty Agreement] shall be incorporated in any new lease.  (italics added)

Paragraph 5 provided that "in the event Lessee [Horne's] shall terminate said prime lease prior to the expiration of the four renewal periods," the Demetrees have a right to:**\*3** execute *a new lease with Lessor on the same terms, provisions and conditions as set forth in said sublease,* except that all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

Motor Lodge' shall not be applicable. FN4 (italics added)

FN4. According to Jack Demetree's Affidavit, when he signed the Triparty Agreement he understood this paragraph to gave the Demetrees a "right to lease the property through 2025, whether or not Horne's continued to lease the property from Commonwealth."

Paragraph 3(a) of the Triparty Agreement, referred to above, stipulated conditions concerning the execution of a mortgage on the subleased premises. Among other things, the Demetrees agreed that any mortgage on the premises would have a final maturity date not exceeding December 31, 1985, the termination date for the initial term of the Sublease. On October 11, 1966, Chase Manhattan Bank extended a $500,000 loan to the Demetrees to construct the motel on the premises. FN5 In addition to the $500,000 loan, the Demetrees invested approximately $275,000 for the construction of the motel.

FN5. The loan had an "interest only" clause applicable to the eighteen month motel construction period, to be followed by a fifteen year term to pay down the principal and interest together. The Triparty Agreement extended the initial term of the Prime Lease, preventing it from expiring during the term of the Demetrees' construction loan. After such extension, the loan would be paid off approximately three years before the end of the initial term of the Prime Lease and Sublease.
An assignment of the sub-sublease agreement with Scott-Douglas Corporation, dated July 29, 1966, was accepted as collateral to secure such loan. After Scott-Douglas defaulted in 1969, the Demetrees entered into a new sub-sublease agreement with Albright and Chason Motels of Delaware, Inc., with an initial term of five years and options for renewal terms expiring December 31, 1985.

### 4. SUBSEQUENT EVENTS

On March 25, 1977, Horne's assigned its interest in the Prime Lease and Sublease to Wayanne, Inc., ("Wayanne"), a Delaware corporation. Wayanne subsequently exercised its option to renew the Prime Lease for an additional ten year term, and the Demetrees did the same, extending the termination

date of both the Prime Lease and Sublease to December 31, 1995.

On March 10, 1990, Wayanne and Commonwealth entered into an agreement of "Release, Accord and Satisfaction" to resolve issues in connection with Wayanne's alleged default under the Prime Lease. The agreement released both parties from potential claims arising out of the Prime Lease and included a statement by Wayanne that it would not exercise the renewal option for a second ten year term, which would cause the Prime Lease to expire on December 31, 1995. The Demetrees were not informed about this agreement until May 18, 1995. FN6 During this time period, there were other communications between the parties concerning the property. FN7

FN6. Commonwealth's attorney asked Wayanne's attorney to "maintain confidentiality" concerning the agreement, despite Demetree's right to receive notice of termination of the Prime Lease. According to Commonwealth, confidentiality concerning the agreement was required due to ongoing litigation to quiet title on the property. Title was cleared March 2, 1994. *Commonwealth Trust Co. v. Ferry,* C.A. No. 12714 (Del.Ch. Mar. 2, 1994) (Judgment Order).

FN7. In 1991, the Demetrees discussed the property with Vinton during a telephone conversation. According to them, Vinton suggested joint redevelopment of the property since they would be "in it for a long time." Vinton denies ever having made that statement. As will become clear, however, neither this factual dispute nor the notice issue is relevant to the determination of this contract construction action.

In June 1992, the Demetrees executed an Agreement of Non-Disturbance and Entitlement with a subtenant Marinor Corp., Marinor's subtenant, MSL Motel Corporation, and Commonwealth. The agreement provided that if the Demetrees' Sublease were terminated by Commonwealth or the Demetrees or should "expire prior to December 31, 2025," for reasons other than MSL's default, then Commonwealth and the Demetrees agreed MSL's possession, use and enjoyment would not be disturbed.

On May 18, 1995, Commonwealth gave the Demetrees notice for the first time that the Prime

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Lease and Sublease would expire on December 31, 1995.    Subsequent to receiving this notice, the Demetrees initiated this action requesting specific performance of paragraph 5 of the Triparty Agreement, construed by the Demetrees to provide a right to enter into a new lease directly with Commonwealth.

