**EXHIBIT E TO PRETRIAL ORDER**

**Resume of Dr. Corinne Vinopol**

**Corinne K. Vinopol, Ph.D.**
**President**
**Institute for Disabilities Research and Training, Inc.**
**11323 Amherst Avenue**
**Wheaton, MD 20902**
**(301) 942-4326 (Voice/TTY)**
**(301) 942-4439 Fax**
**corinne.vinopol@idrt.com**
**www.idrt.com**

## SPECIALTIES:

**Special Education** – Particular expertise with hearing impairment, deaf-blindness, multiple disabilities, visually impairment, and severe/profound disabilities. Experience gained through teaching and administration of public, private, residential and day programs. Extensive background in lecturing to schools and to parent groups on related topics.

**Special Education and Rehabilitation Law** – Twenty-three years experience as a due process hearing officer in the District of Columbia, Delaware, and Maryland. Lecturer and workshop presenter on related topics. Used as an expert by the U.S. Department of Education, U.S. Department of Justice, National Science Foundation, numerous school systems and parents.

**Writing** – Numerous professional publications, editing experience, and successful proposals to the federal government.

**Public Speaking** – Extensive experience as a lecturer and workshop presenter on topics related to special populations, law, and emergency access.

**Project Management** – Ability to handle and experience in management of multiple multi-task projects simultaneously. Project Director of numerous federal government grants and contracts.

## ACADEMIC BACKGROUND:

| | |
|---|---|
| Ph.D. | Special Educational Administration<br>Gallaudet University, Washington, DC 1980 |
| M.A. | Education, Administration and Supervision<br>California State University, Northridge, CA 1976<br>*National Leadership Training Program |
| M.Ed. | Deaf Education<br>Western Maryland College, Westminster, MD, 1975 |
| B.A. | English<br>Western Maryland College, Westminster, MD, 1971 |

*Fluent in American Sign Language

**PROFESSIONAL EXPERIENCE:**

**President**, The Center for Disabilities Research and Training (1988 – Present)

> Job Description:  Administration of a private non-profit (i.e., 501C3) corporation that conducts research, provides training and technical assistance on topics related to disabilities, and educational consultation to families and school systems.  Specific responsibilities include identification of and coordination with clientele, conceptualization of project scope and development of implementation approach, development of marketing plans, supervision of employees, and budget analysis.  Direct training, particularly on topics related to special education, educational and accessibility law, and administrative and evaluative protocols.  Educational evaluations.  Assessments of placements, and recommendations of programming and placement of children with special needs.

> Examples of Company Projects  (** indicates directorship of project):

> **\*\*In-School Disability Awareness Program**:  (Project Officer: D. Blodgett, Phone (301) 732-1049).  This grant from the U.S. Department of Education provided funds to develop and field-test, throughout Maryland, a set of instructional video and print materials that enable teachers in regular education classes to teach their students about deafness as a culture in much the same way that they would teach about ethnic minorities.  These products were published through Paul H. Brooks Publishing, Inc. under the title "Bridges Beyond Sound."

> **\*\*Services to Deaf-Blind Children – Technical Assistance to States**: (Project Officer: C. Freeman, Phone (202) 205-8165).  This project provided services under four contracts to three State Education Agencies (SEA).  The company is widely recognized for its expertise in the education of persons with vision and hearing impairments.

**President**, Institute for Disabilities Research and Training/The Conference Center (1986-Present)

> Job Description:  Administration of private for-profit corporation that provides research, development, and implementation services to business, educational entities, and governmental agencies.  Specific responsibilities include identification of and coordination with clientele, conceptualization of project scope and development of implementation approach, educational and technical research, development of products, technologies, and media, development of marketing plans, supervision of employees, and budget analysis and accounting.  Direct training, particularly on topics related to special education, educational and accessibility law, and administrative and evaluative protocols.

> Examples of Company projects:

**Remote Real-time Transcription Services:** (COTR: Joanne McCann) This Phase I SBIR project investigated the application of remote and in-situ real-time transcription services to school settings.

**Deaf Hispanic Awareness Kit:** (COTR: Ernest Hairston) This three-year project, funded by the U.S. Department of Education, will develop computer software and other instructional materials to teach school children about the contributions of Deaf Hispanic individuals in the U.S. It also will impart information about Hispanic culture to deaf children.

**Cued Speech Crash Course on CD-ROM:** (COTR: Richard Johnson) This U.S. Department of Education funded project will result in the development of a CD-ROM that provides 30 quick lessons for people interested in learning Cued Speech.

**CD-ROM of Visually Represented Songs for Young Deaf Children:** (COTR: J. McCann) Phone (202) 205-8475. This SBIR Phase I project will initiate development of a CD-ROM for young deaf children in which (1) the story/concept, (2) volume, (3) notes, and (4) rhythm of three simple songs are depicted through graphic representations of each of these aspects that are coordinated with each other.

**A Computer Program to Emulate TTY Communications:** (COTR: J. McCann) Phone (202) 205-8475. This grant, which was funded at both Phase I and II levels, will demonstrate that a computer program can be designed which will allow a standard personal computer to communicate with TTY equipment. The final result will be a comprehensive telephone communication program for personal computers and a programmer's tool kit for adding TTY capabilities to other communication programs.

**An American Sign Language Picture Storyboard for Young Children on CD-ROM:** (COTR: J. McCann (202) 205-8475). This Phase II SBIR grant will result in the development of several CD-ROMs that contain 15 stories and 45 learning activities in both English and American Sign Language appropriate for preschool age deaf children. The stories and activities each will support linguistic, cognitive, visual/perceptual, and computer skills.

