IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INSTITUTE FOR DISABILITIES<br>RESEARCH AND TRAINING, INC., )<br><br>Plaintiff,<br><br>v.<br><br>WAL-MART STORES, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)  Case No. 05-176-GMS<br>)<br>)<br>)<br>) |

**DEFENDANT WAL-MART'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

**INTRODUCTION**

These Proposed Findings of Fact and Conclusions of Law are submitted by defendant Wal-Mart Stores, Inc. ("Wal-Mart") pursuant to a Stipulation and Order (Dkt. 46) implementing the Court's direction at the conclusion of the non-jury trial held on Monday, April 24, 2006. Transcript at 192-93. Citations to trial testimony are given by identifying the witness and transcript page(s), *e.g.*, "Vinopol, pp. 44-45." Plaintiff's and defendant's exhibits are cited in the form "PX ___" and "DX ___" respectively.

Two witnesses testified at the trial: Dr. Corinne Vinopol for plaintiff Institute for Disabilities Research and Training ("IDRT") and Mr. Brian Poland for defendant Wal-Mart. Dr. Vinopol is President of IDRT. PX 46. Mr. Poland managed Wal-Mart's training department at the time of most of the events at issue. Poland, p. 121.

The contractual disputes in this action present questions of law and are discussed in the Proposed Conclusions of Law. Wal-Mart's Proposed Findings of Fact provide the context and are based primarily on the Statement of Uncontested Facts attached as Exhibit A to the Pre-

Trial Order of March 20, 2006 (Dkt. 41) (hereinafter "Facts"), supplemented by references to the trial record.

## I. PROPOSED FINDINGS OF FACT

1. Plaintiff IDRT is incorporated and headquartered in Maryland. IDRT is in the business of providing development, training, and technical assistance to businesses that serve or employ persons with disabilities, particularly persons who are hearing impaired. Facts at 1; Vinopol, p. 25.

2. Defendant Wal-Mart is incorporated in Delaware and has its corporate headquarters in Arkansas. Wal-Mart operates retail stores throughout the United States and the world. Wal-Mart employs thousands of people to fulfill numerous jobs, tasks, and positions within its stores. Facts at 1.

3. Wal-Mart provided in-house employee training by a series of media presentations, which evolved with technological changes. Employees "played" these media presentations at their individual sites of employment throughout the United States. At the relevant times to this case, the media presentations were being converted to computer-coded files. *Id.*

4. The media presentations were made in a series of subject areas relevant to Wal-Mart's practices and philosophies. For example, one subject matter was leadership training. Some subjects, like that one, were broad and were broken down into various subtopics, each being a separate module of training. Other subjects were narrower. At the relevant time, there were approximately 260-300 separate individual modules of training. The number and content of these modules was not static, as Wal-Mart continually revised and developed its in-house training. Facts at 2.

5.      The U.S. Equal Employment Opportunities Commission ("EEOC") in Arizona filed a Complaint in the U.S. District Court of Arizona against Wal-Mart for violations of the Americans With Disabilities Act ("ADA"). P.L. 101-336, 42 U.S.C. § 12101, *et seq.* At issue was whether Wal-Mart's training modules were compliant with the ADA, particularly for those persons whose ability to hear and/or speak was impaired. Facts at 1.

6.      Wal-Mart had an existing relationship with Cognitive Arts in Chicago, Illinois. The relationship included using Cognitive Arts to transfer Wal-Mart's training modules into digitalized computer-coded files to be uploaded onto computer hard drives. Facts at 2-3.

7.      IDRT was introduced to Wal-Mart as a specialist in the area of converting media presentations into a format that could be accessible to hearing impaired and deaf people by various methods and means. One method and means was to interpret the audio feed of an audio-visual presentation into American Sign Language ("ASL"), film an interpreter "signing" the audio translation, and, at the point on the audiovisual display where the respective audio is played, implant as a small visual inset on the display a film clip of the respective audio being "signed" by an ASL interpreter. Facts at 2.

