## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INSTITUTE FOR DISABILITIES     *
RESEARCH AND TRAINING, INC.,

                          *

      Plaintiff,

                          *     Case No. 05-176-GMS

WAL-MART STORES, INC.      *

      Defendant.           *

*    *    *    *    *    *    *    *    *    *    *    *

## PLAINTIFF'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Institute for Disabilities Research and Training, Inc. ("IDRT"), by and through its

attorneys, herewith submits its proposed findings of fact and conclusions of law.

## I.     PRELIMINARY STATEMENT

On May 1, 2006, a court trial was held before the Honorable Gregory M. Sleet of

the United States District Court for the District of Delaware in the above case. At the

conclusion of the trial, Judge Sleet requested the parties to simultaneously submit

proposed findings of fact and conclusions of law (Tr.192).[1] This submission will comply

with the Court's Order.

The Proposed Findings of Fact consists of three Parts. In Part A, the contested

issues of fact are identified. In Part B, proposed findings of facts (relevant to the

contested issues of fact) are marshaled from the Record. In Part C, proposed conclusory

findings of contested facts are enumerated. Parts of the Record cited in support of the

---

[1]     References to the Transcript of Testimony are indicated by "Tr" and the page number of
the printed Transcript of Testimony containing the referenced material.

Part B proposed findings of fact include the Transcript of Testimony,[2] Exhibits admitted

at trial[3] and Exhibit A to the Pre-Trial Order (Uncontested Statement of Facts) (D.I. 41)[4]

## II.    PROPOSED FINDINGS OF FACT

### A.    Contested Issues of Fact

1.    Is a Contract Phase based only on the designated number of CBL Modules

to be submitted for development, or the designated number of CBL Modules to be

submitted in accordance with the schedule of production in the Master ASL Timeline?

2.    Is the CBL Module "Hazardous Communications" to be counted as a

Module "submitted for development to IDRT under the Contract?"

3.    Are the items identified as "Leadership Lessons" to be counted as one

Module per lesson, or counted as one Module for each of the "batches" in which they

were submitted to IDRT?

4.    Is the item identified as "Firearms Basic" to be counted as a separate CBL

Module under the Contract; or not separately counted because it was integrated into each

---

[2]    There are a number of transcription errors in the Transcript of Testimony. Most are fairly obvious and are not material. Universally, the printed Transcript of Testimony refers to the "Learning to Lead' as "Learning to *Read*." IDRT believes its references to the Corrected Transcript of Testimony will not be disputed by Wal-Mart. Accordingly, it has not filed a Motion for Correction of the Record. Nevertheless, the absence of such a motion should not be deemed an admission of the accuracy of the Transcript of Testimony.

[3]    Trial Exhibits are referenced by PX or DX, respectively, for Plaintiff and Defendant, and the respective Exhibit number. PX1–46 were identified in the Pre-Trial Order and pre-assigned page numbers 1–409. References to PX1-46, include the relevant pre-assigned page number. PX47–49 and DX1–11 were not assigned page numbers in advance. Multiple page Exhibits in this series of Exhibits are referenced by the respective PX or DX Exhibit number, and the page of the respective Exhibit referenced.

[4]    The "Uncontested Statement of Facts" (Exhibit A) to the Pre-Trial Order (D.I. 41) will be referenced by "Exhibit A" followed by the page number of Exhibit A containing the referenced material. When feasible, the paragraph on the referenced page is indicated.

of the 13 separate "Firearms CBL Modules" developed for each of the 13 respective States?

     5.      If the Contract Phases are determined by the schedule in the Master ASL Timeline, were the CBL Modules identified as TAPS 12, 13, 14 and 15 submitted within or after the close of Phase II?

     6.      If the Contract Phases are determined solely by the number of CBL Modules submitted for development, considering the outcome of the contested issues of fact 2, 3 and 4, were there an additional 60 Modules submitted for development after the first 90 CBL Modules were submitted?

     **B.**      **Proposed Findings of Fact from the Record.**

     1.      The Institute for Disabilities Research and Training (IDRT) is a Maryland Corporation, located in Wheaton, Maryland. Its business is in "research and development in the field of disability, primarily hearing impaired." It conducts research for government agencies on topics related to educational rehabilitation and technology to benefit people with hearing impairments. It is involved with developing software geared primarily to people with hearing impairments.[5]

     2.      Wal-Mart Stores (WM) is a Delaware corporation with its corporate headquarters in Arkansas. WM operates retail stores that trade as "Wal-Mart" and "Sam's Club" throughout the United States and in other countries, and employs some 1.2 million people in various positions to carry out the jobs and tasks incident to its business.[6]

     3.      Since 1994, nationwide, the United States Equal Employment Opportunity Commission (EEOC) had filed 15 lawsuits against WM under the Americans With

---

[5]     Exhibit A, pg. 1, ¶ 1; Tr.25.

[6]     Exhibit A, page 1, ¶ 2; Tr.116.

Disability Act (P.L. 101-336, 42 USC Section 12101, *et seq*.). One of these suits was filed in 1998 by the Phoenix office of the EEOC in the United States District Court for Arizona. That suit resulted in a Court-approved Consent Decree entered on January 6, 2000. On April 18, 2001, the EEOC filed a Motion asserting that WM was in contempt of court because it had not complied with the Consent Decree of January 6, 2000. After a May 29, 2001 hearing, on June 13, 2001, the U.S. District Court for Arizona: (1) found WM had not complied with the Consent Decree "concerning the training of its staff and the requirements of the ADA and in communication methods with the hearing-impaired"; (2) ordered sanctions of $750,000.00, from January 6, 2000, based on $100.00 per day for each of the 22 WM stores in the portions of Arizona affected; (3) ordered WM "to create computer-based learning Modules in American Sign Language"; and (4) ordered that WM pay further penalties of $150.00 per day for each of the affected 22 WM stores for further noncompliance with the Order. A July 31, 2001 hearing was scheduled to determine WM's compliance. As described by WM's representative at trial "one of our lawyers had entered into a Consent Decree that they failed to deliver on." This was the factual background that led to introduction of the parties and their association with one another in creating computer-based learning Modules in American Sign Language.[7]

4.      The task of creating and "delivering" WM's computer-based learning (CBL) Modules in American Sign Language (ASL) was undertaken by WM's "Training Department," more specifically, WM's "People Division," the "Associate Training" and "Corporate Training Support" within that Division, and WM's legal team.[8]

---

[7]      PX1, pages 1-2; Exhibit A, page 1, ¶ 3; Tr.118.

[8]      Tr.121, Tr.122, 166, PX21, page 146.

