IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INSTITUTE FOR DISABILITIES RESEARCH AND TRAINING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 05-176 (GMS) |
| WAL-MART STORES, INC., | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM**

**I.   INTRODUCTION**

On March 22, 2006, the plaintiff, Institute for Disabilities Research and Training, Inc. ("IDRT") filed this contract action against Wal-Mart Stores, Inc. ("Wal-Mart"). On April 24, 2006, the court held a bench trial in the matter. The parties tried essentially two issues: (1) whether the term "Phases" in the contract, i.e. the Development Agreement, between the parties is ambiguous or has a plain meaning; and (2) whether certain of Wal-Mart's submissions to IDRT should be counted as modules. The court subsequently directed the parties to file proposed findings of fact and conclusions of law.

After having considered the testimony elicited during the trial and the arguments presented in the parties' submissions on the issues, the court concludes that the term "Phases" as used in the Development Agreement has a plain meaning, namely that "Phases" are determined by the number of CBL Modules submitted by Wal-Mart. The court further concludes that Wal-Mart submitted a total of 149 modules for Phases I and II, and IDRT, therefore, is entitled to recover additional compensation for Phase II based on the "Phase Contract Price," reduced by the $28,292.01 credit owed by IDRT to Wal-Mart.

**II.     FINDINGS OF FACT**

Having considered the testimony and documentary evidence, the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Prior to trial, the parties submitted an exhibit of uncontested facts in conjunction with their Pretrial Order. (D.I. 41, Ex. A.) The court takes most of its findings of fact from the parties' uncontested facts, supplemented by citation to trial testimony and exhibits that support the uncontested facts. During the bench trial, each party called one witness: IDRT called Dr. Corinne Vinopol ("Dr. Vinopol"), one of its representatives, and Wal-Mart called Mr. Brian Poland ("Mr. Poland"), one of its representatives. Much of the testimony adduced by the parties' witnesses is extrinsic evidence. Because the court finds the contract term "Phases" unambiguous, it need not make findings of fact with respect to the extrinsic evidence adduced at trial regarding the meaning of or parties' intentions as to that term. The court, however, will make findings of fact based on the extrinsic evidence adduced regarding the "Leadership Lessons," because it finds that the Development Agreement does not define this term, and it must turn to the parties' intentions with respect to whether "Leadership Lessons" are modules.

1.  IDRT is incorporated and headquartered in Maryland. IDRT is in the business of providing development, training, and technical assistance to businesses that serve or employ persons with disabilities, particularly persons who are hearing impaired. (Exhibit of Uncontested Facts ("Facts"), at 1.)

2.  Wal-Mart is incorporated in Delaware and has its corporate headquarters in Arkansas. Wal-Mart operates retail stores throughout the United States and the world. Wal-Mart hires, engages, and employs thousands of employees as part of its trade and business, who are

           engaged to fulfill numerous jobs, tasks, and positions with Wal-Mart's retail stores. (Id.)

3.     In or about 2000 to 2001, the United States Equal Employment Opportunities Commission (the "EEOC") in Arizona filed a complaint against Wal-Mart in the United States District Court for the District of Arizona, alleging violations of the Americans With Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et seq*. At issue was whether Wal-Mart's employment practices in "training" were compliant with the ADA, particularly for those persons whose ability to hear and/or speak was impaired. Wal-Mart provided in-house employee training by a series of audio-video media presentations, on VHS tapes, CDs, DVDs, and/or digitalized computer-coded files, with the format of the media presentations evolving with technological changes.[1] Regardless of their format, an employee "played" the media presentations at his or her individual site of employment throughout the United States. (Id.)

4.     The media presentations were created in a series of subject areas relevant to Wal-Mart's practices and philosophies, for example "Leadership Training." Some subjects, including the "Leadership Training" were broad and, therefore, were broken down into various subtopics, each existing as a separate Module of Training or Computer Based Learning Module ("CBL Module"). During the time period relevant to this action, there existed approximately 260-300 separate individual CBL Modules. The number and content of these CBL Modules was not static, as Wal-Mart continuously revised and developed its in-house training. These CBL Modules became the subject of concern between the EEOC and Wal-

---

[1] During the time period relevant to this action, the media presentations were being converted to computer-coded files. (Facts, at 1.)

       Mart, and in turn, the Development Agreement.[2]  (Id. at 2.)