## II. RULES OF CONTRACT CONSTRUCTION

The primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract.    *See* CORBIN ON CONTRACTS § 1 (1960);    *Bell Atlantic Meridian Systems v. Octel Communications Corp.,* C.A. No. 14348 (Del.Ch. Nov. 28, 1995), Mem.Op. at 12.    This process often requires courts to engage in an analysis of the intent or shared understanding of the parties at that time.    *See* WILLISTON ON CONTRACTS § 601 (1961); RESTATEMENT (SECOND) OF CONTRACTS § 201 cmt. c (1981);    *Burge v. Fidelity Bond & Mortgage Co.,* 648 A.2d 414, 420 (Del.1994); *Klair v. Reese,* 531 A.2d 219, 223 (Del.1987).

**\*4** Under the plain meaning rule of contract construction, if a contract is clear on its face, the Court should rely solely on the clear, literal meaning of the words.    *See Myers v. Myers,* 408 A.2d 279, 281 (Del.1979).    Where parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party.    *See City Investing Co. v. Continental Cas. Co.,* 624 A.2d 1191, 1198 (Del.1993);    *US West, Inc. v. Time Warner Inc.,* C.A. No. 14555 (Del.Ch. May 6, 1996), Mem.Op. at 21.    An inquiry into the subjective unexpressed intent or understanding of the individual parties is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning.    *See Bell Atlantic,* Mem.Op. at 13, n. 4.

In cases where the language of a contract is clear and unambiguous, this Court may not consider parol evidence to interpret the intent of the parties.    FN8 *Citadel Holding Corp. v. Roven,* 603 A.2d 818, 822 (Del.1992);    *Pellaton v. Bank of New York,* 592 A.2d 473, 478 (Del.1991).    Deviation from this rule is only required where a literal reading of a contractual provision would be "clearly

unreasonable and yield an arbitrary result."    *Citadel Holding,* 603 A.2d at 822.    The parol evidence rule is based on the principle that the clear meaning of the language of a written agreement most accurately reflects the understanding of the parties at the time, of their contract;    extrinsic evidence reflecting a different potential meaning should not be considered.    *See Mesa Partners v. Phillips Petroleum Co.,* 488 A.2d 107, 113 (Del.Ch.1984). The theoretical underpinnings of the parol evidence rule are particularly applicable in cases such as this one where a very long period has passed since the execution of the contract, making oral testimony concerning expectations of the parties at the time potentially less reliable.    *See* 32A C.J.S., EVIDENCE § 851, p. 216 (1964) (the parol evidence rule is founded on the maxim that "written evidence is so much more certain and accurate than that which rests in fleeting memory only, that it would be unsafe, when parties have expressed the terms of their contract in writing, to permit weaker evidence to control").

FN8. A preliminary assessment of extrinsic evidence may be necessary in certain cases in order to determine whether any ambiguities exist.    *See US West* at n. 10;    *Bell Atlantic* at n. 5;    Williston On Contracts § 601 (1961).

Of course, if there is uncertainty concerning the meaning of contractual language, the Court should consider the context and circumstances in which the words were used in order to determine the intended meaning.    *Klair,* 531 A.2d at 223. FN9 When faced with contract language reasonably susceptible to two possible constructions, this Court has long followed the principle that the:

FN9. Relevant extrinsic evidence could include statements made during negotiations of the contract, prior dealing evidence, or relevant trade or industry practices.    In this action, the depositions and affidavits presented to this Court did not contain any statements made at the time of negotiations. Instead, the submitted evidence merely contained recent testimony concerning memories of what the subjective expectations of the parties were at the time the contract was executed in 1966.    Even if extrinsic evidence were considered in this action, these statements would not aid the Court in construing a reasonable objective meaning of the contract.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair, or improbable contract.

**\*5** *Holland v. National Automotive Fibres,* 194 A. 123, 127 (Del.Ch.1937).   As will be discussed below, however, this is not such a case because the Triparty Agreement is capable of a literal and sensible interpretation, even if there remains doubt that it is an interpretation that the parties subjectively shared.   That interpretation, which is well within the bounds of a commercially reasonable agreement, should be enforced.