**An American Sign Language/English Dictionary on CD-ROM:** (Project Officer: J. McCann, Phone (202) 205-8475. The purpose of the grant is to develop a multimedia dictionary of American Sign Language. There is no order for signs as there is for English (i.e., ABC). The unique feature of it is that signs can be found by describing how they are made.

**Speech Recognition Telecommunications for People Who are Deaf or Hard of Hearing:** (Project Officer: J. McCann, Phone (202) 205-8475). This was an SBIR Phase II grant to develop a system which will allow people who are deaf or hard of hearing to receive voice telephone calls using speech recognition technology and synthetic speech.

**Caption Speech and Viewer Comprehension of Television Programs:** (Project Officer: J. Hauser, Phone (202) 205-8126). This was a three year study which examines how much people learn from television captioning at different caption speeds. Subjects are shown a series of video segments captioned at different speeds and then are asked questions about the material they have been shown.

**Presentation Rate and Readability of Closed Captioned Television:** (Project Officer: J. Hauser, Phone (202) 205-8126). This three-year grant explored the characteristics of closed captioned television and the ability of people to read the captions. A sample of over 200 television programs are being analyzed and special video materials are being created to determine the characteristics a sample of subjects prefer.

**Integrating Speech Recognition into the Classroom Interpreting Services of Mainstream Deaf and Hard of Hearing Students:** (COTR: D. Malouf, Phone (202) 205-8111). This is a three-year grant under which there was exploration of the use of off-the-shelf speech recognition systems as a tool for assisting deaf and hard of hearing students by supplementing the usual sign language interpreting process.

**The Relationship Between Eye Movement and the Reading of Closed Captions:** (COTR: J. McCann (202) 205-8475). This project addresses the question of what eye movements most efficiently absorb closed captions and/or what placement of captions best enhances the readability of closed captions.

**An American Sign Language Picture Dictionary/Storyboard for Young Children on CD-ROM:** (COTR: J. McCann (202) 205-8475). This Phase I SBIR grant demonstrated the feasibility of developing a CD-ROM that depicts stories in English and American Sign Language appropriate for preschool age deaf children. Five stories with three instructional activities each that support linguistic, cognitive, visual/perceptual, and computer skills were included. The CD-ROM was named *Paws Signs Stories*, and is currently commercially sold.

**Speech Recognition Telecommunications for Hearing Impaired People:** (COTR: E. Hairston, Phone (202) 205-8170 TTY). With this SBIR Phase I grant, IDRT explored the use of off-the-shelf speech recognition equipment to provide a way for hearing impaired people to accept voice calls over telephone lines.

**A Computer Sound Cue Indicator for Hearing Impaired People:** (COTR: E. Hairston, Phone (202) 205-8170 TTY). This SBIR project developed a computer board which alerts hearing impaired computer users of sounds made by their computer.

**A Telephone Line Status Indicator for Hearing Impaired People:** (COTR: E. Hairston, Phone (202) 205-8170 TTY). This SBIR project developed a device to inform hearing impaired people of telephone line status tones.

**Examining Advanced Technologies for Benefits to Persons with Sensory Impairments:** (COTR: E. Hairston, Phone (202) 205-8170 TTY). IDRT was a subcontractor on this SAIC project which explored possible applications of emerging technology.

**Assessment of NIDRR Investigator-Initiated Research Programs:** (COTR: R. Johnson, Phone (202) 205-8198). IDRT conducted an assessment of NIDRR's Field-Initiated Research and Innovative Grants Program. Associated activities included literature searches, data collection on individual projects, interviews with principal

investigators, evaluation of project results, and an overall evaluation of the two programs.

**Services to Deaf-Blind Children - Technical Assistance to States:** (COTR: C. Freeman, Phone (202) 205-8165). IDRT provided services under four contracts to three State Education Agencies (SEA's). The company is widely recognized for its expertise in the education of people with vision and hearing impairments.

**Public Awareness - Captioning Services:** (COTR: E. Hairston, Phone (202) 205-8170 TDD). This was a project, supported by the Office of Special Education Programs, to develop and implement an intensive and multifaceted national advertising and promotion campaign. This campaign was aimed, not only at hearing impaired consumers and their families (particularly those groups previously under-represented in decoder sales), but also the cultural organizations which serve them, the general public, public sector agencies (schools, libraries, social services, health services), and private sector industries (hotel, entertainment, advertisement).

**Third International Symposium on Pediatric Pain:** (COTR: D. Cohen, M.D., Phone (215) 590-1881). An international conference was planned for a special interest group on pediatric pain of the International Association for the Study of Pain. Approximately, 600 participants attended this meeting, which was held in June, 1994 in Philadelphia. Services included all aspects of conference planning (e.g., hotel selection, international travel arrangements, menu selection, media rental, booth bookings), as well as unique requests (e.g., art show of works by pediatric patients).

**Criminal Justice and the Deaf:** (COTR: H. Busby, Phone (202) 651-5000). The Institute for Disabilities Research and Training, under contract with the National Academy of Gallaudet University, developed and implemented a lecture series on the topic of criminal justice and the deaf. The contract also involved the development of a training packet for law enforcement and prison personnel, and research at a local jail.

**In-School Disability Awareness Program:** (COTR: D. Blodgett, Phone (301) 732-1049). This grant from the U.S. Department of Education funded funds to develop and field-test, throughout Maryland, a set of instructional materials that enables teachers in regular education classes to teach their students about deafness as a culture in much the same way that they would teach about ethnic minorities. The resulting videotape and instructional materials is sold under the name *Bridges Beyond Sound* by Paul H. Brookes Publishing.