8.      In October-November 2001, Cognitive Arts, at Wal-Mart's request, retained and paid IDRT to complete the translation and conversion of the "Hazardous Communications" training module. Facts at 3; PX 2. It took two weeks, from October 31 to November 13, 2001, for the "Hazardous Communications" module to be converted by IDRT and encoded in digital format by Cognitive Arts. Facts at 3-4; PX 2, p. 10; Vinopol, p. 41.

9.      At Wal-Mart's request, Dr. Vinopol of IDRT attended a meeting in Arizona at which the modified Hazardous Communications module was shown to the EEOC. Facts at 2, 3-4; Vinopol, pp. 42-43. The EEOC approved the conversion of training modules by

this process, and the parties to the ADA proceeding began discussing a resolution of the EEOC Complaint by Consent Order based on Wal-Mart's completing the conversion of all its training modules in this way. Facts at 4.

10. In December 2001, while still negotiating to reach the final terms of a "Consent Order," Wal-Mart requested IDRT to undertake the development of all of its training modules immediately, with the understanding that the parties subsequently would prepare and execute an agreement to fully describe the terms and conditions of the undertaking. Facts at 4-5; Vinopol, pp. 44-45. IDRT agreed. Because of the size of the task and time requirements within which it needed to be completed, IDRT also requested, and Wal-Mart agreed to, an advance payment of $50,000.00. Facts at 5. With these understandings, in December 2001, Wal-Mart began forwarding to IDRT various training modules to be developed in accordance with the method and means established by the development of the "Hazardous Communications" module. *Id.*; Vinopol, p. 48.

11. The methodology was as follows: Wal-Mart would send a CD of the training module to IDRT. IDRT would watch and listen to the training lesson and make suggested changes to both video and audio content to make it adaptable for interpretation by ASL (*i.e.*, in addition to audio, in some instances, text, symbols, and pictorial displays required ASL explanation or change). To make the conversion more efficient and accurate, Wal-Mart also provided IDRT with a written "script" of the module. Using the "script," in conjunction with its view of the audiovisual play of the module, IDRT would modify the "script" to reflect suggested changes and embed a code to reflect the point at which various video clips of signed ASL interpretations should be incorporated into the media display. The explanation, changes, and audio text were translated into ASL, which, in turn, was "signed" by a certified ASL

interpreter and filmed on digital video media. The "coding system" developed by IDRT provided the means by which Cognitive Arts could determine exactly where, on the audiovisual media, the ASL interpretation was to be imbedded. Facts at 3.

12. The project continued in December 2001 and into the months of January, February, and March 2002, while the parties negotiated the terms and conditions of the Development Agreement. Facts at 5. This Agreement was finalized and executed by the parties in late March 2002. PX 21.

13. Generally described, the project was divided into four Phases. Thirty days before the end of each Phase, Wal-Mart could opt out of the contract. Timely, before the end of Phase II, Wal-Mart opted out of the Development Agreement. Nevertheless, IDRT continued to develop modules already submitted. Facts at 6.

14. As work proceeded under the Development Agreement, IDRT invoiced Wal-Mart based on the number of screens that it had worked on. Vinopol, pp. 78-79. For interim bills, it made no difference whether there were four modules of 25 screens each or 25 modules of four screens each. *Id.*, p. 79.

15. Wal-Mart paid IDRT's interim invoices in a total amount of $1,821,053.21. DX 10; compare PX 31, "Amount Paid" entries on pp. 195, 200, 204.

16. The controversy between the parties concerns a different billing formula under the Agreement. Although Wal-Mart paid IDRT's interim invoices relating to the modules developed in Phase II, the Development Agreement provided for increased compensation to IDRT (the "Phase Contract Price") if Wal-Mart delivered fewer modules in a given "Phase" than prescribed in the Agreement. PX 21, ¶¶ 25.B, F(2). IDRT claims that it received 51 modules in Phase II (Complaint, ¶ 40), nine fewer than the 60 specified in the Agreement. PX 21, ¶ 25.A(1).