5.    In one sense, once WM's Training Department contacted the EEOC, the project of converting WM's CBL Modules to an ASL-accessible CBL was started.[9] In another sense, the first week of actually doing the conversion Project started "whenever [WM] approached Dr Vinopol."[10]

6.    The additional fines for non-compliance of the Arizona Court Order placed WM in a "tight Timeline" or "time constraints."[11]

7.    Once alerted to the problem by WM's legal team, in or about June 2001, WM's Training Department started "due diligence" and "research" to comply with the Order.[12]

8.    In conjunction with the research, WM visited Gallaudet University and talked to different government agencies, and during its research, came across some relevant work that Dr. Vinopol[13] had done.  WM identified her as a "rich resource for the ASL side" of the creation of the CBL Modules.[14]

9.    Dr. Vinopol was first contacted by a WM representative in the early Fall of 2001, and asked if IDRT could put ASL into computer software and about its cost.[15]

10.    During several phone calls in the early Fall of 2001 with WM, Dr. Vinopol was advised of WM's time constraints and asked if IDRT could provide the ASL

---

[9]    Tr.154.

[10]    Tr.155.

[11]    Tr.120, 121, 122, 134.

[12]    Tr.135.

[13]    Corrine Vinopol, Ph.D. is President of IDRT, Tr.3, Tr.24-26.

[14]    Tr.119.

[15]    Tr.32; Exhibit A, page 2, ¶ 2, sentence 1.

conversion part of converting WM's Training Modules which, in turn, would be provided to Cognitive Arts (CA) to complete the technical part of the CBL conversion process.[16]

11.    CA was a Chicago, Illinois based "High-End Training technology firm specializing in high-end simulation-based CBL Modules"; and was a WM "associate in Chicago, the infrastructure for Wal-Mart" who provided technological assistance in this area.[17]

12.    WM "solicited" IDRT's "help and guidance" to convert one of its CBL Modules as a demonstration or Pilot Project and asked IDRT to "partner" with CA for that purpose.[18]

13.    WM was to demonstrate to the EEOC it had the means with which to comply with the Court's Order to convert its CBL Training Modules or  "individual units of learning" in a way that, at the employee's option, each CBL Module would display the instructional unit in ASL.[19]

14.    WM selected the CBL Module known as "Hazardous Communications" to convert to ASL as its demonstration Module.[20]

15.    Because of the time constraints and the time delays that would have resulted in WM's vendor approval process for IDRT as a new vendor, the demonstration or Pilot Project was contracted through CA.[21]

---

[16]    Tr.34.

[17]    Exhibit A, page 2, ¶ 2; Tr.119, 174.

[18]    Tr.135 – 136; Exhibit A, page 3; L. 1 – 3.

[19]    Exhibit A, page 3, last ¶ to page 4; Tr.134.

[20]    Exhibit A, page 3, last ¶.

[21]    Tr.134.

16.     IDRT hoped the engagement to develop "Hazardous Communications" would result in its engagement "for conversion of many more CBL Modules."[22]

17.     Pursuant to a "Consulting Agreement" between IDRT and CA, IDRT was engaged to convert the "Hazardous Communications" CBL to an ASL compatible unit of training, and IDRT charged CA and was paid by CA $6,000.00 for that engagement.[23]

18.     The "Hazardous Communications" Conversion Project was developed in accordance with a "Timeline," detailing dates on which tasks for the Project were due – ending on November 13, 2001.[24]

19.     At WM's request, on or about November 21, 2001, Dr. Vinopol attended and assisted in the demonstration of the ASL converted "Hazardous Communications" Module to the EEOC in Tucson, Arizona, for which WM paid IDRT $5,822.79 for its services.[25]

20.     The ASL conversion of the "Hazardous Communications" Module was played to and approved by the EEOC as a WM CBL Training Module that complied with the Court's Order to create computer-based learning in ASL for WM's hearing impaired employees.[26]

21.     The successful demonstration of the ASL converted "Hazardous Communications" Module resulted in the EEOC and WM negotiating an agreement for

---

[22]    Tr.87.

[23]    PX2, pages 5 – 9; Tr.36.

[24]    PX2, page 10; Exhibit A, pages 3 – 4; Tr.38 L. 21; Tr.39 – L. 6; Tr.41, L. 17 – 19.

[25]    Tr.42 – 43, PX34, page 236, L. 3.

[26]    Tr.135, 136; Exhibit A, page 4.

the ASL conversion of all of WM's CBL Modules to ASL in accordance with the converted "Hazardous Communications" Module.[27]

22.    As of mid-December 2001, WM was still negotiating with the EEOC for finalization of a new consent order. The negotiations included deadlines or time requirements for converting all of the CBL Modules. Nevertheless, by November 29, 2001, WM basically knew it would have to convert the "first 15 CBL Modules" within four months; and thereafter, it would have 12 months to complete the balance.[28]

23.    On November 29, 2001, WM represented to IDRT "we need to move forward on the preparation of the final contract" with IDRT; and asked IDRT to submit a proposal to it for providing the same services it had provided for the Module of "Hazardous Communications" for all of the CBL Modules to be converted under what would be the finalized Court Order.[29]

24.    On November 29, 2001, WM identified to IDRT some of the items to be considered in the "Contract." It described four kinds of CBL Modules in its inventory and identified the number of each kind, with the total of all 4 kinds equaling 238 Modules. Sixteen of those were of a kind identified as "Learning to Lead: 16 (HTML – based multi-pathed video-intensive simulation Modules)." WM stated that its "Module listing" was "changing all the time" and recommended that IDRT's contract include unit pricing for each of the four kinds of Modules. WM anticipated "sending [IDRT] more than the 220 Modules initially discussed as we add new programs" and WM requested the contract cover the cost and production of additional Modules. WM further stated

---

[27]    Tr.43; PX3, page 11, ¶ 1; Exhibit A, page 4, L. 1-4.

[28]    PX3, page 11; Exhibit A, page 4.

[29]    PX3; page 11.

there was to be a production schedule to be agreed upon by WM, IDRT, and CA; and that

the schedule should account for "hitting the EEOC Timeline," while giving each party the

time they needed in the development process. WM asked to get IDRT's proposal "in the

next few days to get the approval process rolling," estimating it would take a week or less

to "finalize the contract." So as not to "lose time in the contract process," WM stated it

would operate under a "simple document of understanding" like "during the pilot where

we will pay for services rendered." [30]  WM represented such an arrangement would

"allow us to continue work on the process without waiting on the final contract.

Everyday is precious and [it] would hate to lose a week."[31]

     25.    Because of the "tight Timeline" and the many CBL Modules to be

converted, WM asked IDRT to begin the Project immediately and IDRT agreed.