5.   IDRT was introduced to Wal-Mart as a specialist in the area of converting media presentations into a format that could be accessible to the hearing impaired and the deaf by various methods and means.  One method and means that IDRT employed was to interpret the audio feed of an audio-visual presentation into American Sign Language ("ASL"), film an interpreter "signing" the audio translation and, at the point on the audiovisual display where the respective audio is played, implant a film clip of the respective audio being "signed" as a small visual inset on the display.  At Wal-Mart's request, IDRT attended an EEOC meeting in Arizona to help explain this conversion process to the EEOC.  (Trial Transcript ("Tr.") at 42-43.)  To demonstrate that a converted Wal-Mart CBL Module would satisfy the EEOC, IDRT was contracted through Cognitive Arts ("CA") to convert one of Wal-Mart's Modules as a "demonstration project."  The subject of this CBL Module and its title was "Hazardous Communications."  (Facts, at 2; see PX 2; Tr. at 42, 86.)

6.   Wal-Mart had an existing relationship with CA, in Chicago, Illinois, which included using CA to transfer Wal-Mart's CBL Modules into digitalized computer-coded files to be uploaded onto computer hard drives.  In October-November 2001, CA retained and paid IDRT to complete the translation and conversion of the "Hazardous Communications" CBL Module for Wal-Mart.  (See PX 2; Tr. at 42, 86.)  The method and means by which the conversion was accomplished became, for the most part, the method and means for the

---

[2] The Development Agreement (or "Agreement") is the contract at issue in the present case.  Both IDRT and Wal-Mart are signatories to the Agreement, which sets forth the parties' rights and obligations with respect to the delivery and conversion of CBL Modules.  (See PX 21.)

       conversion of each of Wal-Mart's Training Modules under the contract at issue. The method and means for conversion entailed the following: (1) Wal-Mart would send a CD of the CBL Module to IDRT; (2) IDRT would watch and listen to the training lesson, and make suggested changes to both video (including, in some instances, changing text, symbols, and pictorial displays that required ASL explanation or change) and audio content to make it adaptable for interpretation by ASL. (Facts, at 2-3.)

7.     To make the conversion more efficient and accurate, Wal-Mart also provided IDRT with a written "script" of the Module. Using the "script" in conjunction with its view of the audiovisual play of the Module, IDRT would modify the "script" to reflect suggested changes and embed a code to reflect the point at which various video clips of signed ASL interpretations should be incorporated into the media display. The explanation, changes, and audio test were translated into ASL which, in turn, was "signed" by a certified ASL interpreter and filmed on digital video media. The "coding system" developed by IDRT provided the means by which CA could determine exactly where on the audiovisual media the ASL interpretation was to be imbedded. To insure that the ASL translations would effectively and accurately communicate the CBL Module to a deaf employee, Wal-Mart, IDRT, and CA employed considerable coordinating efforts. (Id. at 3.)

8.     IDRT and CA took about two weeks to convert and encode in digital format the "Hazardous Communication" Module. The Module was completed on or about November 13, 2001, and shown by Wal-Mart to the EEOC for its approval. The EEOC approved the conversion of CBL Modules by this process and, based on Wal-Mart's completing the conversion of all its CBL Modules in this way, Wal-Mart, IDRT, and CA began discussing resolving the EEOC

complaint by Consent Order. (Id. at 3-4.)

9. The EEOC and Wal-Mart negotiations also involved concerns about deadlines or time requirements for Wal-Mart to complete the conversion process for all of its CBL Modules. (See Tr. at 44-45.) In turn, Wal-Mart developed a timeline to reflect time restrictions to meet the EEOC requirements for complete conversion. That timeline changed from time to time, as the EEOC and Wal-Mart continued negotiations. After the EEOC and Wal-Mart completed negotiations, they entered into a Consent Order and implemented a Master ASL Timeline, which became the controlling document, and imposed time requirements to effectuate the conversion process so as to comply with the Consent Order. Ultimately, the Master ASL Timeline was attached to, and made part of, Wal-Mart and IDRT's Development Agreement. (Facts, at 4; see PX 21.)

10. In December 2001, while negotiations with the EEOC to reach the final terms of a Consent Order were still in progress, Wal-Mart requested IDRT to undertake the development of all of its CBL Modules, because it had agreed with the EEOC to begin the conversion process immediately. (See Tr. 44-45.) Upon Wal-Mart's request, IDRT advised that, fully committed, its staff could convert seven CBL Modules per week. Wal-Mart agreed to have IDRT convert seven CBL Modules per week. (Facts, at 4.)