### III. PLAIN MEANING ANALYSIS

The Triparty Agreement can be read in conjunction with the Sublease to have one clear, unambiguous meaning.   Consequently, none of the extrinsic evidence offered by the parties need be analyzed to interpret the contracts.   Since Wayanne terminated the Prime Lease as of December 31, 1995, instead of extending the Prime Lease by exercising its option to renew, paragraph 5 is the principal relevant provision of the Triparty Agreement.   As stated above, paragraph 5 of the Triparty Agreement provided that "in the event Lessee [Horne's] shall terminate said prime lease prior to the expiration of the four renewal periods," the Demetrees would have a right to:
execute a new lease with Lessor on the *same terms, provisions and conditions as set forth in said sublease,* except that all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable. (italics added)

As the prime lessee did, by its waiver, terminate its rights under the prime lease "prior to the expiration of the four renewal periods," the literal command of Section 5 is that by reason of that fact, the Demetrees have a right "to execute a new lease with lessor."   What are the terms of the new lease to which they are entitled?   They are, again literally, "the same terms, provisions and conditions as set forth in said Sublease."   As to term, the Sublease referred to *seventeen* "remaining years" of rental payments under the Sublease.   In light of that fact and the fact that the Sublease did not contain any

other provisions that could be construed as providing the Demetrees an independent right to renew the lease, it is not possible to conclude that the Demetrees have a right to a new lease with renewal rights.   The plain meaning of the Sublease was that it would terminate at the end of the seventeen year term unless the Prime Lease had been renewed.       Thus, paragraph 5 provided the Demetrees in the event that Horne's lease terminated at any time prior to expiration of the four renewal period with a right to enter into a direct lease with Commonwealth for a non-renewable seventeen year lease term. FN10   If the parties had wanted the Demetrees to have the alleged renewal option, it could have been easily written into the contract. FN11

FN10. Paragraph 4 granted the Demetrees a similar right to enter into a direct lease with Commonwealth in the event that Commonwealth, not Wayanne, terminated the Prime Lease prematurely due to default, breach, or any other reason.   This construction of the two paragraphs does not cause them to be redundant, as argued by the Demetrees, because they are applicable under different circumstances.

FN11. Paragraph 5 only refers to the four renewal periods in the context of when the Prime Lease might be terminated by the prime lessee.   This provision recognizes that the Prime Lease had an option to renew.   Paragraph 5, however, does not create a right to enter into a direct lease with a right to renew.   The Demetrees have a right to a direct lease on the same terms as the Sublease, not the Prime Lease.

In resisting any claimed right to a further lease under paragraph 5, Commonwealth asserts that paragraph 18 of the Sublease specifically precludes such a right.   Section 18 provided that:
in the event that Lessor fails to renew the prime lease beyond its initial term or any renewal term … *[the] Sublease shall terminate at the end of the then existing term,* notwithstanding the fact that Lessee may have prior to receipt of this notice indicated its desire to exercise the renewal option. (italics added)

**\*6** This argument is not sound however.   The right created by paragraph 5 of the Triparty Agreement is a right to a new lease on terms of the Sublease. That new lease itself will contain a provision in the



Not Reported in A.2d                                              Page    6
**(Cite as: Not Reported in A.2d)**

form of Section 18.  (That such a provision will be surplusage at this stage creates no legal difficulty). But as the right to the new lease does not arise out of the Sublease, the provision of the Sublease that terminates it is not fatal to the right to get a new lease on the terms reflected in paragraph 5.

An option to renew for forty years is a material term that reasonable people would spell out clearly in such an agreement if it were an intended, agreed upon term. FN12  It would be inappropriate for this Court to read in such a term to this contract which can be interpreted in accord with its plain meaning. If the parties had intended to create such an option to renew, it would have been objectively unreasonable for paragraph 5 to state that the lease would be on the same terms as the Sublease which contains no such right.   Since paragraph 5 does not grant the Demetrees a right to enter into a direct lease with an option to renew for future terms, this Court will not create such a right.

FN12. Demetree cites *Wilgus v. Salt Pond Inv. Co.* for the proposition that a requirement that a contract be on the "same terms and conditions" requires only that it be upon "the same material terms and conditions."  498 A.2d 151, 159 (1985).    While this may be true, it does not help Demetree in this matter because the renewal option would appear to be a highly material term in this context.