**Breakout: Community Based Alternatives for Deaf Persons with Mental Illness:** (COTR: Carole Schauer, Phone (202) 832-6681) The Institute for Disabilities Research and Training provided full conference planning services (e.g., hotel selection, registration, menu selection, travel arrangements) as well as program planning for this two-day national conference of professionals and consumers in the field of mental health and deafness.

**Investigation of TDD Operator Services:** (COTR: C. Murchio, Phone (201) 221-2730). This project surveyed hearing impaired people's knowledge and use of AT&T's TDD operator services for hearing impaired people. The Institute for Disabilities Research and Training collected data on over 1,000 hearing impaired people,

provided computer analysis of the results, and wrote a report for AT&T. This report was distributed throughout AT&T and used to establish corporate policy.

**Study of GSA Relay Service Needs:** (COTR: R. Banister, Phone (202) 566-0291). The Institute for Disabilities Research and Training and Telecommunications for the Deaf, Inc. conducted focus groups for the General Services Administration (GSA) to determine the need for telephone relay services for hearing impaired people by the federal government.

**Analysis of Maine Relay Service Needs:** (COTR: J. Surasras, Phone (207) 289-1374). The Institute for Disabilities Research and Training and Telecommunications for the Deaf, Inc., under contract to the Maine Public Utilities Commission, carried out an in-depth study of the telephone relay needs in Maine. This study was used to develop legislation which was recently signed into law.

**A National Conference on Closed Captioning Television News Programs:** (COTR: J. McCann, Phone (202) 205-8475). The Institute for Disabilities Research and Training was a subcontractor for this Technautics, Incorporated, project which was supported by the Department of Education. The conference was held in November, 1991.

**A Database for Hearing Impaired Research Subjects:** (COTR: E. Hairston, Phone (202) 205-8170 TDD). This Department of Education project explored the feasibility of developing the TDI telephone directory into a database for research on hearing impaired people.

**9-1-1 Operator Training:** (COTR: E. Hairston, Phone (202) 205-8170 TDD). Under two SBIR grants, The Institute for Disabilities Research and Training studied the feasibility of developing training materials to help 911 operators handle calls from hearing impaired people and then created the materials. These materials included a 50-minute videotape, hot sheet of critical information, instructor's guide, workbooks, TTY emergency call simulation software, information collections sheets, and instruction booklet. The training package is currently sold under the name *Responding Effectively to 9-1-1 TDD Calls* and has become in industry standard.

**Materials to Assist in Recruitment and Preparation of Stenocaptioners:** (COTR: E. Hairston, Phone (202) 205-8170 TDD). The Institute for Disabilities Research and Training was a subcontractor on this CaptionAmerica project. Funding was provided by a Department of Education SBIR grant and resulted in the development of materials to help court reporters prepare to become television stenocaptioners.

**Captioned Television and the Learning of Literacy Skills by Educationally Disadvantaged Adults:** (COTR: R. Rodriguez, Phone (202) 205-8174). The Institute for Disabilities Research and Training, under a Department of Education grant, conducted a series of studies in the Maryland prison system to determine if captioned television can be used to help prisoners improve their literacy skills.

**Captioned Television and the Learning of Literacy Skills:** (COTR: R. Rodriguez, Phone (202) 205-8174) This Institute for Disabilities Research and Training project conducted a series of home studies in Baltimore, Maryland on the effects of captioning on the literacy skills of children who speak English as a second language or who have a learning disability.

**Initial and Continuation Training for AT&T Relay Operations** (Project Officer: Norm Lisy)  Through a subcontract with Telecommunications for the Deaf, Inc., IDRT developed the initial and first continuation training packages used with AT&T relay operators when relay services were first initiated.  It was through this effort that many of the present protocols were developed, including identification of operators by number, the introductory explanations of non-conversational information, how to handle answer machines, etc.

**Impartial Hearing Officer,** Maryland State Department of Education, Delaware State Department of Public Instruction, and the District of Columbia Public Schools (1981-Present).

> Job Description:  Act as an "administrative law judge" in disputes between parents, local education agencies and/or state education agencies regarding implementation of Public Law 101-476 and Section 504 of the Rehabilitation Act of 1973.  Position necessitates knowledge of State and Federal education laws and precedence settings and jurisdictional court decisions; review of background material on children's education and due process procedures; conduct of hearings; rendering of decisions, including Findings of Fact and Conclusions of Law in written format.

**Mediator,** District of Columbia Public Schools (1999-2003)

**Adjunct Faculty,** Hearing and Speech Department, University of Maryland, College Park (1984-1995)

**Adjunct Faculty,** Deaf Education Department, Western Maryland College 1976-77.

**Director, The Office of Professional Training,** The National Academy of Gallaudet University, College of Continuing Education, Washington, DC (1984-1986)

> Job Description:  Planning and administration of continuing educational programs for professional-level training of physicians, nurses, lawyers, employers, social workers, government officials, engineers, psychologists, scientists, and other professionals who deliver care to people with sensory, mobility, communication, mental, and emotional problems.  Marketing research and direct marketing; direct training, training the trainer, and identification of faculty; logistical planning; training and marketing evaluation; budget preparation and management; arranging for awarding of CEUs; concept paper proposal development.

**Self-employed Consultant (partial listing of contracts) (1981-1984)**

> The National Academy of Gallaudet University — Develop and conduct programs, workshops and seminars for outside agencies or organizations; develop printed material, films, videotapes and other training materials; provide technical assistance to organizations and agencies for workshop development;

research, write and submit papers and proposals for acquisition of grants and contracts form private and governmental sources; identify and maintain information on resource materials for use with professional training materials.