Therefore, IDRT claims that it was owed $202,233.50 for "Contract Price Billing" on Phase II, over and above the $597,266.50 in interim billings that Wal-Mart paid for that phase. PX 31, p. 200. Wal-Mart contends that it delivered sufficient modules in both Phases of the contract.

       17.    On or about January 23, 2003, IDRT submitted what it termed a "Final Invoice" for $152,446.57 to Wal-Mart. PX 28, p. 155. The amount included what IDRT contended was due for payment of development work during the Phases and additional development work after Phase II. This document was prepared by IDRT's Maryland counsel, Harvey Greenberg, Esquire. After Wal-Mart questioned various items on the first "Final Invoice," Mr. Greenberg prepared a "Revised Final Invoice," in the amount of $174,299.57, which IDRT submitted to Wal-Mart on February 19, 2003. PX 31. Wal-Mart did not pay this invoice, which forms the basis of IDRT's Complaint. Facts at 6.

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Applicable Law

       1.    In this case in which jurisdiction rests upon diversity of citizenship, the Court will apply Delaware choice of law rules. *Weiss v. Northwest Broad., Inc.*, 140 F. Supp. 2d 336, 342 (D. Del. 2001), *citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (citations omitted).

       2.    Delaware courts generally permit parties to specify the law that will govern their contract. *Weiss*, *supra*, 140 F. Supp. 2d at 342; *J. S. Alberci Constr. Co., Inc. v. Mid-West Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000). The Development Agreement provides that either party must be sued in a court (state or federal) in defendant's state of incorporation and that "the law of such state shall govern the terms and conditions of this Agreement." PX 21, ¶ 35. The Development Agreement incorrectly states that Wal-Mart is

incorporated in Arkansas. *Id.* In fact, Wal-Mart is incorporated in Delaware, plaintiff has sued Wal-Mart here, and (as the parties agree) Delaware law applies to the contractual issues.

        3.     This case presents issues of contract interpretation and application of the parties' agreement to essentially undisputed facts. These are issues of law. *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

        4.     Under Delaware law, the Court will enforce the clear terms of the Development Agreement, resorting to extrinsic evidence only if terms are unclear. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). "If the contract's terms are clear on their face, the Court is not permitted to examine parol evidence. Instead, the Court must apply the meaning that would be ascribed to the language by a reasonable third party." *True N. Communications, Inc. v. Publicis S.A.*, 711 A.2d 34, 38 (Del. Ch. 1997), *aff'd*, 705 A.2d 244 (Del. 1997) (citations omitted).

    **B.**    **"Contract Phases"**

        1.     IDRT contends that it is entitled to more compensation than Wal-Mart has paid because Wal-Mart delivered insufficient modules in "Phase II" of the Development Agreement. Resolution of this dispute requires the Court to construe the definition of contract "phases" in the Agreement. In pertinent part, Paragraph 25.A. provides as follows:

> A.    Contract Phases
>
> (1)    The submission of CBL Modules to IDRT as directed by the Master ASL Timeline will be in four (4) phases. The Phases will be determined by the following number of CBL Modules to be submitted to IDRT for Development in accordance for the Master ASL Timeline.
>
>         Phase I:     90 CBL Modules
>         Phase II:    60 CBL Modules
>         Phase III:   50 CBL Modules
>         Phase IV:   60 CBL Modules

>   (2)   The undertakings and payments described in this Agreement shall be performed in the four sequential Phases as provided herein. Each Phase shall automatically follow the other, unless either party notifies the other in writing at least 30 days prior to the beginning of the next phase, that they will terminate the Development Agreement at the end of the Phase then in development … .

PX 21, ¶ 25.A(1) and (2).