Although the parties understood the precise number of Modules to be included in the

undertaking was "dynamic," WM's library of CBL Modules was, "give or take, 300." As

CBL Modules were added and/or deleted, the total number of CBL Modules changed.[32]

     26.    At WM's request, on December 12, 2001, IDRT attended a "kick-off"

meeting of the Project at the offices of CA in Chicago, Illinois. At the meeting an

"Agenda" and "Project Table" were prepared and distributed by CA for the "Wal-Mart

ASL" Project. The Table stated the "start date" was December 12, 2001, and the Table

covered "Phase I – First 15 Courses." According to the Table, the "finish date" of Phase

I was approximately four months after its commencement; i.e., March 8, 2002. In

---

[30]    During the "Pilot Project," WM paid IDRT, on a "services rendered" basis, for attending and assisting at the EEOC conference at which "Hazardous Communications" was demonstrated. (see ¶ 19).

[31]    PX3, page 11-12.

[32]    Tr.43-45; Tr.159, L. 12 – 22; Tr.171.

addition, a "High Level Project Plan" for WM's ASL Conversion was prepared and distributed by CA. It divided the Project into three Phases. Phase I consisted of 12 weeks, during which the first 15 Modules were scheduled to be distributed to IDRT in designated groups of three or less during the 6 designated weeks of Phase I. The balance of the CBL Modules was scheduled to be submitted during each of weeks 13 – 47 of Phase II, in designated numbers per week; and during the weeks 42 – 60 of Phase III, in the designated numbers per week.[33]

27.    Between November 29, 2001 and December 21, 2001, WM changed the basis of billing from a per-Module price, to a per screen price of $266.50 per screen for each Module IDRT developed. IDRT agreed, but requested, and WM agreed, to pay a $50,000.00 advance.[34]

28.    At or about the time the unit of billing for each Module was changed from a per-Module to a per-screen price, WM represented there was an average of 50 screens across the estimated 300 CBL Modules.[35]

29.    The December 12, 2001 Table and "High-Level Plan" Production Schedule produced by CA were not accepted. One reason was that it did not consider input from IDRT, and IDRT's capabilities to meet its part of the conversion process of the number of Modules to be submitted within the times designated in the "High Level Project Plan."[36]

---

[33]    PX5, pages 17-21; PX6, pages 23-26.

[34]    Tr.47 – 48, PX6, page 13; Exhibit A, page 5.

[35]    Tr.45; Tr.50 – 51.

[36]    PX6, page 23; Tr.49-50; Tr.135; L. 22-23; Tr.176-177.

30.    Even though its new Consent Decree was not finalized with the EEOC, WM agreed with the EEOC to begin the conversion process immediately and in or about December 15, 2001, WM began sending CBL Modules to IDRT in accordance with its basic understanding of the EEOC-WM time schedule for conversion.[37]

31.    When the Consent Decree was finalized, IDRT was included as the provider for the ASL side of the CBL Conversion Project.[38]

32.    WM was to select which CBL Modules would be submitted to IDRT in each group, although WM was to "make sure [it] didn't deliver such a heavy load of Modules that [IDRT] would miss their deliverable;" that is, a selection process that "wouldn't choke… IDRT."[39]

33.    During the week ending 12/21/01, WM sent IDRT the group of 15 Modules to be submitted to the EEOC to comply with the anticipated time and production schedule of CBL conversions for the anticipated finalized Consent Decree.[40]

34.    After the initial group of 15 was sent, based on IDRT's gearing-up to a fully committed staffing for the Project, WM was to send seven CBL Modules each week to IDRT for ASL interpretations.[41]

35.    Even though WM sent "Hazardous Communications" to it during the week of December 21, 2001, IDRT did not work on and did not bill for the "Hazardous Communications" Module, since all the work had been done under the CA Contract.[42]

---

[37]    PX3, Page 11, Exhibit A, page 4, ¶ 2; DX1.

[38]    Tr.169.

[39]    Tr.144.

[40]    DX1; PX35, pages 239-240 (Note: PX35 did not include "Hazardous Communications" which was included in the first group of 15 Modules listed in DX1).

[41]    Exhibit A, Page 4.

36.    IDRT prepared, and on January 10, 2000, submitted a Contract Proposal to WM to memorialize the terms and conditions of the undertaking IDRT and WM had been discussing and which IDRT had already began.[43]

37.    The January 10, 2002 Contract Proposal represented that by December 17, 2001, WM would provide 15 CBL Modules and Scripts to IDRT for development, and, "beginning on February 7, 2002, and every 7 days until completion of three hundred (300) Training Modules, WM shall deliver to IDRT, a new group of seven (7) additional Training Modules "to develop."[44] This was the only schedule for production in the January 10, 2002 Contract Proposal.  While WM had discretion to chose the specific Modules comprising each group, that discretion was to be exercised so as to permit IDRT to develop all 300 CBL Modules within 60.5 weeks, from the first group submitted.[45]

38.    The Contract Proposal stated that there were an average of 50 screens across the 300 CBL Modules to be developed; a development charge of $266.50 per screen was to be charged and billed to WM as IDRT submitted its ASL interpretations (Video Clips) of Modules to CA; and the final invoice would reflect the difference between the Minimum Contract Price of $3,997,500.00 and WM's payments of a $50,000.00 advance and payments made on the interim invoices.[46]

39.    The dates of submission of CBL Module Scripts (hereafter "Scripts") reflected in WM's records and the dates of receipt of the Scripts, as reflected in IDRT

---

[42]    Tr.77.

[43]    PX8 and 9.

[44]    PX9, page 47, ¶ 20.

[45]    PX9, page 48, ¶ 22.

[46]    PX9, page 48, ¶ 23A; 49, ¶ 23D(2).

records, do not match. The respective records reported different events, i.e., date of submission for Scripts by WM and date of receipt of the Script by IDRT. The record maintained by WM is a summary of activity by the week, whereas the records maintained by IDRT report daily activity.[47]

40.    While the January 10, 2002 Contract Proposal was pending, after the submission of the first 14 CBL Modules and "Hazardous Communications" Module and February 1, 2002, inclusively, WM reported submitting 27 additional Scripts/Modules to IDRT, and IDRT reported receiving 24 additional Scripts/Modules for interpretation.[48]

41.    While the January 10, 2002 Contract Proposal was pending, IDRT submitted two interim invoices to WM for payment. The invoices identified the name of the CBL Module for which the bill was sent, the number of screens developed per Module and the charge, based on the per-screen charge of $266.50. Each of the invoices was approved and paid by WM.[49]

42.    While the January 10, 2002 Contract Proposal was pending, WM was considering options for ASL interpreters if it continued ALS conversions of its CBL Modules after compliance with the U.S. District Court of Arizona's Order, and options for ASL interpreters for completing the ASL conversion of the CBL Modules necessary to comply with the U.S. District Court Order.[50]

---

[47]    DX1 and PX35, pages 239-240; PX36, pages 240-243; PX37, pages 245-246; PX38, pages 248-249.