11. On or about December 15, 2001, Wal-Mart requested IDRT to undertake the project immediately, with the understanding that the parties subsequently would prepare and execute a contract to fully describe the terms and conditions of the undertaking. IDRT agreed. (Id. at 4-5.)

12. The amount of time and effort to develop each CBL Module varied, depending upon the amount of interpretation required which, in turn, was roughly dependent on the number of separate "Screens" of text and audio in each Module that required interpretation.[3] Based on the size of the task, as well as the time and speed requirements with which the conversion process was to be completed, IDRT requested and Wal-Mart agreed to advance $50,000. (See PX 21; Tr. at 51.)  With these understandings in place, in December 2001, Wal-Mart began forwarding to IDRT various CBL Modules to be developed in accordance with the method and means established by the development of the "Hazardous Communication" Module. (Facts, at 5; Tr. at 48.)

13. The project continued from December 2001 through March 2002, without a written contract establishing the exact terms and agreements of the parties, including the terms of payment. During this time period, draft contracts were submitted and negotiations between the parties continued to reach the terms and conditions of what was to become the final Development Agreement. (See PX 9, 15, 17-19.) The parties settled on a method of compensation that would result in IDRT receiving a payment of $266.50 for each "Screen" of visual or audio test on each respective CBL Module. (PX 21, at 9 ¶ 25F(1).) Additionally, because of its substantial dedication of time and resources to the project, IDRT requested assurance of a minimum obligation on the part of Wal-Mart.  In March 2002, the parties reached a compromise with respect to the scope and terms of the project. That compromise became the Development Agreement that is at issue in the case. (Facts, at 5; see PX 21.)

---

[3] The initial demonstration Module i.e. "Hazardous Communications" was developed for a flat contract price of $6,000. (Facts, at 5; Tr. at 47.)

14. Generally described, the project was divided into four "Phases." Thirty days before the end of each Phase, Wal-Mart could opt out of the contract. For each Phase, Wal-Mart would be responsible for submitting a minimum number of CBL Modules for development. If it failed to meet the minimum number of CBL Modules per Phase, it would be responsible for the payment of the difference between a "Phase Contract Price" and the "per-Screen" development price for the CBL Modules submitted in the respective Phase when the Development Agreement ended.[4]

15. Prior to the end of Phase II, Wal-Mart timely opted out of the Development Agreement. However, IDRT continued development for Training Modules already submitted by Wal-Mart. (Facts, at 6.)

16. On or about January 23, 2003, IDRT submitted what it termed a "Final Invoice" for $152,446.57 to Wal-Mart. The amount included what IDRT contended was due for payment of development work during the Phases, and additional development work after Phase II. The "Final Invoice" was prepared by IDRT's Maryland counsel, Harvey Greenberg, Esquire ("Mr. Greenberg"). After Wal-Mart questioned various items on the "Final Invoice," Mr. Greenberg prepared a "Revised Final Invoice," in the amount of $174,229.57, which IDRT submitted to Wal-Mart on February 26, 2003. Wal-Mart did not pay the "Revised Final Invoice," and IDRT subsequently brought this action. (Facts, at 6.)

---

[4] The "Phase Contract Price" was intended, in part, "to compensate IDRT for its engagement and commitment to the development." (PX 21, at 8 ¶ 25B.) The "Phase Contract Price" for each Phase was set as follows: Phase I - $1,199,250; Phase II - 799,500; Phase III - 666,250; and Phase IV - 799,500. (Id.)

## II. LEGAL STANDARDS

1. The present case presents issues of contract construction and application of the parties' contract to the facts presented. Delaware law applies to the issues presented in the present case. Under Delaware Law, the proper construction of a contract is a question of law. *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1128, 1232 (Del. 1997).

2. "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity." *ThoughtWorks, Inc. v. SV Inv. Partners, LLC*, 902 A.2d 745, 752 (Del. Ch. 2006) (quoting *Eagle Indus.*, 702 A.2d at 1232)). A court may consider extrinsic or parol evidence "to determine the true meaning of the parties' intent when they entered into the contract" when a contract is ambiguous. *See Eagle Indus.* 702 A.2d at 1232. A contract is ambiguous "[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings." *Id.* In other words, a contract is not ambiguous simply because the parties disagree as to its meaning. *See Harrah's Entm't, Inc. v. JCC Holding Co.*, 802 A.2d 294, 309 (Del. Ch. 2002).