Similarly, it would be incorrect for this Court to ignore the plain language of paragraph 5 affording the Demetrees a right to a direct lease on substantially the same terms as the Sublease in the event that the Prime Lease was terminated prior to the four renewal periods.   The material sections of the Sublease set out a seventeen year term lease with no option to renew.    This is exactly what the Demetrees are entitled to demand from Commonwealth at this time and Commonwealth is obligated to grant.    The public policy interest in commercial certainty will be best served by adhering to the plain meaning of the agreement entered into between the parties, even if the parties' differing subjective expectations at the time were different, as may have been true in this action.

### IV. CONCLUSION

The Demetrees are not entitled to their requested specific performance because there is no legal

obligation for Commonwealth to enter into a ten year direct lease with a right to renew for two successive ten year periods according to the plain meaning of the Triparty Agreement.    Nonetheless, the Triparty Agreement, read in conjunction with the Sublease, entitles the Demetrees to specific performance requiring Commonwealth to enter into a direct lease for a seventeen year term, with no renewal option.    Specific performance is appropriate in this type of action where a clear and definite agreement can be enforced without requiring the Court to supply essential additional or inconsistent contractual terms.   *MF v. F,* 172 A.2d 274, 176 (Del.Ch.1961).    Since there are no disputes as to material facts controlling the resolution of this action, the Demetrees are entitled to summary judgment as a matter of law and an order granting the above stated appropriate specific performance.

Del.Ch.,1996.
Demetree v. Commonwealth Trust Co.
Not Reported in A.2d, 1996 WL 494910 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



## EXHIBIT C TO THE PRETRIAL ORDER

The parties likely will stipulate as to the authenticity of the exhibits offered into evidence.

The parties reserve the right to, and will, supplement Exhibit C to the Pretrial Order, to the extent

necessary, to reflect any objections to the exhibits being introduced into evidence, before the date

of the pretrial conference.

The following exhibits were offered by plaintiff, received in evidence, and marked as

indicated:

| Exhibit Number | Description | Number of Pages | Date | Pagination Number |
|---|---|---|---|---|
| | **IDRT Exhibits** | | | |
| 1 | EEOC Press Release | 4 | 06/14/01 | 1 |
| 2 | Cognitive Arts Consulting Agrmnt for Demonstration Project | 6 | 11/01/01 | 5 |
| 3 | Wal-Mart memo – *Key Points for Final Contract* | 3 | 11/29/01 | 11 |
| 4 | Memo – *ASL Translation Process* | 3 | 12/03/01 | 14 |
| 5 | Wal-Mart memo – *Kick-Off Meeting Agenda* | 5 | 12/12/01 | 17 |
| 6 | IDRT letter to its atty | 5 | 12/21/01 | 22 |
| 7 | Wal-Mart ASL Task Schedule/Phase I – first 15 CBLs | 12 | 01/03/02 | 27 |
| 8 | Letter to Wal-Mart (enclosing Draft 1) | 1 | 01/10/02 | 39 |
| 9 | Development Agreement – Draft 1 | 17 | 01/10/02 | 40 |
| 10 | Letter to Wal-Mart (enclosing Draft 1) | 1 | 01/11/02 | 57 |
| 11 | E-mail from Wal-Mart to IDRT – contract changes | 3 | 02/01/02 | 58 |
| 12 | E-mail from IDRT to Wal-Mart – contract changes | 1 | 02/03/02 | 61 |
| 13 | Fax from Wal-Mart to IDRT atty and attached Master ASL Timeline | 4 | 02/15/02 | 62 |
| 14 | Letter from IDRT atty to Wal-Mart (enclosing Draft 2) | 2 | 02/18/02 | 66 |
| 15 | Development Agreement – Draft 2 | 19 | 02/18/02 | 68 |
| 16 | E-mail from Cognitive Arts to Wal-Mart | 1 | 02/19/02 | 87 |
| 17 | Development Agreement – Draft 2 with Wal-Mart changes (black ink) and IDRT proposed changes (in red ink); and Fax cover sheet from Wal-Mart to IDRT atty | 21 | 03/19/02 | 88 |
| 18 | Letter from IDRT atty to Wal-Mart; and facsimile transmission report (enclosing Draft 3 redlined ("marked-up") version) | 4 | 03/21/02 | 109 |
| 19 | Development Agreement – Draft 3 redlined ("marked-up") version | 16 | 03/21/02 | 113 |
| 20 | Letter from IDRT atty to Wal-Mart (enclosing Final Development Agreement) | 1 | 03/25/02 | 129 |
| 21 | Development Agreement – final version | 19 | 03/25/02 | 130 |
| 22 | E-mail from Wal-Mart to IDRT – 30 days notice canceling Phase II | 1 | 04/26/02 | 149 |
| 23 | E-mail from Wal-Mart to IDRT and Cognitive Arts re update-module development | 1 | 07/23/02 | 150 |