<u>Technical Assistance Center, George Mason University</u> – Provide assistance preschool teachers in development and implementation of educational programs for severely/profoundly handicapped, multiply handicapped and deaf-blind preschoolers.

<u>Research Department, Gallaudet University</u> – Editor of two issues of DIRECTIONS, a professional research journal, including solicitation of articles; editing of manuscripts for professionals in the field of deafness for various publications.

**Editor, "Deaf-Blind News",** American Annals of the Deaf (1977-1982)

Job Description: Prepare editorial articles for each issue of professional journal with national distribution.

**Vice Principal,** Maryland School for the Deaf, Columbia and Frederick, Maryland (1978-1981)

Job Description: Supervise three programs for multiply handicapped hearing impaired children on two campuses; oversee the development and implementation of individual education programs across a 24 hour day; develop and implement in-service training programs school-wide; write and submit proposals for acquisition of grants from government sources; develop administrative policies and procedures; conduct staffing, Admissions, Review and Dismissal (ARD) meetings and due process in-house procedures, coordinate activities of ancillary staff (mental health, speech, audiology, etc.) with that of classroom and dormitory staffs.

**Principal,** Margaret S. Sterck School for the Hearing Impaired, Newark, Delaware (1977-1978)

Job Description: Supervision and administration of residential, state-wide school for hearing impaired children, ages birth through 21 years; other duties similar to those listed under position just proceeding this one.

**Teacher and Faculty Chairperson,** Maryland School for the Blind, (1973-1976)

Job Description: Teacher of classes of multiply handicapped deaf and deaf-blind children; representative of faculty in all concerns with school administration.

**Teacher,** Baltimore City Public Schools, (1971-73)

Job Description: Teacher of classes of multiply handicapped deaf and deaf-blind children; also taught emotionally disturbed deaf child at home after school.

**CONTINUING EDUCATION:**

Impartial Hearing Officer Training for Due Process and Appropriateness of Special Education
Placements

> Maryland State Department of Education (1981--initial training)
> District of Columbia Public Schools (1985--initial training)
> Delaware State Department of Public Instruction (1998—initial training)
> *Attend numerous workshops in Maryland, Delaware, and the District of
> Columbia annually on related topics to maintain certification and update skills
> and knowledge.

"Strategic Marketing of Seminars and Conferences"
> The Marketing Federation, 1985

"Controlling Aggression in the Health Care Setting"
> Wickerstry and Associates, Inc., 1985

"Building a Foundation for Teamwork in Permanency Planning"
> Montgomery County Department of Social Services, 1984

"Discipline" Montgomery County Department of Social Services, 1988
"Managing Anger" Montgomery County Department of Social Services, 1988
"Rare Genetic Diseases of Persons with Hearing and Vision Losses, " University of Florida
1991
"Due Process Procedures for P.L. 101-457, " Governor's Office of Children, Youth and
Families, 1991

**SAMPLE PUBLICATIONS AND WRITINGS:**

Developer and Illustrator of Nonverbal Thematic Appreciation Test which was validated by Dr.
> McCay Vernon, Western Maryland College, 1973

Teacher, Aide, Administrator Evaluation Forms and Procedures, Maryland School for the
> Blind, Baltimore, Maryland 1976.

Klein, C. (1976). An analysis of the skills and knowledge required of paraprofessionals
working with deaf-blind children. Unpublished master's thesis, California State University—
Northridge.

Klein, C. Coping patterns of parents of deaf-blind children. American Annals of the Deaf,
> June,1977, 122(3), 310-312.

Klein, C. Variables to consider in developing and selecting servicing for deaf-blind children—
> Part 1. American Annals of the Deaf, February 1978, 123(1), 9.

Jensema, C.K. Paraprofessionals working with deaf-blind children: Why we need them;
> What training they need. American Annals of the Deaf, 123(8), 914-917.

Jensema, C.K. Communication methods used with deaf-blind children: Making the decision.

*American Annals of the Deaf*, February 1979, 124(1), 7-8

Jensema, C.K. Perceptions on innovation in the deaf-blind education. *American Annals of the Deaf*, June 1979, 124(3), 347.

Jensema, C.K. A review of communication systems used by deaf-blind people—Part1. *American Annals of the Deaf*, October, 1979, 124(6), 720-725

Jensema, C.K. The use of positive practice to reduce self-stimulating behaviors. *American Annals of the Deaf*, August, 1980, 125(3), 524-526

Jensema, C.K. A profile of deaf-blind children within various educational facilities. *American Annals of the Deaf*, October, 1980, 125(7), 896-900

Proposals for the establishment of a program for severe/profoundly handicapped hearing impaired children, 1980 (Funded by the Governor of Maryland)

Jensema, C.K. Methods of communication used by and with deaf-blind children and youth in classroom settings. Unpublished doctoral dissertation, Gallaudet College, Washington, DC, 1980

Jensema, C.K. (November, 1982). Communication methods and devices for deaf-blind persons. *Directions*.

Jensema, C.K. (November, 1982). A look at the cognitive and language development of deaf-blind children. *Directions*.

Sims-Tucker, B., & Jensema, C.K. Severely and profoundly auditorially/visually impaired students: The deaf-blind population. In P.J. Valletutti & B. Sims-Tucker (Eds.), *Severely and profoundly handicapped students: Their nature and needs*. Baltimore: Paul H. Brookes Publishing Co., 1983.