2. Wal-Mart contends that Phase I ended with its delivery of the 90th module to IDRT (which happened to be in the week ending March 15, 2002; DX 1, p. 1, Column for Project Week 13). IDRT contends that Phase I ended on March 22, 2002. IDRT arrives at this date by beginning with the "90 CBL Modules" specified in the Agreement for Phase I, and then counting out 90 modules on the "Master ASL Timeline" attached thereto. Complaint ¶ 39; PX 31, p. 191, n.1. IDRT maintains that Phase I actually contained 93 modules (not 90 as specified in the Agreement) since, by IDRT's count, 93 modules had been submitted as of March 22, 2006.[1]

3. Based on the clear language of the Agreement, the Court finds that IDRT's construction is unpersuasive. If the parties had wanted to define "phases" by date, they would have done so expressly in Paragraph 25.A. For example, they could have provided that "Phase I shall end on March 22, 2002, by which time Wal-Mart shall submit 90 CBL Modules to IDRT; Phase II shall consist of the period beginning March 23 and ending May 31, 2002, during which Wal-Mart shall submit a further 60 CBL Modules. …" and so forth. The parties did not define "phases" by dates in this way. Instead, they identified "phases" by the number of modules submitted by Wal-Mart. The Agreement clearly limits Phase I to 90 modules and initiates Phase II "automatically" after that milestone has been reached. Development Agreement, ¶ 25.A(1)

---

[1] IDRT thus counts three extra modules in Phase I that Wal-Mart would count in Phase II.

and (2). Tellingly, the Agreement was executed by IDRT on March 24, 2002 and by Wal-Mart on March 28, 2002. If, as IDRT contends (Vinopol, p. 83), the parties really intended that Phase I include all 93 modules that IDRT asserts were submitted days earlier (*i.e.*, by March 22, 2002), they would not have defined the phase by the lesser sum of 90. The Court concludes that the clear language of the Agreement defines "Phases" in terms of number of modules, not dates deduced by distributing the enumerated modules over a timeline.

        4.    IDRT is correct that the Agreement does refer to "Modules to be submitted to IDRT for Development in accordance for [with] the Master ASL Timeline." PX 21, ¶ 25.A(1). But this raises a second reason for rejecting IDRT's rigid adherence to dates that are not specified in the contractual language defining "Phases." Based on the Development Agreement itself (and the testimony of both parties), the Court concludes that the purpose of the Master ASL Timeline was to enable timely performance of the parties' obligations under the Agreement in order to enable Wal-Mart to meet its obligations in the EEOC litigation. "The consent decree placed Wal-Mart in a very difficult situation of having to get these modules rolled out very quickly. And there was a very tight timeline for doing this. And they had many to do." Vinopol, pp. 44-45; Vinopol, p. 34; Poland, p. 118. To this end, the Agreement provides that a party would be in breach for "late performance," *i.e.*, if performance was more than ten days *late*. PX 21, ¶ 25.F(4). No penalty is provided for *early* performance, such as early delivery of modules by Wal-Mart. Penalizing promptness in this way would be contrary to a central purpose of the Agreement and is not supported by the contractual language.[2]

---

[2] Dr. Vinopol conceded that, under IDRT's construction, Wal-Mart could be liable for the higher "Phase Contract Price" in a later phase if it delivered extra modules (in a finite set) in an early phase, leaving fewer to be delivered in the later phase. Vinopol, p. 81.

9

      5.      Accordingly, the Court concludes that "Phase I" of the Agreement ended with Wal-Mart's delivery of the 90th module to IDRT and that Phase II "automatically follow[ed]." PX 21, ¶ 25.A(1) and (2). Because of that "automatic" continuity of Phases I and II, the merits of IDRT's claim of a shortfall in Phase II can be assessed by a tally of the total number of CBL modules delivered by Wal-Mart in both phases. The issue is whether Wal-Mart delivered at least 150 (90 plus 60) modules by the time Phase II ended. If not, IDRT is entitled to compensation based on the "Phase Contract Price" for Phase II, less certain amounts already paid by Wal-Mart. Conversely, Wal-Mart does not owe additional compensation to IDRT if it delivered at least 150 modules in the two Phases.