[48]    DX1; PX35, pages 239-240. (Note: IDRT reported receiving 3 of the 27 Scripts/Modules reported by WM on 2/3/02 (2) and 2/4/02 (1).

[49]    PX33, 206, 208.

[50]    PX47, pages 1 and 2, Tr.166-169.

43.     The options for ASL interpreters included "contemplating" an "alternative" to IDRT as the ASL interpreter to perform the work within the Decree period.[51]

44.     WM's first response to IDRT's Contract Proposal of January 10, 2002 was received by e-mail on February 1, 2002.[52]

45.     WM's February 1, 2002 response was identified as "Contract Clarifications." The clarifications included dividing the ASL Conversion Project into a "Five Phase Cost Structure."[53] As proposed, the cost structure would be based on the per-screen rate of $266.50 for each screen developed by IDRT, and it was proposed that each Phase would include a designated number of screens, i.e., Phase I, 4,500 screens; Phase II, 3,000 screens and Phases III through V of 2,500 screens each.[54]

46.     Based on an average of 50 screens per Module, the screens in each of the reported Phases equaled 90 CBL Modules in Phase I; 60 in Phase II and 50 each in Phases III through V, for a total of 300 Modules.[55]

47.     WM's "Contract Clarification" stated the proposed "Five Phase Cost Structure" was "due to the fact that CBL Training Volumes varies (sic) throughout the year."[56]

48.     At trial, WM's representative testified, "there were many reasons we went to Phases."[57]

---

[51]     Tr.167 – 168.

[52]     Tr.52; PX11, pages 58-60.

[53]     PX11, page 58.

[54]     PX11, page 58.

[55]     PX11, page 58.

[56]     PX11, page 58.

49.    One of the "reasons" was WM couldn't guarantee 300 Modules "because we didn't know we would have that many to give them over the course of the term."[58]

50.    Another reason was that IDRT "wanted some certainty, they hire contract workers, and there (sic) is a small shop that needed to scale up… one of the ways to get that was to break it into Phases and give both parties some certainties among the uncertainty."[59]

51.    IDRT agreed with breaking the Project into Phases.[60]  However, IDRT was concerned because it was "putting together a lot of resources that [it] typically would not have…; and it wanted assurance it "would at least be paid for a Phase price" if it wasn't "given all the business promised."[61]

52.    IDRT revised the January 10, 2002 Contract Proposal to provide for 5 Phases and a minimum payment per Phase, and on February 18, 2002, submitted the February 18, 2002 Contract Proposal to WM.[62]

53.    The February 18, 2002 Contract Proposal provided: "The submission of CBL Modules to IDRT as directed by the Master ASL Timeline will be in Five (5) Phases.  The Phases will be determined by the following number of CBL Modules to be submitted to IDRT for Development in accordance with the Master ASL Timeline."  The

---

[57]    Tr.172.

[58]    Tr.172.

[59]    Tr.172.

[60]    PX12; Tr.52.

[61]    Tr.53.

[62]    PX14 and 15.

number of Modules designated were 90 for Phase I; 60 for Phase II; and 50 each for Phases III to V – a total of 300 Modules.[63]

54.    The Master ASL Timeline attached to the February 18, 2002 Contract submission was that which was provided to IDRT on February 15, 2002.[64]

55.    The attached Timeline was specifically incorporated into the February 18, 2002 Contract Proposal and required WM to provide groups of CBL Modules in accordance with the weekly schedule enumerated therein.[65]

56.    The February 18, 2002 Agreement acknowledged IDRT had began the development process for Phase I.[66]

57.    The February 18, 2002 Contract Proposal provided for a Minimum Contract Price for each Phase.  The amount of the Minimum Contract Price per Phase equaled the number of Modules designated to be submitted for each Phase, multiplied by an average screen count of 50, multiplied by the per screen development charge of $266.50.[67]

58.    The February 18, 2002 Contract Proposal provided that during the Contract period, IDRT was to submit interim invoices as it provided ASL interpretations to CA.  On the last invoice for the Phase, IDRT was to bill WM for any difference between the aggregate number of billable screens invoiced in the respected Phase and the

---

[63]    PX15, page 76, ¶ 25A(1).

[64]    PX15, pages 85-86 (Note: facsimile stamp of sender on page 85); and PX13, pages 62-65.

[65]    PX15, pages 85-86.

[66]    PX15, ¶ 25A(3).

[67]    PX15, page 77; ¶ 25B.

Minimum Contract Price of that Phase, and on the final invoice, WM was to be credited for the initial payment of $50,000.00.[68]

59.    The February 18, 2002 Contract Proposal provided that the parties "understood and agree both must comply with their undertakings in accordance with the Timeline.  If either fails to perform its undertaking within 10 business dates of the dates specified in the Timeline, unless the non-performing party agrees in writing to such late performance prior to the specified date, they shall be in breach of the Agreement."[69]

60.    Between February 2, 2002 and February 18, 2002, inclusive, WM's weekly summary and progress records reported sending an additional 14 CBL Module/Scripts and two groups of Learning to Lead's Leadership Lessons as extras; IDRT records report that during the same period, it received 17 additional CBL Module/Scripts and Batches 1 and 2 of "Leadership Lessons."[70]

61.    During the period of February 1, 2002 through February 2, 2002, inclusive, IDRT submitted two additional invoices for payment to IDRT for Module development.  Each identified the title of the Module, the number of screens developed per Module, and the per-Module charge based on the per-screen charge of $266.50, multiplied by the specified number of screens developed per Module.[71]

62.    WM approved and paid each of the Invoices submitted.[72]

---

[68]    PX15, page 78, ¶ 25F(1).

[69]    PX15, page 79, ¶ 25F(3).

[70]    PX1; PX35, pages 239-240, PX36 pages 242-243 (Note: the additional 3 CBL Scripts being reported by IDRT during this period, were the 3 CBL Scripts WM had reported being received on or before February 1, 2002).

[71]    PX33, pages 209-210.

[72]    DX9; Tr.138.