**III.    CONCLUSIONS OF LAW**

1.  IDRT contends that it is entitled to more compensation than Wal-Mart has paid, because Wal-Mart delivered insufficient modules in "Phase II" of the Development Agreement. Accordingly, resolution of this dispute requires the court to construe the term "Contract Phases" in the Development Agreement.

2.  With respect to the term "Contract Phases," the Development Agreement states the following:

    25.    Compensation for Development:

    A.    Contract Phases
    (1) The submission of CBL Modules to IDRT as directed by the Master ASL Timeline will be in four (4) phases. The Phases will be determined by the following number of CBL Modules to be submitted to IDRT for development in accordance for the Master ASL Timeline.

    |            |                 |
    |------------|-----------------|
    | Phase I:   | 90 CBL Modules  |
    | Phase II:  | 60 CBL Modules  |
    | Phase III: | 50 CBL Modules  |
    | Phase IV:  | 60 CBL Modules  |

    (2) The undertakings and payments provided for in this Agreement shall be performed in the four sequential Phases as provided herein. Each Phase shall automatically follow the other, unless either party notifies the other in writing at least 30 days prior to the beginning of the next phase, that they will terminate the Development Agreement at the end of the Phase then in development. In that event, each party is responsible for completing the terms and conditions of this Development Agreement through the Phase during which such notice was given.

(PX 21, at 7 ¶ 25A(1) and (2).)

3.  Turning to the Development Agreement, IDRT contends that Phase I ended on March 23, 2002, regardless of how many modules Wal-Mart submitted by that date. As of March 23, 2002, Wal-Mart had submitted 93 modules, or 3 additional modules to those it was required to submit in Phase I. IDRT contends that the 3 additional modules count toward Phase I of

the contract because they were submitted before Phase I closed on March 23, 2002. Put another way, IDRT contends that a "Contract Phase[]" incorporates and means the production of Modules in the time periods included in the Master ASL Timeline. Thus, according to IDRT, Phase I began with week one in the Master ASL Timeline and ended with the week ending March 22, 2002.

4. Conversely, Wal-Mart asserts that the "Contract Phases" are number-driven, irrespective of Module submission in accordance with the dates in the Master ASL Timeline. Accordingly, Wal-Mart asserts that Phase I ended with its deliver of the 90th module to IDRT, during the week ending March 15, 2002. The parties' differing contentions boil down to this: IDRT counts three extra modules in Phase I that Wal-Mart would count in Phase II.

5. After having considered the language of the Development Agreement regarding "Contract Phases," the court concludes that it is unambiguous. Further, the court concludes that the term "Contract Phases" as used in the Development Agreement means that the Phases are determined by the number of CBL Modules submitted by Wal-Mart.[5] That is, as illustrated above, the Agreement defines "Phase I," "Phase 2," "Phase 3," and "Phase 4" in terms of the number of CBL Modules Wal-Mart was to deliver to IDRT. (PX 21, at 7 ¶ 25A.) The Development Agreement thus limits Phase I to 90 CBL modules. The Agreement further

---

[5] IDRT's Findings of Fact supports the court's conclusion that the term "Contract Phases" is based on the number of modules submitted to IDRT for development. (D.I. 49, at 21 ¶ 81) ("The Final Agreement provided that during each Phase, WM [Wal-Mart] would submit to IDRT a designated Minimum number of Modules in each Phase."). IDRT attempts to qualify the contract language by citing to Dr. Vinopol's testimony regarding what she believed to be the parties' intentions regarding "Contract Phases." IDRT's resort to extrinsic evidence to support its position is unavailing, however, as the court has already determined that the contract is unambiguous. *Eagle Indus.*, 702 A.2d at 1232.

provides that "[e]ach Phase will automatically follow the other." (Id. at ¶ 25A(2).) Thus, Phase II began after Wal-Mart delivered its 90th CBL Module to IDRT during the week of March 15, 2002.