| IDRT Exhibits | | | | |
|---|---|---|---|---|
| Exhibit Number | Description | Number of Pages | Date | Pagination Number |
| 24 | E-mail from Wal-Mart to IDRT re site visit | 1 | 08/05/02 | 151 |
| 25 | E-Mail from IDRT to Wal-Mart re module development | 1 | 07/16/02 | 152 |
| 26 | E-mail from IDRT to Wal-Mart re site visit | 1 | 08/09/02 | 153 |
| 27 | Letter from IDRT atty to Wal-Mart (enclosing Final Invoice) | 1 | 01/23/03 | 154 |
| 28 | IDRT Final Invoice | 16 | 01/23/03 | 155 |
| 29 | Fax from Wal-Mart to IDRT atty and attachments re 3 modules | 3 | 01/29/03 | 171 |
| 30 | Certified letter from IDRT atty to Wal-Mart re three modules and attachments (enclosing Revised Final Invoice) | 14 | 02/19/03 | 174 |
| 31 | Revised Final Invoice | 17 | 02/19/03 | 188 |
| 32 | Certified letter from IDRT atty to Wal-Mart re Revised Final Invoice and Interest | 1 | 05/22/03 | 205 |
| 33 | 25 Interim Invoices | 30 | 01/17/02-12/01/02 | 206 |
| 34 | Invoice Tracking Sheet with notes by IDRT atty | 3 | | 236 |
| 35 | IDRT Spreadsheet 1 with notes by IDRT atty | 3 | | 239 |
| 36 | IDRT Spreadsheet 2 with notes by IDRT atty | 3 | | 242 |
| 37 | IDRT Spreadsheet 3 with notes by IDRT atty | 3 | | 245 |
| 38 | IDRT Spreadsheet 4 with notes by IDRT atty | 2 | | 248 |
| 39 | Script of Training Modules with IDRT codes | 59 | | |
| 40 | CD of Training Module "Leadership Toolbox" | - | | |
| 41 | Text files ("htm" & "doc" content of "Leadership Toolbox" CD) | - | | |
| 42 | CD-1 & text of CD-1 for Firearms (Questions & Answers)* | - | | |
| 43 | CD-2 & text for Firearms (content)* | - | | |
| 44 | E-mail from IDRT to Wal-Mart (re "Leadership Lesson") – 8/9/02 | | | |
| 45 | E-mail from IDRT to Wal-Mart (re Firearms Procedure") | | | |

* may also be used as demonstrative evidence

## WAL-MART'S EXHIBITS

The following exhibits were offered by defendant, received in evidence, and marked as indicated:

1.     Record of Deliverables (Wal-Mart spreadsheet to monitor progress on modification of CBL modules).

2.     IDRT's Index of Documents Produced in Response to Wal-Mart's First Request for Documents.

3.     IDRT Interim Invoice – Letter dated February 23, 2002 (IDRT # 211).

4.     IDRT Interim Invoice – Letter dated March 29, 2002 (IDRT # 216).

5.    IDRT Spreadsheet 4 with notes by IDRT attorney (IDRT ## 248-249).

6.    IDRT Interim Invoice – Letter dated April 4, 2002 (IDRT ## 217-218).

7.    IDRT Interim Invoice – Letter dated April 12, 2002 (IDRT ## 220-221).

8.    IDRT Invoice Tracking Sheet with notes by IDRT attorney (IDRT ## 236-238).

9.    Wal-Mart Check Index (W000003).

10.   Wal-Mart Spreadsheet Reflecting Wal-Mart's Payment of IDRT Invoices (W000144-145).

## EXHIBIT D TO PRE-TRIAL ORDER

## NAMES AND ADDRESS OF POTENTIAL WITNESSES TO BE CALLED BY EACH PARTY

### IDRT

Corinne K. Vinopol, Ph.D., President
Institute for Disabilities Research and Training, Inc.
11323 Amherst Avenue
Wheaton, Maryland  20902

### WAL-MART

Brian Poland, Director of Learning Services
Wal-Mart University
Wal-Mart Stores, Inc.
805 Moberly Lane
Bentonville, Arkansas   72716