Jensema, C.K., & Downing-Wilson, T. (1991) *Bridges Beyond Sound*, (Interactive Videotape and Accompanying Instructional Materials), Baltimore: Paul H. Brookes.

Jensema, C.K. (1992). *Initial and Continuation Training Course Materials for Telephone Relay Operators*. Chicago: AT&T.

Jensema, C.K., & Downing-Wilson, T. (1991). *Self-Study Guide for 9-1-1 Operators*. Silver Spring, MD: Telecommunications for the Deaf.

Jensema, C.K., & Downing-Wilson, T. (1991). Continuing Education Training Manual and Accompanying Materials for Telephone Communication Assistants, Illinois Relay Center, AT&T.

Jensema, C.K., & Lennox, Debra. (1994). *Responding effectively to 9-1-1 TDD calls* (Training package consisting of an interactive videotape, trainer's manual, trainee workbooks, "hot sheet" of tips for 9-1-1 operators, instructional computer program, and computer manual). Silver Spring, MD: Institute for Disabilities Research and Training.

Jensema, C.K., et al. (1998). Paws Signs Stories. (CD-ROM and storybooks). Silver Spring, MD: Institute for Disabilities Research and Training.

Jensema, C.J., & Vinopol, C.K. (2004) Baby's First Book of Signs, Volume 1. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Jensema, C.J., & Vinopol, C.K. (2004): Baby's First Book of Signs, Volume 2. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Jensema, C.J., & Vinopol, C.K. (2004) Baby's First Book of Signs, Volume 3. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Jensema, C.J., & Vinopol, C.K. (2004) School Days. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K. et al. (2003). American Sign Language Clip and Create. (Versions 1-3) (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K. et al. (2002). ASL Tales and Games for Kids-1. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K. et al. (2003). ASL Tales and Games for Kids-2. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K., et al. (1999). Con-SIGN-tration. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K., et al. (1999). Con-SIGN-tration-II. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K., et al. (2003). Con-SIGN-tration-III. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K., et al. (2003). Con-SIGN-tration-IV. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K., et al. (1999). Mexican Sign Language/American Sign Language Translator. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K., et al. (2001) Russian Sign Language/American Sign Language Translator. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K., et al. (2005). Sign Find Vacation. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K., et al. (2005). Somos Muy Fiesteros. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K., et al. (2005). Sueño Sordo Hispano-Americano. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K., et al. (2005). Tomados de la Mano-CD-1. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K., et al. (2005). Tomados de la Mano-CD-2. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

Vinopol, C.K. et al. (2001). The Ultimate American Sign Language Dictionary. (CD-ROM). Silver Spring, MD: Institute for Disabilities Research and Training.

## SAMPLE OF SPEAKING ENGAGEMENTS

Speaker: "Setting Standards for Healthcare of Incarcerated Deaf Persons." National Commission on Correctional Healthcare of Incarcerated Deaf Persons." New York, 1987.

Trainer: "Providing Victim Services for Deaf Persons." New Jersey Organization for Victim Assistance, 1988

Speaker: "Needs of Incarcerated Deaf Youth." Incarcerated Youth Conference, Philadelphia, PA, 1991

Trainer: "Evaluating and Programming for Deaf-Blind Students", North Carolina 1993

Speaker: "Responding Effectively to 9-1-1 TDD Calls." National Emergency Number Association International Convention. Montreal, Canada, 1993

Speaker: "Hearing and Sight Impaired Victims." State conference sponsored by the Governor's Office of Justice Administration, "Serving Crime Victims: A Criminal Justice/Community Partnership." University of Maryland, May 11-12, 1994

Speaker: Responding Effectively to 9-1-1 TDD Calls." National Emergency Number Association International Convention. Las Vegas, Nevada, June 11-16, 1994

Speaker: "Responding Effectively to 9-1-1 TDD Calls." Association of Public-Safety Communications Officers Convention. Pittsburgh, Pennsylvania, August 1994.

"Compliance with Special Education Due Process Requirements" – workshop given to Western States Superintendents for the Deaf

"Implications for Human Rights within P.L. 94-142" – presentation for conference entitled "Reclaiming the Future"

"Assessment of Deaf-Blind Children" – presentation to Maryland State Teachers of Deaf-Blind Students

"IEP Writing" – workshop given to district-wide staff of Junction City, Kansas

"Careers related to Deafness"–Towson State University, 2001 and 2002

"Special Education Law and Procedures"–American University School of Law, 2001 and 2002

"Creating Software for Deaf Children"—Deaf Way II, Washington, DC.

**<u>EXHIBIT F TO PRETRIAL ORDER</u>**

There are no depositions or portions of depositions to be read into evidence.

## EXHIBIT G TO PRETRIAL ORDER

**A.      Plaintiff's Proposed Findings of Fact and Conclusions of Law**

### 1. IDRT's Proposed Findings of Fact

1.      The parties entered into a binding contract identified as "Development Agreement" with an acceptance date of March 28, 2002.

2.      The Development Agreement divided the work to be completed by plaintiff and the payment obligation into four phases.  Thirty (30) days prior to completion of each Phase, the defendant could opt-out of the contract so as to terminate continuation of the contract for additional Phases.

3.      The Development Agreement required that in each Phase, in accordance with a "Master ASL Timeline" which was part of the Development Agreement, Wal-Mart would submit a designated number of modules for development, respectively, 90 Training Modules in Phase I and 60 Training Modules in Phase II at the intervals and dates contained in the Timeline.

4.      In or about early December 2001, based on representations by Wal-Mart that it would engage IDRT to develop 300 of its Training Modules in the methodology and procedure utilized to develop the Training Module in its previously contracted "demonstration project," IDRT agree to begin the development project.