      6.      Wal-Mart's Record of Deliverables (DX 1) is a week-by-week spreadsheet created to manage the task of meeting Wal-Mart's obligations established by the EEOC litigation (Poland, p. 120). It shows that Wal-Mart sent a total of 160 CBL modules to IDRT from the outset of the relationship through May 31, 2002, when IDRT claims that Phase II of the contract concluded. Since "Phase I" was defined by Wal-Mart's submission of the first "90 CBL Modules" (¶ 25.A(1)) and Phase II "automatically follow[ed]" Phase I (¶ 25.A(2)), Wal-Mart asserts that it submitted 70 modules in Phase II, ten more than the 60 modules specified by the Agreement.

      7.      IDRT contends that Wal-Mart delivered only 144 modules in all, six shy of the 150 (90 plus 60) contemplated in the Agreement. *See* PX 31, p. 197, including n. 3; Complaint ¶¶ 39, 40 (93 in "Phase I" plus 51 in "Phase II").

    C.    **<u>Hazardous Communications, TAPS, And Firearms Procedures Modules</u>**

      1.      The first discrepancy in the parties' respective counts relates to the fact that Wal-Mart counts six modules that IDRT does not count, namely Hazardous Communications, Firearms Procedures (Basic), and four TAPS modules (Nos. 12-15).

10

### **Hazardous Communications**

2.    Dr. Vinopol agreed that IDRT collaborated with Wal-Mart on the Hazardous Communications module in hopes that (1) the EEOC would approve the methodology and the product which resulted and (2) that in turn would result in an engagement of IDRT by Wal-Mart for the conversion of many more CBL modules. Vinopol, p. 87. In other words, the work on the Hazardous Communications module was done "in contemplation of a more extensive Wal-Mart – IDRT commercial relationship" (Vinopol, p. 88) and falls squarely within the unambiguous scope of the Development Agreement which states that it "will include all work involved in the parties' undertakings that began before the date of the Agreement and was in contemplation of this Agreement." PX 21, Introductory Paragraph 3.

3.    IDRT argues that the Hazardous Communications module should not count on the grounds that it developed this module under contract with Cognitive Arts. Vinopol, p. 86. IDRT concedes that it did so at Wal-Mart's request. *Id.* IDRT had just been introduced to Wal-Mart and was not yet an authorized vendor. Retention of IDRT through Cognitive Arts enabled Wal-Mart to make prompt payment to IDRT before Wal-Mart's screening process was complete. Poland, p. 134.

4.    IDRT billed Wal-Mart directly, under the Development Agreement, for certain expenses related to the Hazardous Communications module. On April 24, 2002, after the Development Agreement was signed, IDRT sent Wal-Mart an invoice (DX 6) for "expenses under the agreement that were for activities other than the interpretation of the modules." Vinopol, p. 88. This invoice included Federal Express charges for November 2 and November 6, 2001 (Vinopol, p. 89; DX 6) when IDRT was working on the Hazardous Communications module. DX 2, p. 10; Facts at 3-4; Vinopol, p. 41. If these expenses were within the admittedly

retroactive scope of the Development Agreement, then the Hazardous Communications module to which they related was within the scope of the Agreement as well.

### TAPS Modules

5.  IDRT also excludes four CBL modules ("TAPS" Nos. 12-15), apparently on the basis that Wal-Mart sent them too late. IDRT contends that Phase II ended on May 31, 2002 (PX 31, p. 197, n.1). Wal-Mart's Record of Deliverables indicates that the TAPS 12, TAPS 13, TAPS 14, and TAPS 15 modules were sent to IDRT in the week ending on May 31, 2002. DX 1, week 24; Poland, p. 133. IDRT's "Revised Final Invoice" admits that the scripts for the modules were delivered by the next day, June 1, 2002 (a Saturday), but treats them as "Add-On Modules," outside of Phase II. PX 31, "Revised Add-On Module Table," p. 201.

6.  IDRT's contention that Phase II ended on May 31, 2002 is based on the "Master ASL Timeline" (PX 31, p. 197, n.1), which specifies only "Wal-Mart Scripts to IDRT" by that date. PX 21, p. 147, column for Week 24. Dr. Vinopol testified that IDRT actually got the module scripts on or about Friday, May 31, 2002, and the related CDs the next business day, Monday, June 3, 2002. Vinopol, p. 75. Even on IDRT's version, Wal-Mart literally complied with the timeline by delivery of the scripts on May 31, 2002.