63.     On March 19, 2002, WM sent IDRT a facsimile with a marked-up copy of the February 18, 2002 Contract Proposal with proposed changes.[73]

64.     The proposed changes included changing the number of Phases from 5 to 4.[74]

65.     The proposed changes included deletion of the Minimum Contract Price per Phase.[75]

66.     WM did not propose to change the February 18, 2002 Contract Proposal's basis for determination of Phases; that is, by the designated number of Modules "to be submitted to IDRT for Development in accordance with the master ASL Timeline," or the designated number of Modules for Phases I, II and III, (respectively, or 90, 60 and 50). However, WM did propose to change the designated number in Phase IV to 60, which then totaled an aggregate of 260 Modules.[76]

67.     WM attached a Revised Master ASL Timeline, which changed the aggregate total of Modules designated in the weekly submissions throughout the Project from 309 (the February 18, 2002 Timeline), to 260, the aggregate total of the designated number of Modules to be converted in the 4 Phases.[77]

---

[73]     PX17, pages 88-89, and 90-106 (Note: sender's facsimile date stamp).

[74]     PX17, page 98, ¶ 25A(1).

[75]     PX17, page 99.

[76]     PX17, page 98, ¶ 25A(1).

[77]     PX17; pages 107-108.

68.     The Revised Master ASL Timeline reflected the time and production requirements effectuated by WM in the ASL conversion process for compliance with its U.S. District Court Consent Order. [78]

69.     The March 19, 2002 Revised Master ASL Timeline did not change the number of weeks of the Project (64) or the dates each of the respective weeks ended, or during weeks 1-19 (week ending April 26, 2002) the production schedule of the number of Scripts/Modules to be submitted to IDRT per week.  However, beginning with week 20 (week ending May 3, 2002) and through week 45 (week ending October 25, 2002), the March 19, 2002 Revised Master ASL Timeline reduced the number of Scripts/Modules to be submitted each week from 7 to 5; and for week 46 (week ending 11/1/02), the last week for Module submission to IDRT in both Timelines, increased the number from 1 to 3 which would then equal an aggregate cumulative Project total of 260 Modules.[79]

70.     The March 19, 2002 proposed changes to the February 18, 2002 Contract Proposal did not change the provision of the February 18, 2002 Contract Proposal that acknowledged "IDRT has begun and is in the process of developing CBL Modules for Phase I."[80]

71.     During the period February 19, 2002 through March 19, 2002, inclusive, the weeks designated in both Timelines as weeks 10-13 transpired and according to WM's records it reported to deliver to IDRT 7 CBL Scripts/Modules for each of the 4 weeks, as provided in both Timelines, for a total of an additional 28 CBL Modules.[81]

---

[78]     Exhibit A, page 4, L. 5-10.

[79]     PX17, pages 107-108; PX15, pages 85-86.

[80]     PX17, page 99; ¶ 25A(3); PX15, page 77, ¶ 25A(3).

[81]     DX1.

72.    According to IDRT's records, during the period February 19, 2001 through March 19, 2001, inclusive, IDRT continued to receive Scripts/Modules on 8 different dates, totaling 26 Modules.[82]

73.    During the period February 19, 2002 through March 19, 2002, IDRT submitted 4 additional invoices for payment and like the previous invoices, each identified in 3 columns the names of the Modules developed, the number of screens per Module and the total per-Module charge, based on the $266.50 per-screen development charges.[83]

74.    In the February 23, 2001 invoice, two items under the Module column identified as "Leadership Lessons – Batch 1" and "Leadership Lessons – Batch 2" were listed, and each, respectively, identified 5 and 6 sub-components.[84]

75.    The 4 invoices submitted for the period February 19, 2002 through March 19, 2002 were approved and paid by WM.[85]

76.    In WM's approval process for the February 23, 2001 Invoice, the sub-components of Batch 1 and Batch 2 were grouped together by a handwritten interlineated bracket and the word "okay" was written next to each.[86]

77.    Because of its substantial dedication of time and resources, IDRT wanted assurances of a minimum obligation by WM and "the parties and reached a compromise

---

[82]    PX36, page 243; PX28, page 157, L. 58-83.

[83]    PX33, pages 211-214.

[84]    PX33, pages 211-214; DX9.

[85]    PX33, page 211.

[86]    Tr.138.

agreement as to the scope and terms of the project. That compromise is incorporated in the Development Agreement," (the Final Agreement signed by the parties).[87]

78.    On March 24, 2002, IDRT signed the Final Agreement, submitted it to WM on March 25, 2002, and WM signed it on March 28, 2002.[88]

79.    The Final Agreement still provided for 4 Phases and still provided that WM could opt out of a Phase by 30 days prior written notice.[89]

80.    By the time the Final Agreement was signed, WM had submitted over 91 Modules to IDRT by week ending March 22, 2002.[90] Nevertheless, the Final Agreement did not change the acknowledgment: "IDRT had begun and was in the process of developing CBL Modules for Phase I."[91]

81.    The Final Agreement provided that during each Phase, WM would submit to IDRT a designated Minimum number of Modules in each Phase.[92]

82.    The Final Agreement provided that in any Phase, if less than the designated number of Modules per Phase was submitted to IDRT for development, WM would pay the difference between a stipulated amount called "Phase Contract Price," and the payments for per-screen charges for the Modules that had been submitted in the respective Phase.[93]

---

[87]    Exhibit A, page 5, L. 18-22.

[88]    PX20; PX21, pages 130-148.

[89]    PX21, page 138, ¶ 25A.

[90]    DX1, pages 239-246; PX36, pages 248-243.

[91]    PX21, page 139, ¶ 25A(3).

[92]    Exhibit A, page 6, ¶1; and Tr.57.

[93]    Exhibit A, page 6, Exhibit 21, pages 139-140, ¶ 21B and 25F(2).

83.    In any Phase, WM could submit more than the minimum number of designated Modules, which would not have reduced the number of Modules to be submitted for the next Phase.[94]

84.    The Final Agreement did not change the provision that "Phases will be determined by the following number of CBL Modules to be submitted to IDRT for development in accordance with the Master ASL Timeline."[95]

85.    The intention was to allocate a number of CBL modules to be developed by IDRT "within a set period in accordance with the Timeline."[96]

86.    While the guaranteed stipulated Contract Price per Phase in the February 18, 2002 Contract Proposal had been removed, as long as at least the set number of Modules was submitted in a Phase, based on an average of 50 screens per Module, the per-screen billing per Phase "would be close to the designated Phase Contract Price."[97]

87.    IDRT allocated its resources in anticipation of the designated number of Modules to be submitted within the weekly production schedule in the Master ASL Timeline and if WM submitted less Modules in that time, IDRT "would still be covered as far as the resources we had allocated."[98]

88.    Between March 20, 2002 and March 28, 2002, inclusive, IDRT submitted a March 22, 2002 invoice to WM, and on March 29, 2002, another invoice was submitted.  Both were set up on the same format as previous Invoices and on the Invoice

---

[94]    Tr.58.