6. The court agrees with IDRT that the Development Agreement refers to "Modules to be submitted to IDRT for development in accordance for [sic] the Master ASL Timeline." (Id. at ¶ 25A(1).) The Agreement, however, does not define the Phases with respect to any timeline.[6] Rather, as previously stated, it plainly and unambiguously defines Phases with respect to the number of CBL Modules to be delivered. Therefore, the court concludes that the purpose of including the Master ASL Timeline was to guarantee timely performance of the parties' obligations under the Development Agreement, in order to enable Wal-Mart to meet its time constraints in the EEOC litigation.[7]

7. Both Dr. Vinopol and Poland testified that Wal-Mart was under great time pressure due to the EEOC litigation. (Tr. at 44-45) ("The consent decree placed Wal-Mart in a very difficult situation of having to get these modules rolled out very quickly. And[,] there was a very tight timeline for doing this. And[,] they had many to do. So they wanted us to begin immediately."); (id. at 118.) Further, the Development Agreement provides that a party would be in breach if it failed "to perform its undertaking within 10 business days of the

---

[6] Nor does the Master ASL Timeline that is attached to and incorporated into the Agreement provide a date certain for the end of one Phase and the beginning of the next Phase. In fact, nothing in the Development Agreement or Master ASL Timeline prevented Wal-Mart from delivering the 90th module during the week of March 15, 2002, thereby triggering the start of Phase II.

[7] IDRT agrees, stating: "The Revised Master ASL Timeline reflected the time and production requirements effectuated by WM [Wal-Mart] in the ASL conversion process for compliance with its U.S. District Court Consent Order." (D.I. 49, at 19 ¶ 68.)

dates specified in the Timeline." (PX 21 at 10 ¶ 25F(3).) Thus, the Master ASL Timeline was also included for the purpose of determining a breach of contract. The Development Agreement, however, provides no penalty for early performance, such as Wal-Mart's early delivery of CBL Modules to IDRT.

8. Based on the foregoing, the court concludes that "Phase I" of the Development Agreement ended when Wal-Mart delivered its 90th module to IDRT, and "Phase II" automatically followed. Having made its determination with respect to construction of the Development Agreement, the issue before the court is whether Wal-Mart delivered at least 150 modules – 90 for Phase I and 60 for Phase II – to IDRT by the end of Phase II. If Wal-Mart failed to meet its obligations under the contract as construed by the court, IDRT is entitled to compensation based on the "Phase Contract Price" for Phase II.

9. Wal-Mart contends that it delivered a total of 160 CBL Modules to IDRT for development from the outset of the relationship through May 31, 2002. Breaking the modules down into Phases, Wal-Mart contends that it delivered 90 CBL Modules in Phase I and 70 CBL Modules in Phase II. Conversely, IDRT contends that Wal-Mart delivered a total of 144 CBL Modules, which (according to the court's construction of the Development Agreement) would amount to 90 Modules in Phase I and 54 Modules in Phase II. Thus, IDRT contends that it is owed the difference between the Phase Contract Price and the payments for per-screen charges for the CBL Modules already submitted in Phase II, because of the six outstanding CBL Modules. There are two discrepancies in the parties' respective CBL Module counts: (1) Wal-Mart counts 6 CBL Modules that IDRT does not count, namely Hazardous Communications, Firearms Procedures (Basic), and four TAPS Modules; and (2)

        Wal-Mart counts 15 "Leadership Lessons" as separate CBL Modules, while IDRT counts the lessons as 3 batches of CBL Modules. The court addresses these two discrepancies in turn.

10. The court first turns to the Hazardous Communications Module that IDRT developed through a Consulting Agreement with Cognitive Arts. (PX 2.) Wal-Mart contends that the Hazardous Communications Module falls within the plain language of the contract, which states: "This Agreement will include all work involved in the parties' undertakings that began before the date of the Agreement and was in contemplation of this Agreement." (PX 21, at 1 ¶ 3.) The court disagrees and finds that the work relating to the Hazardous Communications module was not done in contemplation of the Agreement but, rather, to demonstrate to the EEOC that Wal-Mart could comply with the Consent Order from the district court in Arizona. The contract for developing the Hazardous Communications Module was between IDRT and Cognitive Arts. (See PX 2.) After developing the Module, IDRT sent an invoice for payment to Cognitive Arts, and Cognitive Arts paid for the services. (Id. at 3-6.) Wal-Mart then demonstrated the Hazardous Communications video to the EEOC attorney, who approved it under the consent decree. (Tr. at 43.) After the demonstration, Wal-Mart and IDRT began contract negotiations. (Id. at 43-44; PX 3.)

11. Moreover, as previously mentioned, the Development Agreement was signed by IDRT and Wal-Mart on March 24, 2002, and March 28, 2002, respectively. Prior to signing the final Development Agreement, and during the process of negotiating a final agreement, IDRT began work to incorporate ASL into Wal-Mart's CBL Modules. By the time the parties signed the final Development agreement, Phase I had ended and Phase II had begun.