5.      IDRT began the undertaking with the representation that the project would be a unitary project, IDRT would complete the development of all of Wal-Mart's Training Modules, IDRT would be compensated for each "screen" developed on each Training Module at the rate of $266.50 per screen.

1

6.     From on or about December 15, 2001 to March 28, 2002, IDRT worked on the development project without a formal written contract, while the parties continued to work out the terms of the Development Agreement.

7.     Wal-Mart requested IDRT to prepare and submit to it a Development Agreement; and IDRT did so, with Wal-Mart accepting parts, rejecting other parts and proposing changes, through the period December 2001 to March 24, 2002.

8.     Based upon the representation made by Wal-Mart in or about December 2001, the Development Agreement prepared and submitted to Wal-Mart provided for a unitary project for which compensation was to be paid at the rate indicate previously (i.e. $266.50 per screen) for each screen on each Training Module developed by IDRT, and on the basis that there would be 300 Training Modules to be developed; a Minimum Contract Price of $3,997,500.00 was stipulated.

9.     The development of the Training Modules was to be accomplished in order to satisfy time requirements being negotiated and imposed by the EEOC on Wal-Mart with respect to the settlement of a collateral case in Arizona under the ADA; and, in accordance with a schedule based on the parties' respective ability to do the type of work each of the parties was required to do in order to fully develop the Training Module into an accessible Training Module for the hearing impaired.

10.     Wal-Mart prepared a document known as a "Timeline" which was revised from time to time, based on the two criteria above.

11.     The Timeline was a Table with columns and rows.  The columns in the Table reflected the respective number of weeks included in the development project and the calendar date of each of the respective weeks.  The rows in the Table reflected the designated number of

Training Modules to these submitted for development work by the respective parties on the calendar date of each of the weeks in the entire project.

12.    The Timeline was revised from time to time and the Timeline that was attached to the Development Agreement of March 28, 2002 was incorporated and made part of that Agreement.

13.    During the period of December 2001 through March 24, 2002, Wal-Mart determined that instead of a unitary development project with IDRT, it wanted the project broken down into phases with Wal-Mart having the right to opt-out at the end of each phase and IDRT agreed to that change from the initial representation of the project.

14    In each Phase, Wal-Mart proposed to submit a designated number of Modules to IDRT in accordance with the Timeline.

15.    Phase I began, according to the Timeline, on December 21, 2001 and, according to the Timeline, ended on March 22, 2002.

16.    Phase II began immediately following the conclusion of Phase I, that is, March 23, 2002, and concluded May 31, 2002.

17.    During Phase I, Wal-Mart submitted 93 Modules for development to IDRT.

18.    During Phase II, Wal-Mart submitted 51 Modules for development to IDRT.

19.    As a result of changes of proposals and counterproposals, the Development Agreement of March 28, 2002 contained a provision for a Phase Contract Price, calculated on the basis of the designated number of Modules that were to be submitted in each Phase, multiplied by an average number of screens per Module of 50, multiplied by screen development price of $266.50 a screen.

20.    In order to comport with the 30-day opt-out provision, on April 26, 2002, Wal-Mart notified IDRT that it was opting out the Agreement after Phase II.

21.    That at the request of Wal-Mart, IDRT performed additional work after the close of Phase II.

22.    IDRT provided Wal-Mart a Revised Final Invoice dated February 19, 2003 to reflect final billing for Phase I and Phase II; and billing for expenses, miscellaneous and add-on work.

23.    The total amount of the Revised Final Invoice, $224,299.57 was reduced by a $50,000.00 initial payment credit, reflecting a total net due of $174,299.57.

24.    The reporting of module development, changes and calculations that comprise the IDRT Revised Final Invoice are correct.

25.    That the net payment due of $174,299.57, according to the March 28, 2002 Development Agreement was to be paid within 30 days; it was not paid and remains unpaid as of this date.

26.    The March 8, 2002 Development Agreement also provides for contract interest at the rate of 8% per annum on the amounts remaining unpaid on invoices after 30 days of their submission to Wal-Mart. The interest calculations, as stipulated by IDRT, began from March 27, 2003. Since the entire net balance of $174,299.57 remains unpaid, simple interest (as stipulated by IDRT) has accrued for the three years between March 27, 2003 and March 27, 2006 in the amount of $41,831.91. In addition, interest has continued to accrue on the net balance from March 28, 2006 to the date of this Order, at the rate of $38.20 per diem. Accordingly, the total amount of contract interest now due and owing is $_____.

27.    That judgment shall be entered against Wal-Mart in this case in the amount of

$_____, comprising of $174,299.57, net balance due; and $_____

in contract interest up to and through the date of this Order.

## 2. IDRT's Proposed Conclusions of Law

1.    The Development Agreement of March 28, 2002 between the parties is construed in accordance with the law of the State of Delaware.

2.    In accordance with the law of the State of Delaware, there are two terms of the contract which require construction as applicable to this case; namely, "Phase" and "Training Module."

3.    That given the nature of the undertaking involved in the contract and the relative complexities, these terms are not so plain, clear and certain that they can be determined through the contract itself; that is, the terms at issue are "fairly susceptible to more than one interpretation." *True North Communication, Inc.,* 711 A.2d at 38.