7.  Even assuming Wal-Mart's delivery were a day or two late, IDRT is still wrong in not including these four modules in Phase II. Time is not of the essence in interpreting a contract unless it is specifically stated in the contract. *Bryan v. Moore*, 863 A.2d 258, 260 (Del. Ch. 2004). "If time is not of the essence in a contract, the court will allow a reasonable time to perform." *Id.* at 261 (citation omitted). The Agreement does not state that time is of the essence and, indeed, allows a ten-day grace period with respect to due dates under the "Timeline." PX 21, ¶ 25.F(4). Whether or not the scripts were delivered on Friday, May 31, 2002, or Saturday, June 1, 2002, could not have made a difference in efficient utilization of

IDRT staff over an engagement of many months. Dr. Vinopol acknowledged that the fact that the CDs arrived on Monday, June 3, 2002 (after the arrival of the scripts on Friday, May 31, 2002), did not inconvenience IDRT. Vinopol, pp. 95-96. Wal-Mart substantially performed and literally performed its contractual undertaking and cannot be penalized under the Agreement.

### Firearms Procedures

8.  IDRT omits a module devoted to "Firearms Procedures: Basic" from the tally of modules delivered in Phase II on the premise that "it was not a separate module but a component" of other modules. PX 31, "Revised Phase II Module Table," p. 197, n.3. IDRT points to no contractual or factual basis for this conclusion.

9.  The Development Agreement defines "Computer-Based Learning Module" as follows:

> 5.  *Computer-Based Learning Module*: Wal-Mart has produced as its proprietary product certain Computer-Based Learning (CBL) software for training employees (a/k/a "Associates"). The CBL Software is organized into individual units of Training or Modules, each of which is reproduced on a computer storage medium. Each CBL Module consists of a series of computer-generated Screens that are related to the topic or subject of the respective CBL Module and are sequentially displayed to the computer operator when the CBL Module is engaged or run on a computer. A Screen may display text, symbols and/or pictorial displays of still and/or moving pictures. As a Screen is displayed, audio may also be reproduced by the computer-regeneration. A Screen may have allied components engaged by the computer operator through mouse manipulation and/or keystroke. Such allied components may be text displayed questions and answers related to the respective Screen; and/or pictorial displays of still and/or moving pictures. Allied components may also have audio that is reproduced during the display of the respective Screen Component. The textual, symbolic, pictorial and audio features that are displayed and/or audibly reproduced in conjunction with a Screen are hereinafter referred to as "Screen Components."

PX 21, ¶ 5.

Case 1:05-cv-00176-GMS   Document 48   Filed 05/31/2006   Page 14 of 18

10. The "Firearms Procedures 1" materials consisted of a basic section that would have been shown everywhere in the country, plus 13 supplemental sections to teach specific further requirements variously imposed by 13 states. Poland, p. 133; Vinopol, p. 72.

11. The "Basic" section, at 38 screens, was more substantial than the 13 state-specific sections which ranged from one to eleven screens. IDRT's April 12, 2002 Invoice, DX 7. IDRT agrees that each of the state-specific sections counts as a separate module, but asserts that the larger, basic section does not count. PX 31 at 196, 197, n.3; Vinopol, p. 91.

12. The Basic material on Firearms Procedures was one of two modules that taught generally applicable "firearms procedures" to Wal-Mart's sales force.[3] The Court concludes that, like the smaller supplemental modules, the Basic section falls within the contractual definition of "module" as an "individual unit of training."

13. The "Hazardous Communications" module, four "TAPS" modules, and the Basic "Firearms Procedures 1" total six modules delivered by Wal-Mart but not counted by IDRT. Adding these six to the 144 modules that plaintiff does count yields 150 modules delivered by Wal-Mart for Phases I and II.