[95]    PX15, page 78, ¶ 25A(1), PX17, page 98, ¶ 25A(1); and PX21, page 138, ¶ 25A(1).

[96]    Tr.58.

[97]    Tr.58-59; PX17, page 99.

[98]    Tr.58-59.

of March 29, 2002, IDRT identified a Module as "Leadership Lessons – Batch 3"; and it was approved and paid by WM.[99]

89.    According to WM's Per-Week Summary Report of CBL Modules sent to IDRT, titled "Record of Deliverables," not including the Hazardous Communications Module and the 3 batches of Leadership Lessons WM had submitted 90 Modules to IDRT within the weeks of 1 – 14, the latter ending on March 22, 2002.[100]

90.    Counting the Leadership Lessons Batches as 1 Module each, the total number of Modules submitted to IDRT, starting with week 1 and ending on week ending March 22, 2002 was 93.[101]

91.    WM's per-week summary report, which counted each of the sub-components of the Leadership Lessons as separate Modules, and counted Hazardous Communications, reported that 104 Modules were submitted by the week ending March 22, 2002.[102]

92.    According to WM's per-week summary report, by week 19, ending April 26, 2002, a total of 133 CBL Modules were submitted to IDRT for development.[103]

93.    From the date the Final Agreement was submitted to WM by IDRT (on March 25, 2002), IDRT continued to develop the CBL Modules. On April 26, 2002, by

---

[99]    PX33, pages 215-216; DX9; Tr.138.

[100]    DX1.

[101]    PX31, pages 189-191.

[102]    DX1.

[103]    DX1.

e-mail of that date, IDRT received notice that WM was canceling the Agreement at the completion of Phase II (the "April 26, 2002 Notice").[104]

94.    According to the Master ASL Timeline incorporated into the Final Agreement, by the week ending April 26, 2002, WM was to have submitted 126 CBL Modules.[105]

95.    From April 27, 2002 to the week ending May 31, 2002, the Revised Master ASL Timeline changed the production schedule from 7 to 5 Modules per week, and by week ending May 31, 2002, an additional 25 Modules were to have been submitted for a total Module submission under the Revised ASL Timeline Schedule of 151 Modules.[106]

96.    The April 26, 2002 Notice stated it was a 30-day Notice of Cancellation and was submitted "in an abundance of caution with respect to the timing of this Notice and in light of the number of deliverables associated with your Contract."[107]

97.    According to the WM's Per-Week Summary Report, the 150th CBL Module was submitted to IDRT for development during the week ending May 24, 2002.[108]

98.    Assuming Phases were to be determined simply by the number of Modules submitted each Phase, by May 24, 2002, Phase II would have concluded, which

---

[104]    PX22, page 142.

[105]    PX21, page 147.

[106]    DX21, page 147.

[107]    PX22, page 142.

[108]    DX1.

would result in WM's April 26, 2002 Notice being submitted less than 30 days before the end of Phase II.[109]

99.     The April 26, 2002 Notice was timely if based on the Production Schedule in the Revised Master ALS Timeline; that is, according to that schedule in the Master ASL Timeline, the 150th Module was to have been submitted by May 31, 2002.[110]

100.    An internal WM ASL Conversion Project Status Report for the period February 4, 2002 - February 15, 2002 ("Feb 02 Status Report"), identified as weeks 8 and 9, reported "the deliverable goals of 7 scripts/modules were met" in each week; and its "major work planned for" the next week included the delivery of 7 scripts/modules to IDRT.  The Feb 02 Status Report matches the dates, weeks numbers and module production schedule in the Master ASL Timeline attached to the February 18, 2002 Contract Proposal.[111]

101.    The Feb 02 Status Report also reported that during the February 4, 2002 - February 15, 2002 period, "13 Learning to Lead Leadership Lessons were prepared and sent to IDRT as extras."[112]

102.    WM maintained an internal schedule of per-week module/script production by/for module developers and the project's leader, Rose Pace (hereinafter "Developers' Production Schedule").[113]

---

[109]    PX27, Page 149; DX1.

[110]    PX22, page 149; PX21, page 147.

[111]    DX11, page 2; PX15, page 185.

[112]    DX11, page 2.

[113]    PX47, pages 1-2; Tr.121, 140-145, 150-152, 180-183.

103.    In the Developers' Production Schedule, under the column "Sent to IDRT," for the developers' weeks 2 and 4, respectively, annotations of "WK 8" and "WK 10" are identified.  The annotations correspond to weeks 8 and 10 in the Master ASL Timeline and WM's "Record of Deliverables"; and, the identification of Modules submitted each week in WM's "Record of Deliverables" and the Developers' Production Schedule are nearly the same.[114]

104.    In the Developers' Production Schedule there are 7 Scripts/Modules and 4 "Learning to Lead Leadership Lessons" identified in the developers' week 2, corresponding to week 8 of the Master ASL Timeline, and the annotation "Does not count" is stated on each of the lines for each of the 4 Leadership Lessons.[115]

105.    The Developers' Production Schedule also includes a per-week and Project cumulative total count for CBL Scripts/Modules submitted, and for the developers' Week 2, corresponding to Week 8 in the Master ASL Timeline, the 4 identified Leadership Lessons are not counted in both the weekly and Project cumulative totals of Modules produced.[116]

106.    For the developers' Week 3 (corresponding to the Master ASL Timeline – week 9) and the developers' week 8 (corresponding to week 14 in the Master ASL Timeline) respectively, 7 and 5 "Leadership Lessons" are listed as submitted in the respective weeks; and in each week and for each "Leadership Lesson," the annotation

---

[114]    DX1; PX21, page 147; PX47, pages 2 and 3.

[115]    PX47, page 2.

[116]    PX47, page 2.

"Does not count" is added; and all of the "Leadership Lessons" are excluded from the weekly and Project cumulative totals of Modules produced.[117]

107.     The annotation "Does not count" in the Developers' Production Schedule is only inserted for the items identified as "Leadership Lessons."[118]

108.     In week 18 of the Developers' Production Schedule, corresponding to week 24 of the Master ASL Timeline, 5 Modules are identified as produced that week, including TAPS 12, 13, 14 and 15.  These are the same 5 Modules identified in week 24 on WM's "Record of Deliverables."  On the Developers' Production Schedule, at the end of developers' week 18, from the beginning of the Project, 146 Modules were identified as submitted for development, compared to 160 Modules identified for the same period in WM's "Record of Deliverables."[119]

109.     In the Developers' Production Schedule, the first 15 Modules produced before the first-listed developers' due date of January 7, 2002 were not identified.[120]

110.     In WM's "Record of Deliverables" prior to January 7, 2002, 16 Modules are identified as produced prior to January 7, 2002, including the Module "Hazardous Communications."[121]

111.     As a result of an August 2000 meeting between representatives for IDRT, CA and WM, IDRT memorialized an understanding that WM never sent to IDRT for development, the CBL Modules known as "Learning to Lead."[122]

---

[117]     PX47, pages 2 and 4.