       Therefore, the court concludes that "in contemplation of this Agreement," as used in the introductory paragraphs of the Development Agreement, means the work initiated by IDRT after the parties had demonstrated the Hazardous Communications Module to the EEOC, but before the parties had signed the final Development Agreement. As such, the Hazardous Communications Module is not part of the Phase I or Phase II CBL Modules contemplated by the Development Agreement.

12. The court now turns to the four TAPS Modules. Wal-Mart's Record of Deliverables (DX 1) indicates that the four TAPS Module scripts were sent to IDRT in the week ending on May 31, 2002. (DX 1, at 2.) IDRT's "Revised Final Invoice " (PX 31) indicates that the scripts were received on June 1, 2002, after the closing date for Phase II. Wal-Mart points to Dr. Vinopol's testimony as support for its position that the TAPS Modules are to be included in the Phase II CBL Module calculation. Dr. Vinopol's testimony, however, is inapposite. She did not testify that she received the CBL Module scripts on May 31, 2002. Rather, she testified "yes" in responding to this question: "Did there come a time *on or about May 31, 2002*, that you received the scripts for some modules called TAPS?" (Tr. at 75) (emphasis added). Dr. Vinopol's simple answer of "yes" to a question that did not pinpoint the exact date on which the scripts were received does not lend credence to Wal-Mart's position. Nor does Wal-Mart's assertion that it did not matter whether the scripts were delivered on May 31, 2002 or June 1, 2002, because IDRT was not inconvenienced. The court does not look to whether one party was inconvenienced when determining if

contractual obligations were met.[8]

13. Here, the parties agree that the date certain for Phase II closing was May 31, 2002 – the date by which Wal-Mart was to deliver the 60th CBL Module.[9] IDRT's records reflect that it did not receive the TAPS Modules until June 1, 2002. Thus, the TAPS Modules were not properly submitted by Wal-Mart before the termination of the Development Agreement at the close of Phase II. Nevertheless, the Agreement provides a 10 day grace period for Phase Module fulfillment. (PX 21, at 10 ¶ 25F(4).) In the present case, IDRT concedes that Wal-Mart provided the four TAPS Modules by June 3, 2002. (PX 31, at 14; Tr. at 75.) Pursuant to the terms of the Development Agreement, Wal-Mart had until June 10, 2002, to fulfill its module obligations. Accordingly, the court concludes that the four TAPS Modules count toward the 60 modules that Wal-Mart had to submit before the close of Phase II.

14. The court next turns to the Firearms Procedures: Basic Module. IDRT contends that it listed "Firearms Procedures: Basic" as a "Module" only for record-keeping purposes, and that it "was not a separate module, but a component" of other CBL Modules. (PX 31, at 10 n.3.) IDRT, however, points to no contractual or factual basis for its conclusion. In fact, IDRT seems to concede this point in its Proposed Findings of Fact and Conclusions of Law. (D.I.

---

[8] Additionally, Wal-Mart's contention that time was not of the essence is not well-received by the court. The Development Agreement repeatedly states that the parties will comply with their undertakings in accordance with the Master ASL Timeline, which was incorporated into the Agreement. (PX 21 ¶¶ 20, 21, 23, 25F(4)). Moreover, the testimony adduced at trial, and cited by Wal-Mart in its Proposed Conclusions of Law, demonstrates that the timeline was very tight, because Wal-Mart had a limited amount of time in which to comply with the consent decree. (See D.I. 48, at 9 ¶ 4; Tr. at 44-45; 75; 118.) As such, the court completely discounts Wal-Mart's argument as to time constraints.

[9] That is not to say that Wal-Mart was prohibited from delivering its 60th module earlier, thereby triggering the closing of Phase II at an earlier date.

49, at 32 ¶ 13) ("The 'screens' included in an item identified as 'Firearms Pro Basic' will be considered a separate Module; and that Module was submitted in Phase II, increasing the number of Modules submitted in Phase II to 52."). Seeing no disagreement between the parties as to the "Firearms Procedures: Basic" Module, the court finds that it is included in Wal-Mart's Phase II CBL Module submissions to IDRT.