4.    In the event, the Court interprets the relevant language as clear on its face, the interpretation of the relevant terms is a matter of law applying a reasonable third party standard. *Id.* In that event, interpretations of the relevant terms, as a matter of law, are:

(a)    Based upon the contract and all of its parts and extrinsic evidence that pertain to these terms, the term "Phase" is determined by the Phase I starting date, namely, the date in the ASL Master Timeline in which the first group of 3 Modules in the undertaking were to be submitted to IDRT (i.e. 12/21/01); and, concludes on the date the 90th Training Module was to be submitted to IDRT in accordance with the date of the designated week in the Timeline, specifically, March 22, 2002.

5

(b)     That Phase II of the contract began March 23, 2002, during which Phase, 60 additional Training Modules were to be submitted; and Phase II, concluded, on the date of the designated week on which the last of the 60 Training Modules in this Phase were to be submitted, specifically, May 31, 2007.

(c)     The term "Training Module or Computer Based Lesson (CBL) means the written text script and audio, visual and graphic digitized files on a compact disc which together, when analyzed and digitized into a file, CD or other medial comprise a single unit of training for a particular subject matter that Wal-Mart would display to its employees for training purposes.

**B.**    **Defendant's Proposed Findings of Fact and Conclusions of Law**

**1.**    **Wal-Mart's Proposed Findings of Fact**

1.    The statement of uncontested facts in Section 2(a) of the Pretrial Order is incorporated herein by reference.

2.    The parties agree that Wal-Mart delivered at least 144 Computer Based Learning Modules ("CBL Modules") from the beginning of "Phase I," as defined under the Development Agreement, until May 31, 2002, the date that IDRT contends concluded "Phase II." IDRT contends that Wal-Mart delivered only 144 CBL Modules in Phases I and II combined; Wal-Mart's records reflect delivery of 160 CBL Modules in the same period.

3.    The discrepancy in the parties' counts relates *first* to the fact that Wal-Mart counts 13 Learning to Lead modules, 10 more than the 3 counted by IDRT; and *second* that Wal-Mart counts six modules that IDRT does not count at all, namely, Hazardous Communications, Firearms Procedures II (Basic), and four TAPS modules (nos. 12-15).

4.    Wal-Mart's records reflect that the TAPS modules were sent to IDRT on May 31, 2002; IDRT asserts that they were received the next day, June 1, 2002. Otherwise, the parties agree that scripts relating to Learning to Lead, Hazardous Communications, and Firearms Procedures were sent to IDRT before May 31, 2002.

**Wal-Mart's Proposed Conclusions of Law**

1.    In this case in which jurisdiction rests upon diversity of citizenship, the Court will apply Delaware choice of law rules. *Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, 295 F. Supp. 2d 430, 434 (D. Del. 2003), *citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

2.    Delaware courts generally permit parties to specify the law that will govern their contract. *J. S. Alberci Constr. Co., Inc. v. Mid-West Conveyor Co., Inc.*, 750 A.2d

7

518, 520 (Del. 2000). The Development Agreement provides that either party must be sued in a court (state or federal) in defendant's state of incorporation and that "the law of such state shall govern the terms and conditions of this Agreement." ¶ 35. The Development Agreement incorrectly states that Wal-Mart is incorporated in Arkansas. *Id.* In fact, Wal-Mart is incorporated in Delaware, plaintiff has sued Wal-Mart here, and Delaware law applies to the contractual issues.

3.    The major issues in this case involve contract interpretation and application of the parties' agreement to essentially undisputed facts. These are issues of law. *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

4.    Under Delaware law, the Court will enforce the clear terms of the Development Agreement, resorting to extrinsic evidence only if terms are unclear. *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

5.    The single largest amount in controversy between the parties is $202,233.50 that IDRT claims is owed for "Contract Price Billing" on Phase II, over and above the $597,266.50 that IDRT asserts was paid for that phase. Although Wal-Mart has paid IDRT's invoices relating to the modules developed in Phase II, the Development Agreement provided for increased compensation to IDRT (the "Phase Contract Price") if Wal-Mart delivered fewer modules in a given "Phase" than prescribed in the Agreement (¶¶ 25.B, F(2)). IDRT claims that it received 51 modules in Phase II (Complaint, ¶ 40), nine fewer than the 60 specified in the Agreement (¶ 25.A.(1)).

6.    The parties agreed that Phase II "automatically" commenced with the completion of Phase I, defined as the submission of 90 modules to IDRT. Development

8

Agreement, ¶¶ 25.A.(1), (2). IDRT contends that "Phase I ended on March 22, 2002, when IDRT was to receive the 90th CBL Module" under a master time line attached to the Agreement. Complaint, ¶ 39. On this basis, IDRT argues that "[d]uring Phase I, Wal-Mart submitted a total of 93 modules. ..."[1] The Court rejects this contention for two reasons.

7.    First, if the parties had wanted to define "phases" strictly by date, they would have done so specifically in Section 25.A. They did not do so. Instead, they identified phases by the number of modules submitted by Wal-Mart. The Agreement clearly limits Phase I to 90 modules and initiates Phase II "automatically" after that milestone has been reached. Development Agreement, ¶¶ 25.A.(1), (2). Tellingly, the Agreement was executed by IDRT on March 24, 2002 and by Wal-Mart on March 28, 2002. If, as IDRT contends, the parties really intended that Phase I included all 93 modules that IDRT asserts were submitted days earlier, by March 22, 2002, they would not have defined the phase by the lesser sum of 90.

8.    Second, the Court concludes that the purpose of the Master Time Line was to secure timely performance of the parties' obligations to enable Wal-Mart to meet its obligations in the EEOC litigation and, secondarily, to enable IDRT to keep its staff productively employed. To this end, the Agreement provides that a party would be in breach if performance was more than ten days *late*. ¶ 25.F(4). No penalty is provided for *early* performance, such as early delivery of modules by Wal-Mart. Such a penalty would be contrary to the purpose of the Agreement.