### D. Leadership Lessons

14. The second discrepancy in the parties' module count relates to the "Leadership Lessons." Wal-Mart's Record of Deliverables indicates that a total of 13 of these

---

[3] Mr. Poland noted a discrepancy (probably immaterial to the issues that the Court must decide) in the parties' terminology with respect to the Firearms Procedures modules at issue. Poland, pp. 132-133. Wal-Mart's Record of Deliverables refers to the 14 modules delivered to IDRT in late March as "Fire Pro 1." DX 1, p. 2, Project Week 15. IDRT's invoice refers to those modules as "Firearms Procedures II."

Wal-Mart and IDRT records agree that Wal-Mart had earlier submitted another Firearms Procedures module in January, which Wal-Mart called "firepro 2" (DX 1, p. 1, Week 6) and IDRT's invoice called "Firearm Procedures 1." PX 31, p. 189, No. 32. Plaintiff's Exhibit 43 is a "Final Draft" of the January module (dated 1/23/02) and is denominated Firearms Procedures II, or "Firepro 2," consistent with Wal-Mart's usage.

modules were delivered to IDRT in weeks ending February 8, February 15, and March 22, 2002. IDRT's evidence shows that actually there were 15 (PX 38 (same as DX 5); PX 40; PX 41; PX 42), but IDRT now counts these collectively as only "three modules or *batches*." PX 31, "Revised Phase I Module Table," p. 191, n.3. Emphasis supplied. "Batch" is a plural term. The Development Agreement, in contrast, defines "Modules" as "*individual units* of Training … ." PX 21, ¶ 5, emphasis supplied. IDRT cannot legitimately "batch" these "individual units of training" in order to compress 13 (or 15) modules to three for purposes of calculating compensation owed under the Agreement.

15. A "lesson" is, almost by definition, an "individual unit of training." Upon review of the 15 "Leadership Lessons" (collected at PX 40, PX 41, and PX 42), the Court concludes that they are, in fact, "individual units of training" in that each is a self-contained lesson. The Court concludes that each Leadership Lesson is a "CBL module" within the meaning of the Agreement. Adding 10-12 more modules to IDRT's combined count of 144 yields 154-156 modules delivered by Wal-Mart, more than the 150 (90 plus 60) minimum specified in the Agreement.

16. Since the contractual definition of CBL module is clear, it is neither necessary nor appropriate to examine extrinsic evidence on the issue. IDRT nonetheless offered several different arguments, based on extrinsic evidence, why the Leadership Lessons should not be counted separately as modules.

17. Dr. Vinopol testified that she did not discuss with Mr. Poland or anyone else how many modules were contained in PX 40 and the other CDs (PX 41 and PX 42) containing the Leadership Lessons. Vinopol, p. 67. She further testified that she discussed the Leadership Lessons with Mr. Poland and that they agreed that the "extra material" would be

broken down as reflected in an IDRT invoice for some of the Lessons, PX 33, p. 211 (same as DX 3). Vinopol, pp. 67-68. That invoice expressly itemizes each Leadership Lesson in the "Module Name" column and is as consistent with Wal-Mart's contention that each Lesson is a discrete module as with IDRT's contention to the contrary. Ms. Vinopol further testified that the third "Batch" of Leadership Lessons was listed as a module in a later invoice, PX 33, p. 216 (same as DX 4), and stated that Wal-Mart paid the invoiced amounts to IDRT. Vinopol, p. 73. Ms. Vinopol conceded, however, that the interim bills were based on the number of screens, not modules. Vinopol, p. 79. Wal-Mart's payment of an invoice based on the number of screens is not an admission that the "Batch" is one module or rather, as implied by the word "Batch," several modules.

18.  Ms. Vinopol further testified that, months later, another Wal-Mart representative (Scott Winn) was "very upset" that complex, "multi-pathed video-intensive instructional [Learning to [L]ead] modules" had not been sent along with "these [Leadership Lessons] what were called extras." Vinopol, p. 65. Wal-Mart's witness, Mr. Poland, agreed that Learning to [L]ead modules were "HTML-based multi-pathed video-intensive simulation modules" and that, in contrast, the Leadership Lessons were not "multi-pathed" modules. Poland, p. 130. The Development Agreement (PX 21, ¶ 6) recognized that CBL modules may be either "Standard" or "Complex" – *i.e.*, multi-pathed. The fact that the Leadership Lessons were not the multi-pathed "Learning to Lead" modules does not mean that they were not themselves modules.[4] IDRT did American Sign Language interpretation for each of the Leadership Lessons, which then would have been watched on computer. Vinopol, p. 109.