[118]     PX47, pages 1-12; Tr.145.

[119]     PX47, page 6; DX1, page 2.

[120]     PX47, page 1.

[121]     DX1.

112.    IDRT submitted a final invoice to WM on January 23, 2003, (the "Final Invoice") and included in the Final Invoice, Tables that identified the Modules submitted in each Phase, including a listing of 91 Modules in Phase I and 51 Modules in Phase II.[123]

113.    On January 29, 2003, WM responded to the January 23, 2003 invoice and asserted that the Module listings included in the Tables did not include 3 Modules; namely, Hazardous Communications, Advanced Photo Systems, and Hourly Supervisor Labor Relations Test.[124]

114.    The January 29, 2003 WM response did not assert that "Leadership Lessons" identified in the Tables included in the January 23, 2003 Final Invoice as 3 Modules, were not properly counted.[125]

115.    In reply to WM's response to the January 23, 2003 Final Invoice, a re-examination of IDRT's records was made and 2 of the Modules identified in WM's response were added to the list of Modules previously received in Phase I (excluding Hazardous Communications), increasing Phase I Module count to 93.[126]

116.    In the January 23, 2003 Final Invoice submitted to WM, a separate Table entitled "Add-On Module Table" was included for TAPS 12, 13, 14 and 15, and these Modules were not included in the Table listing Modules received in Phase II.[127]

117.    WM's January 29, 2003 response to the January 23, 2003 Final Invoice, and the Tables and calculations included in it, did not assert that the "Add-On Modules"

---

[122]    PX25; Tr.62, 65, 106.

[123]    PX28, pages 155-158, 162-163.

[124]    PX29, pages 171-173.

[125]    PX29, pages 171-173.

[126]    PX30, pages 174-177; PX31, pages 189-191.

[127]    PX28, pages 162-163, 167.

of TAPS 12, 13, 14 and 15 should have been counted in the Table listing modules received in Phase II.[128]

### C.    Conclusory Findings of Facts

1.    The Final Agreement included that a breach of the Agreement would be a failure to provide IDRT with the CBL Scripts/Modules within 10 business days "of the time period required in this Agreement"; and that provision would only have effect if the production of CBL Scripts/Modules were to be in accordance with the Master ASL Timeline.[129]

2.    The submission of the Modules of TAPS 12, 13, 14 and 15 were within 10 business days of the time period required in the Master ASL Timeline. The 10-day grace period only affects whether late submission would constitute a breach of the Agreement; it does not affect whether these Modules were submitted within the time period of Phase II. However, the late submission within 10 business days would result in the submission of *less* than the designated number of Modules per Phase, which was not a breach of the Agreement – it triggered the Agreement's designated Phase Contract Price provisions.[130]

3.    It is more probable than not, that the screens developed for "Firearms Basic" were not only integrated into the 13 State Modules submitted to IDRT, but distributed as a separate unit of training in all other States in which WM sold firearms.[131]

---

[128]    PX29, pages 171-173; PX28, pages 162-163, 167.

[129]    PX21, page 144, ¶ 29D.

[130]    PX21, page 144, ¶ 29D; PX21, page 139, ¶ 25B, and page 140, ¶ 25F(2): "during each respective Phase initiated in accordance with ¶ 25A(2), if *less* than the number of CBL Modules...."

[131]    The consideration of "Firearms Basic" as a separate Module requires construction and correction to the Transcript of Testimony, at Tr.132-133. In response to the question whether or not WM sold firearms only in the 13 States itemized, the Transcript of Testimony reflects: "No, I *don't* believe we sold it in more than those 13 States. And, at that point, you get the general

4.      Considering "Firearms Basic" as a separate Module, which, according to both parties' records was submitted/received in the week ending March 29, 2002, one additional Module was submitted in Phase II, increasing the Phase II Module submission from 51 to 52.[132]

5.      Including "Firearms Basic" as an additional Module in Phase II would not effect the engagement of the Phase Contract Price and would not effect the calculation of the Phase II Price reflected in IDRT's Revised Final Invoice of February 19, 2003 because the "screens" comprising the Firearms Basic Module were already included in the total of $597,266.50 IDRT credited against the Phase II Contract Price.  Accordingly, it does not effect IDRT's claim or calculation of damages.[133]

6.      The business relationship of the parties from the Fall, 2001 through March, 2002 and WM's requirements, obligations and potential jeopardy with relation to the ADA case in the U.S. District Court for Arizona, reflect the need to comply with specific time scheduling for the ASL Conversion Project and the incorporation of the specific time schedules in the Contract being negotiated and finalized between the parties.

---

content that we developed in cooperation with the FBI."  IDRT believes that "don't" should be *do*.  Moreover, IDRT's recollection of the testimony is supported by the follow-up question and response at Tr.133.  There, in response to the question whether WM's attorney's understanding was correct that the basic section under Firearms Procedures "would have been shown everywhere in the Country, and every State where Wal-Mart sold firearms, whether or not that State had additional requirements that needed to be addressed, in addition" – the witness responded: "Yes.  It's my understanding that is the basic front-end, if you will.  If you are in a State that has additional, then you receive the instruction that came with that State, only those that were defined to need additional reference."

[132]      PX31, pages 196-197, 200; DX1.

[133]      PX31, page 300; PX31, page 198, L. 2 – invoice 13; and Footnote 4(b) to invoice 13.

7.    The term "Contract Phase" incorporates and means the production of Modules in the time periods included in the Master ASL Timeline and accordingly, Phase I started with week 1 in the Master ASL Timeline and ended with the week ending March 22, 2002, when the 90th CBL Module was to be submitted.

8.    There were 93 CBL Modules submitted in Phase I.

9.    Phase II of the Project began immediately after the close of Phase I; namely, on March 23, 2002 and ended when the 60th additional Module was to be submitted in accordance with the Master ASL Timeline; namely, May 31, 2002.

10.    During Phase II, 52 additional Modules were submitted to IDRT, less than the minimum number of 60 Modules required under the parties' Agreement.

11.    In determining the number of Modules as stated above, the items identified as "Learning to Lead Lessons" are not counted as Modules; however, by the parties' actions, an understanding was reached that these extra materials would be considered as 3 separate Modules and each of the 3 Modules were included in Phase I's accounting of 93 Modules.