15. The court has determined that the "Hazardous Communications" Module does not qualify as a CBL Module submitted by Wal-Mart pursuant to the Development Agreement. The court has also determined that the four TAPS Modules and the "Firearms Procedures: Basic" do qualify as Phase II CBL Modules. Adding the five modules to the 144 that IDRT counts, yields a subtotal 149 modules delivered by Wal-Mart for Phases I and II. The court now addresses the parties discrepancies with respect to the "Leadership Lessons."

16. The parties views as to whether the "Leadership Lessons" count as "CBL Modules" under the Development Agreement greatly differ. Wal-Mart contends that the "Leadership Lessons" are individual CBL Modules, whereas IDRT contends that the 15 lessons count collectively as three CBL Modules or batches. (See PX 38, PX 40-42.)

17. The Development Agreement does not define or contain any reference to "Leadership Lessons." Accordingly, the court looks to the conduct of the parties to determine whether the "Leadership Lessons" should each be counted as a CBL Module, and concludes that they should be counted collectively as three CBL Modules,[10] not as individual CBL Modules. Dr. Vinopol testified that the "Leadership Lessons" were text not Modules, and that "[t]hey

---

[10] The three Modules were included in IDRT's count of 93 CBL Modules for Phase I. As such, the court does not count them a second time.

didn't look like anything . . . we [IDRT] had been doing." (Tr. at 64.) She further testified that she spoke with Mr. Poland, who told her that the "Leadership Lessons" were "extra materials that accompanied the Learning to [L]ead modules." (Id. at 64, 68, 70, 114.)

18. Dr. Vinopol received three CDs containing the "Leadership Lessons" material and testified that Mr. Poland told her to break them down into three batches. (Id. at 67-68.) Further, the invoices for the completion of the three sets of "Leadership Lessons" show that IDRT identified them as three batches of five lessons each. (PX 33, at 211, 216.) Wal-Mart paid the invoice without objecting to the identification of "Leadership Lessons" as "batches." (Tr. at 73.) Finally, Dr. Vinopol testified that Scott Winn ("Mr. Winn"), a Wal-Mart representative that was working on the project, asked her to prepare a memorandum regarding the fact that the Learning to Lead Modules had never been submitted to IDRT. (Id. at 114.) Dr. Vinopol memorialized her discussion with Mr. Winn in an e-mail, which states "[d]uring the meeting, you . . . alerted . . . me to the fact that the files that were sent to IDRT for the 'Learning to Lead' CBLs were not the module scripts at all." (PX 26.) This evidence demonstrates to the court that the parties had an understanding that the "Leadership Lessons" were extra or supplementary materials that were to be identified as three CBL Modules for purposes of the parties' undertakings. Thus, the court will not count each "Leadership Lesson" as a separate CBL Module.

## IV. CONCLUSION

1. IDRT counts 144 modules delivered by Wal-Mart in Phases I and II of the Development Agreement. The court concludes that IDRT's count incorrectly omits five modules – Firearms Procedures: Basic and four TAPS Modules. Adding these five modules to IDRT's

count yields a total of 149 modules submitted by Wal-Mart during Phases I and II of the Development Agreement. As such, Wal-Mart did not meet its obligation under the Agreement of delivering 150 modules during Phases I and II, and the court concludes that IDRT is entitled to additional compensation for Phase II based on the "Phase Contract Price."

2. The parties have stipulated that several smaller amounts, credits, and adjustments owed by one or the other party are summed and netted out to result in a credit of $28,292.01 owed by IDRT to Wal-Mart. (D.I. 47.) The parties also have stipulated that the $28,292.01 credit shall be set off against any amount that Wal-Mart owes to IDRT. (Id.) Accordingly, the court concludes that IDRT is entitled to recover additional compensation for Phase II based on the "Phase Contract Price," reduced by the $28,292.01 credit owed by IDRT to Wal-Mart.

Dated: September 25, 2007                     /s/ Gregory M. Sleet
                                              CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INSTITUTE FOR DISABILITIES RESEARCH AND TRAINING, INC., ) ) ) Plaintiff, ) ) v. ) ) ) WAL-MART STORES, INC., ) ) Defendant. ) | Civil Action No. 05-176 (GMS) |

**<u>ORDER</u>**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The clerk of court shall enter judgment in favor of the plaintiff, IDRT, and against the defendant, Wal-Mart, on IDRT's contract claim.

Dated: September 25, 2007        /s/ Gregory M. Sleet
                                 CHIEF, UNITED STATES DISTRICT JUDGE