9.    Accordingly, since Phase II begins immediately ("automatically") after submission of the first 90 modules (concluding Phase I), the merits of IDRT's claim of a shortfall in Phase II can be assessed by a tally of the total number of CBL modules delivered by

---

[1]    IDRT's interpretation, if accepted, would worsen the supposed shortfall in Phase II by moving three modules (93 minus 90) from Phase II to Phase I.

Wal-Mart in both phases. The issue is whether Wal-Mart delivered 150 (90 plus 60) or more modules. Wal-Mart's Record of Deliverables, a spreadsheet created to manage the task of meeting the requirements in the EEOC litigation, shows that Wal-Mart sent a total of 160 CBL modules to IDRT from the outset of the relationship through May 31, 2003, when IDRT claims that Phase II of the contract concluded. Since "Phase I" was defined by Wal-Mart's submission of the first "90 CBL Modules" (¶ 25.A.(1)) and Phase II "automatically follow[ed] Phase I" (¶ 25.A.(2)), Wal-Mart asserts that it submitted 70 modules in Phase II, ten more than the 60 modules specified by the Agreement. IDRT contends that Wal-Mart delivered only 144 modules (93 in Phase I plus 51 in Phase II), six shy of the 150 (90 plus 60) contemplated in the Agreement.

      10.    The first discrepancy in the parties' respective counts relates to the "Learning to Lead" modules. Wal-Mart's Record of Deliverables indicates that a total of 13 Learning to Lead modules were delivered to IDRT in weeks ending February 8, February 15, and March 22, 2002. IDRT's pre-litigation billing records show that actually there were 15, but IDRT now counts these collectively as only "three modules or *batches*." Complaint, Ex. 3, "Revised Phase I Module Table," p. 3, ftn. 3. Emphasis supplied. This usage is inconsistent with the Development Agreement, which defines "Modules" not as "batches" but as "*individual units* of training." ¶ 5, emphasis supplied. IDRT cannot legitimately "batch" these "individual units" in order to compress 13 (or 15) modules to three. Adding ten more modules to IDRT's combined count of 144 yields 154 modules delivered by Wal-Mart, four more than the 150 (90 plus 60) specified in the Agreement.

      11.    IDRT does not count the first module delivered to IDRT, relating to "Hazardous Communications." IDRT notes that this module was delivered to it by Cognitive

Arts, a Wal-Mart contractor, and that it was a "demonstration" project for Wal-Mart and IDRT to show to the EEOC. However, IDRT worked on many modules that it asserts were covered by the Development Agreement before the Agreement was finalized and signed. Introductory Paragraph 3 of the Agreement provides that it "will include all work involved in the parties' undertakings that began before the date of the Agreement and was in contemplation of this Agreement." The "Hazardous Communications" module, intended to secure the government's agreement to a Wal-Mart/IDRT collaboration, clearly contemplated a commercial agreement between Wal-Mart and IDRT and falls within this definition.

12.    IDRT also excludes the CBL modules "TAPS #12," "TAPS #13," "TAPS #14," and "TAPS #15," apparently on the basis that Wal-Mart sent them too late. Wal-Mart's Record of Deliverables indicates that these modules were sent to IDRT on May 31, 2002, which IDRT asserts was the concluding day of "Phase II" under the Development Agreement. IDRT admits that the modules were delivered by the next day, June 1, 2002 (a Saturday), but treats them as "Add-On Modules," outside of Phase II. Complaint, Ex. 3, "Revised Add-On Module Table."

13.    Assuming (1) that IDRT is correct that Phase II ended on May 31, 2002; and (2) that Wal-Mart's records indicating delivery on that day are in error because the TAPS modules were delivered a day later on Saturday, June 1, 2002, IDRT is still wrong in not including these four modules in Phase II. Time is not of the essence in interpreting a contract unless it is specifically stated in the contract. *Bryan v. Moore*, 863 A.2d 258, 260 (Del. Ch. 2004). "If time is not of the essence in a contract, the court will allow a reasonable time to perform." *Id.* at 261. The Agreement does not state that time is of the essence and, indeed, allows a ten-day grace period with respect to due dates under the "Timeline." ¶ 25.F(4).

11

Whether or not the modules were delivered on Friday, May 31, 2002, or Saturday, June 1, 2002, could not have made a difference in efficient utilization of IDRT staff over an engagement of many months. Even on IDRT's version of the facts, Wal-Mart substantially performed its contractual undertaking and cannot be penalized under the Agreement.

14.     Finally, IDRT omits CBL Module 96 ("Firearms Procedures: Basic") from the tally of modules delivered in Phase II because it was a component of other modules. "Revised Phase II Module Table," p. 2, fn. 3. IDRT points to no contractual basis for this omission. IDRT invoiced Wal-Mart for this module on the same basis as the other firearms modules, and Wal-Mart paid IDRT on the same basis as the rest. There is no basis to arbitrarily exclude it from the total.

15.     The "Hazardous Communications" module, four "TAPS" modules, and the "Firearms Procedures: Basic" total six modules delivered by Wal-Mart but not counted by IDRT. Added to the 144 modules that plaintiff does count yields 150 modules delivered by Wal-Mart for Phases I and II. For this reason, and on the additional, independent basis that plaintiff undercounted the "Learning to Lead" modules by ten, there was no shortfall of modules delivered to IDRT in Phases I and II. Therefore, IDRT is not entitled to a "Phase Contract" premium over the amounts previously billed to and paid by Wal-Mart.

1366596/1