---

[4]  The Statement of Uncontested facts submitted by the parties as Exhibit A to the March 20, 2006 Pretrial Order (Dkt. 41) provides at page 2 that "Leadership Training" was a "broad" subject, "broken down into various subtopics, each being a separate Module of Training."

19. IDRT offered exhibits at trial that it did not designate in the Pretrial Order, even though the documents had been produced in discovery by Wal-Mart months earlier. In one of those documents (PX 47), each of the 15 Leadership Lessons was itemized in the "Module" column, opposite a notation "Does not count" in the "Developer" or "Week Completed" column. Wal-Mart's witness, Mr. Poland, was not familiar with the document (Poland, pp. 140-41, 152) and had not been deposed about it. Poland, p. 146. He did not know what the words "Does not count" meant (Poland, p. 142) and denied that they meant "do[es] not count as a module." Poland, p. 144.

20. Another exhibit identified by IDRT for the first time at trial was a document produced in discovery by Wal-Mart that referred to "Leadership Lessons" as "Extras." PX 49, W000947. Whatever the Wal-Mart employee (Rose Pace) meant by that usage, it was not an interpretation of the term "CBL Module" in the Development Agreement. Ms. Pace referred to Leadership Lessons as "extras" as early as February 19, 2002 (DX 11, W001660), six weeks prior to the execution of the Development Agreement in late March 2002. Poland, pp. 188-89.

21. IDRT's contentions based on extrinsic evidence are not coherent. On the one had, IDRT contends that the 15 Leadership Lessons were in three "batches" which count as three modules (PX 31 at 191, n.3). On the other hand, IDRT also contends, based on an unexplained Wal-Mart document (PX 47), that the Leadership Lessons "do not count" as modules at all. *See* Mr. Greenberg's question at p. 144 of the Transcript.

22. In any event, whether either party subjectively thought that the contract meant is not the issue. "Instead, the Court must apply the meaning that would be ascribed to the language by a reasonable third party." *True N. Communications*, *supra*, 711 A.2d at 38 (citation

omitted). As stated at the outset, the Court holds that the 15 Leadership Lessons are "individual units of training" and, therefore, that each lesson is a CBL "Module" within the clear and unambiguous meaning of Paragraph 5 of the Development Agreement.

### E. Conclusion

1. IDRT counts 144 modules delivered by Wal-Mart in Phases I and II of the Agreement. The Court concludes that IDRT's count (a) incorrectly omits six modules (Hazardous Communications, Firearms Procedures 1 (Basic and TAPS 12-15); and (b) incorrectly lumps 15 Leadership Lessons into only three "batch" modules. Correction of either error leads to the conclusion that Wal-Mart delivered at least 150 modules as required. Therefore, the Court concludes that IDRT is not entitled to additional compensation for "Phase II" based on the "Phase Contract Price."

2. The parties have stipulated that several smaller amounts, credits, and adjustments owed by one or the other party are summed and netted out to result in a credit of $28,292.01 owed by IDRT to Wal-Mart. Dkt. 47. Wal-Mart is entitled to recover that sum on its counterclaim against IDRT. *Id.*

POTTER ANDERSON & CORROON LLP

By   /s/ Gregory A. Inskip
    Robert K. Payson (ID No. 274)
    Gregory A. Inskip (ID No. 270)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    P.O. Box 951
    Wilmington, Delaware  19899
    (302) 984-6000
    rpayson@potteranderson.com
    ginskip@potteranderson.com

*Attorneys for Defendant Wal-Mart Stores, Inc.*

Dated: May 31, 2006
730362 / 29009