12.    The Module "Hazardous Communications" is not included as a Module to be included in the Agreement of the parties inasmuch as it was not "submitted for development" to IDRT under this Contract.  It was submitted to IDRT for the purposes of it being forwarded to the EEOC to comply with WM's obligations with respect to the Consent Order from the U.S. District Court of Arizona.  "Hazardous Communications" was not worked on or billed by IDRT at all during the term of the relevant Contract.  The term "prior undertaking" as used in ¶ 3 of the Contract in the context of the rest of the

Agreement, particularly, ¶ 25A(3) does not mean the development of "Hazardous Communications" in IDRT's Contract with CA.

13.     The "screens" included in an item identified as "Firearms Pro Basic" will be considered a separate Module; and that Module was submitted in Phase II, increasing the number of Modules submitted in Phase II, to 52.  However, based on the parties' Agreement and IDRT's calculation of the difference between the Phase II "Phase Contract Price" and the interim invoice billing, the addition of "Firearms Basics" as an additional Module in Phase II does not effect the calculations in IDRT's Revised Final Invoice of February 19, 2002, or its claim for damages in this case.

14.     WM "timely" provided a 30-day notice of cancellation of Phase II of the Contract, and that notice would have been timely, based on Phase II ending on May 31, 2002, in accordance with the Master ASL Timeline; it would not have been timely, based on WM's assertion that the Contract Phase was based only on the number of Modules submitted to IDRT.

15.     After the close of Phase II, IDRT received 4 additional Modules, namely, TAPS 12, 13, 14 and 15.

16.     Because WM elected to terminate the Contract at the end of Phase II, which ended on May 31, 2002, IDRT correctly did not include these Modules in Phase II; and accordingly, the calculations in IDRT's Revised February 19, 2002 Final Invoice and its claim for damages herein, is correct.

17.     After the submission of the Revised Final Invoice of February 19, 2002, WM made no payments and the balance reflected in that invoice of $174,299.57 has

remained open. According to the terms of the Contract, interest at the rate of 8% per annum is also due on the outstanding balance.

18.    The amount owed by WM to IDRT includes additional billing for Phase I in the amount of $18,145.58; additional billing for Phase II in the amount of $204,916.49; and additional billing of $1,237.50 for unpaid additional work, for a grand total of $224,299.57.

19.    According to the parties' Agreement, WM is entitled to a $50,000.00 credit for its initial payment, reducing the total net balance, which should have been paid as of March 27, 2003, of $174,299.57.

20.    The calculations stated herein include a credit to WM for correcting invoice No. 2 in the amount of $10,393.50.[134]

21.    The total interest, based on simple interest calculations for the outstanding balance due, as of May 27, 2006 is $44,155.90, which, together with the outstanding balance of $174,299.57, equals a total of $218,455.47.

22.    Even if WM's contention that Phases were to be determined without regard to the schedule of production in the Master ASL Timeline and were to be determined only by a count of Modules submitted to IDRT for development, the total Modules submitted were 149 (93 + 52 + 4). Assuming, *arguendo*, 90 Modules comprised Phase I, the balance of Modules submitted, 59, would comprise Phase II and that total, being less than the designated minimum amount of 60 Modules as required in the Contract, also engaged a calculation of money owed by WM under the Phase Contract Price for Phase II.

---

[134]    PX31, page 195.

III.    **CONCLUSIONS OF LAW**

1.      When interpreting or construing a contract, "the Court's primary function is to ascertain the intent of the parties." *Coca-Cola Bottling Co., Inc. v. Coca-Cola Company*, 769 F.Supp. 599, 616 (D. Del. 1991), *aff'd in part*, 988 F.2d 386 (3d Cir. 1993).

2.      When a court engages in construction of a contract, it determines a contract's legal operation, that is, "its effect upon the action of courts and administrative officials." *John F. Harkins, Co., Inc. v. Waldinger Corp.*, 796 F.2d 657, 659 (3rd Cir. 1986).

3.      When a court engages in "interpretation of language it determines what ideas the language induces in other persons." *In Re: Professional Video Association*, C.A. No. 95-016-PJW, 01-488 GMS, 2005 WL 189733, at *4 (D. Del. Jan. 27, 2005), *aff'd in part, rev'd in part on other grounds*, 2006 WL 859042 (3d Cir. 2006). Interpretation and construction of a written contract present only questions of law "so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's fact." *Id.*

4.      WM has not moved for summary judgment relief under Fed.R.Civ.P. 56. While not dispositive, the absence of a Rule 56 Motion asserting that there is no dispute of material facts and that judgment should be entered as a matter of law reflects an indication that there is a dispute of material facts, and that since judgment as a matter of law is inappropriate, so to is a construction of the contract as a matter of law.

5.      The language of a contract is ambiguous when it is "subject to reasonable alternative interpretations." *Coca-Cola,* 769 F.Supp. at 616.

6.      In determining ambiguity, "the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings" are considered. *Id.*

7.      When interpreting a contract, primary importance should be placed upon the words of a contract, but the court may also look to "the course of performance, prior course of dealing and the circumstances surrounding the transaction." *Id.*

8.      When interpreting a contract, a court puts itself in the position of the parties at the time the contract was entered, not in a position of hindsight. *Coca-Cola,* 769 F.Supp. at 616.

9.      In interpreting a contract, "the court should give the greatest weight to the express language of the contract itself… as the words used in themselves are the best and most important evidence of the intention of the parties. The meaning of words is dependant upon their context, and the contract should be interpreted as a whole." *Id.* (Internal quotations and citations omitted.)

10.     If possible, a contract is to be interpreted to give significance to each part and to provide consistent meaning of a contract term. *Id.*

11.     "In making the ambiguity determination, a court must consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings… If a reasonable alternative interpretation is suggested… objective evidence in support of that interpretation should be considered by the factfinder." *Int'l Union, United Auto., Aerospace and Agriculture Implement Workers of America, UAW v. Mac Trucks, Inc.*, 917 F.2d 107, 111 (3d. Cir. 1990) (internal quotation marks and internal citations omitted).

12.    As a matter of law, the court finds the disputed language is susceptible to more than each one meaning, and that the terms of the contract are ambiguous. The Court therefore moves on to its role as the fact finder to determine the meaning consistent with the intention of the parties at the time they entered the contract.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Patricia R. Uhlenbrock (#4011)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800
Attorneys for Plaintiff

OF COUNSEL:

Harvey Greenberg, Esquire
29 W. Susquehanna Avenue – Suite 700
Towson, MD  21204
(410) 823-2277

Dated:    May 31, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of May, 2006, I electronically filed IDRT's Proposed Findings of Fact and Conclusions of Law with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Gregory A. Inskip, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951


Patricia R. Uhlenbrock (#4011)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
puhlenbrock@morrisjames.com
Attorneys for Plaintiff